# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DANIEL TODD SILVERIA and JOHN RAYMOND TRAVIS,
Defendants and Appellants.

S062417

Santa Clara County Superior Court
155731

August 13, 2020

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Kruger concurred.

PEOPLE v. SILVERIA and TRAVIS

S062417

Opinion of the Court by Groban, J.

Defendants Daniel Todd Silveria and John Raymond Travis were convicted by separate juries[1] of the first degree murder and second degree robbery of James Madden, and the second degree burglary of a LeeWards crafts store. (Pen. Code,[2] § 187, subd. (a), former §§ 189, 211, 212.5, subd. (b), 459, 460.2.) The juries also found true robbery-murder and burglary-murder special-circumstance allegations and an allegation that defendants personally used a knife in committing the murder.[3] (Former §§ 190.2, subd. (a)(17), 12022, subd. (b).) Silveria was also convicted of the second degree robberies of Ben Graber at Gavilan Bottle Shop and Ramsis Youssef at Quik Stop Market, and stipulated that on May 2, 1995, he had pled guilty to the

---

[1]  Defendants were tried jointly before separate juries.

[2]  All further undesignated statutory references are to this code.

[3]  Also as to Silveria, a lying-in-wait special-circumstance allegation was found not true, and the jury deadlocked on the allegation Silveria had used a stun gun and a torture-murder special-circumstance allegation. As to Travis, a torture-murder special-circumstance allegation was found not true, and the jury deadlocked on the lying-in-wait special-circumstance allegation. After the first penalty trial, the court granted the prosecutor's motion to strike the torture-murder special-circumstance allegation as to Silveria and the lying-in-wait special-circumstance allegation as to Travis.

1

second degree burglary of Sportsmen's Supply. (§§ 211, former §§ 212.5, subd. (b), 459, 460, subd. 2.)

Silveria and Travis also had separate penalty juries. Each jury deadlocked, and the court declared mistrials. Defendants were retried before a single penalty jury, the jury returned death verdicts, and the trial court entered judgments of death. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) For the reasons that follow, we affirm the judgments.

## I. FACTS

On the night of January 28, 1991, Silveria, Travis, Christopher Spencer, Matthew Jennings, and Troy Rackley, a juvenile, robbed and killed James Madden while he was working as the manager of a LeeWards crafts store in Santa Clara County. The indictment charged all four adult perpetrators, but the cases of Spencer and Jennings were severed.

### A. Guilt Phase

During interviews with different law enforcement officers, Silveria and Travis waived their *Miranda* rights, and ultimately confessed their involvement in Madden's murder, including the circumstances that both men had stabbed Madden and Silveria had used a stun gun on him. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444–445.) Silveria also confessed his involvement in several other crimes, including the burglary of a gun store in which coperpetrator Jennings had obtained a stun gun, the Quik Stop robbery, and the robbery of a liquor store on Blossom Hill Road in which Silveria had used the stun gun. Each defendant's statement was played for his jury.

### 1. *Prosecution Evidence*

#### a. *Theft of stun gun and stun gun robberies*

On January 24, 1991, about 1:00 a.m., a PARALI/AZER stun gun was taken during a burglary of a Sportsmen's Supply tackle and gun store located in an unincorporated area of Santa Clara County. About an hour later, at 2:20 a.m., Silveria, Rackley, and Jennings robbed Ramsis Youssef, a cashier at a Quik Stop Market located in San Jose. Rackley used a stun gun on Youssef during the robbery. A videotape of the crime was played for the jury. About 10:00 p.m. that night, Silveria, Rackley, and Jennings robbed Ben Graber, a temporary assistant at the Gavilan Bottle Shop, which was located on Blossom Hill Road in San Jose. A stun gun was used on Graber.

#### b. *Madden's murder*

Silveria and Travis were hired to work for Madden at the LeeWards crafts store on September 3, 1990. They failed to appear for three consecutive scheduled shifts, and were permitted to resign rather than be terminated on November 15, 1990.

On the night of January 28, 1991, Silveria, Travis, Spencer, Jennings, and Rackley drove to LeeWards to rob the store. Madden's truck was parked in the back lot and Spencer slashed the tire in order to prevent Madden from leaving. Silveria and Travis watched the front of the store until the last customer and the cleaning crew had left and Madden had locked the front doors. Silveria and Spencer then surprised Madden as he left the store by the back door. Madden was led back inside and ordered to turn off the store alarm. He was unsuccessful in doing so, and the alarm was triggered at 10:53 p.m.

Silveria instructed Madden to open the safe and remove the money. The money was placed into a duffel bag. Silveria and Travis bound Madden's hands and feet respectively together with silver duct tape. At 11:02 p.m., a Honeywell Protection Services operator dispatcher called Madden, and he gave her the pass card number to clear the alarm. Madden's mouth was then taped. Silveria held the duffel bag and repeatedly said, "Let's go." Travis said, "[N]o," and told Spencer to kill Madden. Spencer slit Madden's throat with a knife, and he and Travis repeatedly stabbed Madden. Silveria then stabbed Madden once, and used the stun gun on him. The five perpetrators fled to a Redwood City motel where they divided the money from the robbery.

About 8:00 a.m. the next morning, Madden's body was discovered in the store. Travis later told law enforcement officers that all of the perpetrators knew when they went to LeeWards they would have to kill Madden. The perpetrators chose LeeWards because it excited everyone to kill Madden. If one of the female supervisors had been present instead, Travis would have simply tied her up because he "got along with all the women over there."

Later that day Silveria purchased a Honda Civic and he and Travis purchased a Datsun 280Z; both vehicle down payments were in cash. On a Tuesday in January 1991, Silveria showed his friend Gregg Orlando a wad of cash, and said, "We killed somebody last night." On the night of January 29, 1991, Silveria and Travis were arrested in the Oakridge Mall parking lot. A PARALI/AZER stun gun, silver duct tape, and $694 were found in Silveria's vehicle.

The cause of Madden's death was 32 stab wounds to his neck, chest, and abdomen. Forensic pathologist Dr. Parviz

Pakdaman, who performed Madden's autopsy, opined Madden was alive when some of the wounds to his neck and chest were inflicted. Dr. Robert Stratbucker, a medical doctor and biomedical engineer, testified that a stun gun generally causes "a very intense kind of . . . sharp pain."

### 2. *Defense Evidence*

In Silveria's statement to police, he told officers that he had placed jeans, L.A. Gear shoes, and a T-shirt that he had worn during Madden's murder in an Oakridge Mall garbage can. At trial, Silveria called only one witness, Elizabeth Skinner, a Santa Clara County crime lab criminalist, apparently to attempt to demonstrate that Silveria had a minimal role in the murder. Skinner testified that she had received from the Santa Clara Police Department a T-shirt, Levi's, and a pair of L.A. Gear shoes, that she was told were found in an Oakridge Mall dumpster, to test for the presence of blood. No blood was detected on the T-shirt or the shoes. A small spot on the Levi's tested presumptively positive for the presence of blood, but Skinner could not ascertain whether the stain was human blood. Skinner also tested shoes and jeans that she had been told had been collected at some point from Travis. She found human blood on the shoes and inside a front pocket of the jeans.

Travis presented no defense evidence.

## B. Penalty Retrial

Many of the individuals discussed in the testimony shared the same surname, so for clarity, we use first names to identify certain witnesses.

### 1. *Prosecution Evidence*

Much of the guilt phase evidence regarding Madden's murder, the Sportsmen's Supply burglary, and the Graber and

Youssef stun gun robberies was introduced at the 1997 penalty retrial. Evidence of Travis's 1990 first degree burglary conviction was also admitted. (Former §§ 459, 460, subd. 1.)

### a. *Silveria's former testimony*

Silveria's statement to law enforcement was not admitted, but portions of Silveria's first penalty phase testimony were read to the jury.

Silveria had worked at LeeWards from early September 1990 to Thanksgiving of 1990, and was instrumental in Travis being hired there. At times during this period, Silveria was homeless and used marijuana and methamphetamine.

Silveria described Madden as "just a really nice guy." Madden's wife and young daughter occasionally visited him at the store. Silveria was terminated by Madden because of his work absences, but Madden allowed him to resign so that his future employment would not be adversely affected. Silveria then went to work at Toys "R" Us apparently for the Christmas holiday season.

On January 26, 1991, the Saturday before the capital crime was committed, Travis was adamant that "Madden [would] need[] to be killed because he could identify us." Silveria saw no need for anyone in the store to be harmed, and was "taken aback," and immediately protested. Silveria and Travis debated the point. Silveria was feeling "horribly sick" that night, and left the discussion to lie down. His illness was not related to the discussion of killing Madden.

On Sunday, January 27, while Silveria was still "very sick," the topic of killing Madden arose again. Spencer held a knife and said he would be willing to stab Madden. Silveria did not intend to kill Madden and did not believe his coperpetrators

would actually do so because they were not generally violent. Although Silveria initially suggested wearing disguises, the perpetrators did not do so. Silveria was ultimately not concerned if he was identified during the robbery because he planned to immediately flee the area. On Sunday night, Silveria, Travis, and the others drove to LeeWards to commit the robbery, but the store had already closed.

Silveria's description of the murder was similar to his statement to law enforcement introduced at the guilt phase. In addition, Silveria testified that on the night of Monday, January 28, 1991, Silveria was armed with a stun gun, Travis a hammer, Spencer a fillet knife, Rackley a hand device with leather spikes, and Jennings a crowbar. At one point Silveria entered the store to see who was working that night.

When Madden left the store, and Silveria and the others confronted him, Madden recognized Silveria, and appeared to calm down, saying, "Oh Danny, oh, it's you, Danny." Silveria told him to turn off the store alarm. Madden pleaded with Silveria that he not be hurt, and Silveria said: "We are not here to hurt you. We just want the money." Silveria described Madden turning off the alarm, obtaining the money from the safe, being restrained in a chair by the perpetrators, speaking with the alarm company, and the perpetrators taping Madden's mouth.

Silveria fired the stun gun at Madden's leg twice, once for a long period of time in an effort to render him unconscious. Madden made sounds like "somebody . . . trying to scream through tape," and his legs jerked. Silveria then picked up the duffel bag and said several times, "Let's go." Travis told Spencer, "Kill him." Madden said, "No, no" through the tape.

Spencer looked uncertain, and Travis repeated, "Kill him." Spencer repeatedly stabbed Madden in the chest, and then at Travis's direction, cut Madden's throat. Silveria was numb with disbelief and did nothing to stop the attack except perhaps to once more say, "Let's go." Travis then stabbed Madden about five times, and handed the knife to Silveria, saying, "[I]t's your turn." At that point Madden was slumped over in the chair and appeared to be unconscious. Silveria initially protested, but then took the knife and stabbed Madden once, plunging the knife in all the way up to its hilt. Travis then resumed stabbing Madden. Silveria agreed with the prosecutor that Madden had been "tortured," but did not believe he had "tortured Mr. Madden by legal definition."

After the attack ended, Madden fell over in the chair. Silveria felt a slight pulse in Madden's neck, and they left. As they drove away, Silveria and others described the robbery as a success. Silveria said saying this made him feel "like crap" because he had just participated in killing someone. After Silveria's arrest, he assisted law enforcement in apprehending Spencer and Jennings.

Silveria did not believe causing Madden pain with the stun gun was "right," and felt "horrible" for doing it. He felt "sick" about participating in Madden's murder, and "horrible" about the effect of the murder on Madden's family. Silveria did not feel that anything that had happened to him in his life was an excuse for what he did on the night of Madden's murder, but rather that he "should be held accountable for what [he] did," and "deserve[d] whatever punishment [was] given to" him.

### b.  *Other prosecution evidence*

Dr. Pakdaman testified that Madden had suffered 32 "slash-like superficial cuts" that were skin-deep and "stab-like wounds" in his neck, chest, and abdomen.  Six stab wounds penetrated Madden's heart.  Other stab wounds penetrated his lungs, fracturing two ribs, and his liver and trachea.  He was alive after his trachea was cut, although his breathing was impaired.  Dr. Stratbucker testified that marks made by the stun gun on Madden's thigh were inflicted while he was alive.

California Men's Colony Correctional Lieutenant Jackie Graham testified that in September 1991, Charles "Tex" Watson, a member of the "Charles Manson Family," was a prisoner at the colony.  On about September 20, 1991, a letter from Travis to Watson was intercepted.[4]

The prosecution also introduced victim impact testimony. Shirley "Sissy" Madden testified that she and Madden were married in 1979.  Madden was a kind and loving husband, and made Sissy feel cherished and safe.  Their daughter Julie was born in 1984, and Madden was a wonderful father.

Sissy testified regarding seeing Madden for the last time several hours before his murder.  On January 28, 1991, about 6:30 p.m., Sissy and Julie, then seven years old, made an unplanned visit to Madden at LeeWards, but declined his dinner invitation because Julie had school the next day.

Susan Thuringer, Sissy's coworker at the University of California at Santa Cruz, testified Sissy arrived late to work the following morning, distraught because Madden had not come home and she did not know where he was.  Later that morning

---

[4]     The letter was further described by Travis in his penalty phase retrial defense testimony.  (See *post*, at pp. 29–30.)

Thuringer learned from police about Madden's murder. Thuringer told Sissy, and she and her coworkers restrained Sissy as she screamed and cried. Police arrived, and Thuringer and her supervisor, Kay House, and an officer accompanied Sissy home. James Douglas Sykes II, Madden's brother-in-law, testified that later that day he and Sissy picked up Julie at school. When they arrived home, Sissy took Julie upstairs to tell her about Madden's death. Sykes heard an "excruciating[ly] painful waning scream" from Julie.

Testimony regarding the effect of Madden's death on Sissy and Julie was also introduced. Sissy testified, "I loved my husband so much and I feel so lonely and empty without him. . . . I miss him terribly." Sissy's brother, Eric Lindstrand, testified that Sissy was "devastated," and "a good part of her life" at the time of his testimony was "just a big, sad open wound." Julie was "a blessing" who kept Sissy "going." Madden's mother, Joan Madden, said that since Madden's death, Sissy had gained at least 30 pounds, and suffered from depression and psoriasis induced by stress.

Sissy testified that Julie had slept with her every night for the first year after Madden's death, and had been in therapy for nearly six years. She suffered from panic attacks and stomachaches so severe "she feels like she is going to die." Eric testified that Julie was so frightened by her father's murder that for a long time she would not let Sissy out of her sight even to use a restroom, and her development regressed five or six years. She had also struggled academically. Joan testified she once took Julie shopping for a Mother's Day gift, and Julie asked, "You know, Grandma, what I really, really want?" Joan said, "No," and Julie said, "I wish[] you only died for one day."

Family members also described their own loss. Judith Sykes, Madden's older sister, testified that Madden had been her only sibling. They were close, and she described Madden as a strong, but kind and gentle person who had cared for his family. When asked if the passage of time had lessened the impact of Madden's death, she said that because Madden had been "murdered senselessly and brutally. . . . the closure is not the same . . . [a]nd there's something about it you . . . just can't get past. . . . [I]t's not like losing someone from a heart attack." Their mother Joan often said that "the joy in her life [was] gone," and she was now overly protective of Judith.

Eric described Madden as a close friend and "good man" who had generously shared his time to help Eric and who had enjoyed life. Eric said living without Madden has "been hell for me," and described it as "learning to live without a heart . . . . [or] without your legs. You learn how to survive. If you're lucky, you learn how to try and not let your life be ruined."

### 2. *Defense Evidence*

#### a. *Silveria*

##### *(1) Background and character witnesses*

Silveria, who was born on December 22, 1969, was 21 years old at the time of the January 1991 crime. He presented numerous witnesses who testified regarding his childhood and his behavior in jail after commission of the capital crime.

Silveria had an older sister Lenae, an older brother S.S., and a younger brother Michael. Silveria's father, Daniel Silveria (Daniel), a long-haul trucker, was often away from home. He brought gifts to Lenae when he returned and was affectionate to her. By contrast, he showed no affection to

11

Silveria, S.S., or their mother B.S., and was frequently physically abusive to them. In April 1974, when Silveria was four years old, Daniel left the family, and Silveria had little contact with him until Silveria was about 19 years old.

In February 1976, when Silveira was six years old, at B.S.'s request he and S.S. were declared dependents of the court. B.S. retained custody of Lenae and Michael. Lenae recalled that after Silveria and S.S. were declared court dependents, B.S., an alcoholic, began to drink excessively, staying out all night and coming home drunk.

Silveria lived in foster homes for nearly all of his remaining childhood. Two foster families, the Garcias and the Gambles, were nurturing and emotionally and financially supportive. In two other families, the Heberts and the Georges, however, Silveria was sexually abused and emotionally neglected.

Linda Cortez, a Santa Clara County Department of Social Services social worker, supervised the Silveria family, including Silveria, S.S., Lenae, and Michael from March 1976 until the end of 1981.[5] During this time Silveria was a sweet and likeable child, who was eager to please.

Silveria was first placed for about a year in the home of Marcus and Lorain Garcia, where he was well-treated and thrived. When Silveria was about seven years old, the Garcias moved out of Santa Clara County, and he joined S.S. in the Hebert foster family.

---

[5]   Many of Cortez's department of social services reports could not be located at the time of her testimony and had presumably been destroyed.

Mark Hebert, worked as a civilian for the Navy, and his wife Evelyn Hebert was a nurse. Dean Hebert, who was about three years older than Silveria, testified that his father Mr. Hebert was an alcoholic, who when drunk became verbally abusive. Mr. Hebert would not engage with Dean, his older brother Mark, Silveria, or S.S., and would only speak to "put somebody down or just to yell at somebody." His mother, Mrs. Hebert, inflicted physical punishment on Silveria.

Dean frequently beat Silveria, once burned him with matches, and once placed a pillow over Silveria's face until he could no longer breathe or scream. When Silveria was 11 years old, Dean forced him to perform oral and anal sex.

Robert Ector, Silveria's fourth grade teacher at the time Silveria lived with the Heberts, testified that Silveria was an average or below average student who worked hard and wanted to please Ector. Silveria was intelligent, but had "suffered . . . academically" apparently because of a lack of parental support with his schoolwork. That was unusual in the "solidly middle-class community." Silveria frequently volunteered to stay after school to perform small tasks for Ector, and on field trips he "always wanted to be near my side."

Between 1976 and 1981, Silveria's father visited him once. B.S. visited Silveria about three times a year, and once cared for him for several days after he had wandering eye surgery.

In late 1980 or early 1981, Cortez told B.S. that if she did not become actively involved in returning Silveria home by establishing a visitation plan, Cortez would locate a long-term placement for him. The ensuing visits were successful, and Silveria was scheduled to return to live with his mother in June 1981.

13

During a visit home in April 1981, Silveria told his mother, and then Cortez, that Dean had molested him. Cortez determined that Silveria should not return to the Heberts, but should stay in his mother's care. Silveria did not receive therapy as a result of the molestation report. His dependency case was later dismissed.

In the fall of 1981, when Lenae was about 14 years old, she moved in with the nearby family of her friend Tasha Guimmond, whose father Richard Guimmond was the assistant and resident manager of the apartment complex in which the Silverias lived. Richard Guimmond described their neighborhood as a "ghetto." When Lenae visited her family, she observed B.S. continued to go out drinking, and failed to exercise control over Silveria. The Guimmonds and Lenae moved out of the complex in about 1983, and Lenae did not speak to Silveria until late 1990.

In April 1982 then San Jose Police Officer Michael George (George) brought 12-year-old Silveria home to live with him, his wife Deborah, and their children. Silveria lived with the Georges for about eight months. Deborah displayed no affection for Silveria. George was attentive to Silveria, even more so than to his biological family.

Defense investigator Daniel DeSantis testified that in about April 1996 he learned that George, who had also served as a Clearlake police officer, had in May 1996 been convicted in Lake County of 11 counts of child molestation for crimes committed against a different child. (§ 288, subd. (a).) On October 3, 1996, DeSantis and Silveria's defense counsel interviewed George in prison. George expressed concern for his life because he was a former police officer and a convicted child molester, and said he did not expect to leave prison alive. George admitted that when Silveria lived with him, George had

on different occasions given Silveria rum and coke and then molested him by engaging in "mutual masturbation and oral copulation." George expressed remorse for what he had done to Silveria, and agreed to testify at the penalty retrial.

On February 13, 1997, DeSantis again met with George. George was no longer willing to testify, but did not retract his earlier statements made during the first interview.

In May 1983, when Silveria was 13 years old, he left the Georges' home and went to live with the Gambles. John Gamble testified that he and Silveria, whom Gamble identified as his brother, were the same age and had met in the sixth grade while Silveria was living with the Georges. Silveria had been a peaceful child and John's best friend. John's mother, Patricia Gamble, who worked in the family support division of the Santa Clara County District Attorney's Office, testified that Silveria moved into their home with only a bird book, a picture of Jesus, and clothing so worn much of it had to be discarded.

The Gambles were loving and supportive of Silveria, and treated him like a member of the family. Silveria was protective of John and his younger sister Lisa, and performed additional household chores on his own initiative. Silveria was respectful to Patricia and her husband, and called Patricia "Mom." He was also was good at sports, especially football.

To assist with Silveria's separation from his parents, Patricia placed him in therapy. Silveria asked to be removed from therapy after six to eight sessions.

Patricia and Silveria visited B.S. soon after Silveria moved in, and Patricia invited her to call and visit Silveria. B.S. often seemed indifferent to Patricia's and Silveria's attempts to contact her, and showed Silveria little affection when she saw him, once not even getting up to greet him when he visited her.

Julie Morrella testified she was Silveria's girlfriend from 1984 to 1985 when they were 14 to 15 years old. Silveria was loving and attentive, and demonstrated a need for affection. He never mistreated Morrella, and she never saw him be violent.

In March 1985, when Silveria and John Gamble were 15 years old, John's father moved out of the house. About this time, John and Silveria began to smoke marijuana and drink alcohol. Silveria became angry and violent when drunk, and once lay on the kitchen floor kicking and screaming, "I hate this shit." On a different occasion he cut up the kitchen cabinets with a knife.

When Silveria was 15 and a half years old, Patricia took Silveria without protest to juvenile hall for several days because of his alcohol abuse. She again provided Silveria with counseling for about a month until Silveria was sent to the boys ranch in Morgan Hill for about five months for violating his probation by drinking. Patricia visited him every weekend until he was allowed to come home on weekends. Patricia invited B.S., Silveria's mother, on several occasions to join her on these visits to the boys ranch, but B.S. declined. After Silveria returned home from the ranch, and before July 1987, he was placed into a group home in Soquel until he was about 18 years old because of his alcohol use.

In February 1988, when Silveria and John were about 18 years old, Patricia moved to Sacramento. Silveria lived with Patricia intermittently from 1988 to 1989. John visited Silveria numerous times in Sacramento and observed his mother continued to love and support Silveria. In the fall of 1989, while living in Sacramento, Silveria slit his wrists, received medical attention, and Patricia sent him back to San Jose to live. She did not see him again until after his arrest.

16

Also at some point in 1988 to 1989, Silveria lived in Gilroy for several months with his cousin Geraldine Macias and her husband, both postal service workers, and their two young children. During this period, Daniel, Silveria's biological father and Geraldine's uncle, also lived in Gilroy. Geraldine trusted Silveria — but not Daniel — to babysit her children.

After Silveria left Geraldine's home, he lived for at least six months with Daniel in Gilroy. They used "crank" (methamphetamine) and marijuana. Daniel was physically abusive to Silveria, and Silveria eventually moved out after Daniel broke Silveria's nose.

In August 1990, Patricia Gamble was contacted by an Army recruiter for Silveria's diploma because Silveria was trying to enlist. Later that year, Lenae happened to work with Silveria at Toys "R" Us for the holiday season. During that time, Lenae observed Silveria lost weight, developed acne and poor hygiene, and appeared to be using drugs.

Patricia visited Silveria frequently after his January 1991 arrest. Silveria told her he had stabbed Madden. On several occasions Silveria said that he was sorry, was praying for the Madden family, and "knows how it feels to grow up without a father and that it hurt him to know that Julie [Madden's daughter] now would not have a father to grow up with."

In 1991, Silveria and Patricia both studied the Bible and shared with each other what they had learned. Silveria's biblical knowledge and insight appeared to increase over time. He exhibited "an excitement and a real joy about what he was learning." In late 1993 she stopped visiting Silveria, but eventually resumed communicating with him by letter. Patricia loved Silveria because "there was something very good in him, something very sad . . . . I see that value."

17

Morrella also visited Silveria in jail frequently for about a year from 1991 to 1992, and later resumed visits. Silveria was initially cold to her and his physical appearance was poor. Over time, his demeanor and physical appearance improved. Morrella was now a Christian, and at one point during her visits she and Silveria began to discuss religion. Silveria was very excited during these discussions, would quote scriptures, and would often bring a Bible or Christian book to their meetings.

Silveria told Morrella he felt "very bad about the fact that Julie," Madden's young daughter, "was going to grow up without a father." Silveria said "he had been praying for the family and that he . . . felt terrible and that he was just continuously praying for them. He was very remorseful." Silveria did not tell Morrella he had stabbed and used a stun gun on Madden. Morrella believed Silveria was a loving and valuable person who had "done a lot of good[] things."

John Gamble had visited Silveria about five times in the six years since Silveria had been incarcerated, and had never spoken to him on the telephone. John loved Silveria and enjoyed his visits with him. Lenae testified that she loved Silveria, and believed that "[f]rom [d]ay one he never had a fair shot. He's pretty much struggled ever since he came into this world."

Several officers testified regarding Silveria's behavior in jail. Santa Clara County Correctional Officer Victor Bergado testified that when Silveria was first incarcerated, he appeared to be "emotionless," a "hard person" who "didn't really . . . say much to anybody." Three to four months later, during a random check, Officer Bergado observed Silveria kneeling with his arms over his bunk. Officer Bergado asked if Silveria was "Okay." Silveria turned his head toward the officer and appeared distraught. He explained he had been praying, and said, "I'm

18

just really . . . sad . . . for the family of the victim." He was "asking for forgiveness and he's sorry for what he did and he feels sorry for the family of his victim and his family." Officer Bergado and Silveria discussed their shared Christian beliefs. Periodically thereafter for several years, they had discussed Christianity and lessons Silveria had learned from the Bible. Silveria was well-behaved and shared commissary items with other inmates.

Former Santa Clara County Sheriff's Deputy Patrick Doyle testified that several months after Silveria had been incarcerated, he began to ask Deputy Doyle, a former missionary who was referred to by inmates and deputies as "Father Doyle," questions about the Bible and started a Bible study group. Deputy Doyle believed Silveria's Christian faith was sincere because of his conduct, joyfulness, and the frequency with which Deputy Doyle observed him kneeling by his bunk. Silveria did not engage in physical altercations with other inmates, commit assaults on correctional staff, or display behavioral problems. He had not been caught possessing weapons, drugs, or alcohol.

Department of Corrections Officer Lauren Dennehy testified that Silveria was intelligent, cooperative, and volunteered for additional jobs. Silveria appeared to go out of his way to welcome new inmates, and at Officer Dennehy's request, had provided orientation for inmates new to the module. Santa Clara County Correctional Officer Edwin Lausten observed that Silveria was empathetic to other inmates, and had appeared to twice successfully intervene with inmates who were struggling emotionally.

### (2) Expert witnesses

Reverend Leo Charon testified he had worked in the Santa Clara jail for 15 years. He had not previously testified on behalf of any inmates other than Silveria and Travis. (See *post*, pt. I.B.2.b.2.)

Reverend Charon had known Silveria, whom he met when Silveria started attending his jail Bible study, for about five years. Silveria asked thoughtful questions in Bible study, had requested different Bible versions to compare text, and had studied Greek to read parts of the Bible in its original tongue. Silveria's spiritual gift was teaching, and he wanted to use that gift to help other inmates. Reverend Charon believed it "would be very difficult" to feign the level of study and depth of interest Silveria had shown over the years in Christianity.

About a year after starting Bible study, Silveria began to meet individually with Reverend Charon. Silveria had displayed "brokenness," a process whereby one honestly confesses sins and feels true sorrow for them. Silveria had told Reverend Charon he had stabbed Madden, and had used a stun gun on him. They periodically discussed Silveria's remorse about Madden's murder, and Silveria's concern for Madden's wife and family.

Dr. Harry Kormos, a psychiatrist at the University of California Hospital in San Francisco and Alta Bates Hospital in Berkeley, conducted a psychiatric evaluation of Silveria, and testified as an expert on the effects of childhood neglect and abuse on the development of adult personality. Dr. Kormos had interviewed Silveria 12 to 15 times in 1993 and 1995, and had reviewed Silveria's former testimony concerning his life until he was 21 years old, summaries of other testimony, case statements of fact, investigative reports, witness interviews,

Silveria's birth medical records, and a report regarding Silveria's psychological tests. Silveria told Dr. Kormos he did not want "anything about his past to be used in a way to excuse what he had done because he didn't feel that there was an excuse."

Dr. Kormos opined that Silveria did not suffer from manic-depressive illness, an antisocial personality disorder, posttraumatic stress disorder, conduct disorder, organic brain damage, fetal alcohol syndrome, or subnormal intelligence. He did suffer from child neglect, and alcohol and methamphetamine addiction.

Dr. Kormos described child neglect as a long-term situation in which the child did not receive the support necessary for normal development, and in addition was mistreated by "those charged with [the child's] well-being." Low self-esteem and decreased ability to delay gratification were general issues often seen in those neglected during childhood. Depression, drug addiction, and delinquency were negative outcomes that "can be traced back to a situation of child neglect."

In Dr. Kormos's view, Silveria had never bonded with his parents. Silveria had only two memories of his father while the family was intact. In one, his father responded to Silveria spilling food by violently throwing him down a flight of stairs. In the other, Silveria brought home a stray dog, and his father killed it by repeatedly hitting it with a shovel. Dr. Kormos concluded Silveria was likely traumatized by his father's violence. Silveria acknowledged problems with his parents, but nevertheless retained "a positive image of both his mother and his father."

Silveria told Dr. Kormos that he had also been sexually abused by Dean Hebert's older brother Mark. Dr. Kormos

compared the constant and severe punishments, sexual abuse, and shaming or tormenting inflicted on Silveria at the Hebert home to a concentration camp. He explained, "[T]he person subjected to this feels terrorized, feels threatened every day, has nowhere to turn and is completely in the power of the persons in charge who are not concerned about [his] well-being in any way." Silveria told Dr. Kormos he had no way of knowing his experience at the Heberts was abnormal, and also assumed that if he complained, worse punishment would occur. In Dr. Kormos's view, psychological therapy was indicated for Silveria when he reported Dean Hebert's sexual abuse and was removed from the Hebert home.

Dr. Kormos opined that Silveria's molestation by Police Officer George would have made it difficult for him to "correctly interpret the nature of authority and of legal behavior." Silveria told Dr. Kormos that "it had always been useless for him to dwell on problems that had occurred in his life . . . because there was . . . nothing that he could possibly do about it. So . . . the best thing to do would be to try and push it out of his mind which is really a very primitive, a very impaired way of dealing with reality."

Dr. Kormos was of the view that Silveria, Travis, Spencer, and Jennings "were quite close due to the fact that they were all very much . . . in need of emotional support." They helped each other by being together and it was "almost like they were trying to make up an artificial, a pseudo-family."

Dr. Kormos further opined that the older a child gets, the less likely it is that positive intervention will reverse earlier damage. Dr. Kormos was of the view that "there was an unusual accumulation of negative factors in this particular case, more than you would ordinarily see on the average." He agreed with

22

defense counsel that a person with Silveria's background of failure to bond with either biological parent, and his experiences of neglect, abandonment, physical abuse, sexual abuse, and emotional abuse, would be impaired in his ability to make rational choices later in life, because "there would likely be such distortions in his views of the world that his decisions are likely to be skewed." He subsequently added, "I think their entire world view would be impaired, and that would certainly have an effect on all decisions they make." He also testified that a "solid majority" of persons who had suffered abuse similar to that suffered by Mr. Silveria "would indeed suffer from severe psychiatric and psychological problems," including criminality, later in life.

James Park, a former San Quentin associate warden, testified as an expert on prison classification and on the security for prisoners serving sentences of life imprisonment without the possibility of parole. Park described the four security "levels" of prisons, with level four being the most secure prisons.

Park stated that a person serving a sentence of life imprisonment without the possibility of parole "will never be paroled," but could earn credits that would allow him or her to be considered for incarceration in a level three prison. Park observed that life imprisonment prisoners were required to work, and could receive an education, play sports, have a television, and purchase books and magazines, but were denied conjugal visits.

In 1995, Park interviewed Silveria, and reviewed capital crime fact summaries and Silveria's jail records up to the summer of 1995. Silveria displayed a "positive and productive" outlook, and had spent his jail time constructively by studying. Park had seen no evidence that Silveria had been involved with

drugs or weapons while incarcerated, and his infractions while incarcerated had created no danger to jail personnel or other inmates. Park opined that if Silveria were serving a sentence of life imprisonment without the possibility of parole, he would "make a good adjustment," and would not be "a threat or a danger to other staff or other inmates." "[I]n short I think he will be a substantially better than average prisoner."

### b. *Travis*

#### (1) *Travis's background*

Travis, his mother Pamela M., and his younger sister D.S., described Travis's childhood. Pamela married Travis's father, John Travis, Sr., in about November 1967. Travis was born in December 1969. Pamela did not drink alcohol or take any nonprescription drugs while she was pregnant with Travis. D.S. was born in 1973.

John, Sr. abused alcohol and was unfaithful to Pamela. Once when Pamela was seven months pregnant with D.S., he was physically violent with Pamela, punching her in the stomach and face, leaving extensive bruising, and causing her to bleed. He never physically abused Travis.

During the first five years of Travis's life, John, Sr., was a good financial provider, but never told Travis he loved him, or hugged or kissed Travis. In late 1974 or early 1975, when Travis was about five years old, Pamela separated from John, Sr. For about two years she, Travis, and D.S. lived with relatives, other than a few months in 1975 when they lived with Larry Holly. In 1976, Pamela — who was pregnant with Holly's son Joseph — Travis, and D.S. moved to an apartment on Bendorf Drive in San Jose that was filled with roaches and had leaks that caused the ceiling to disintegrate. John, Sr., had no relationship with

his children and provided financial support only when "ordered to."

Travis and D.S. recalled that Pamela was loving, supportive, and a "very good mom" who worked hard to support the family. Pamela testified that she did not use drugs or abuse alcohol. The family was religious and held "family devotions" or Bible study. Travis had been baptized and attended church and Sunday school. He attended religious youth classes at the Los Gatos Christian Church until he was about 15 years old.

During elementary school, Travis was responsible for getting himself and D.S. to school because his mother worked at night and was asleep in the morning. When Travis came home from school, his mother was at work, so he would make dinner, and would occasionally put D.S. and Joseph to bed when their mother worked late.

When Travis was seven years old he began smoking marijuana. He began drinking alcohol before the age of 14, and perhaps at 10 or 11.

In 1979, when Travis was about 10 years old, Pamela married Joseph Carvalho, and the family's financial situation improved. Carvalho often took Travis fishing and treated him as his own son, but was physically violent when inflicting discipline. Carvalho disciplined Travis for minor infractions by spanking his bare bottom with a belt or cutting board, once breaking a one-inch thick cutting board on Travis's backside. Pamela never intervened.

Carvalho and Pamela frequently fought over finances, and their verbal arguments generally escalated into physical fights. Travis once saw Carvalho pick up Pamela and slam her body onto a table. Travis felt intimidated and helpless. When Travis was 14, he came home to see Carvalho and Pamela wrestling,

and Carvalho pin Pamela down and hit her. Travis intervened, and Carvalho and Travis fought until Carvalho pushed Travis's head through a sheetrock wall.

In about 1981, when D.S. and Carvalho's daughter S. were both about eight years old, and Travis was at least 12 years old, Carvalho was arrested for molesting D.S. and S. Travis was devastated when he learned of the molestations. He and D.S. had previously been close, but Travis felt ashamed because he had failed her. When Travis was about 15 years old, Pamela divorced Carvalho and obtained a restraining order against him.

Travis was a poor student in high school, and from the ages of 14 to 16, he periodically was truant from school. He started using methamphetamine when he was about 15 years old, and continued to use marijuana and alcohol.

When Travis was about 16 years old, he and his mother, who was concerned about his misbehavior, agreed Travis should live with his biological father, John, Sr., in North Carolina. Travis had not seen John, Sr., since he was five years old, and was looking for support and to establish a relationship with his father. Once in North Carolina, Travis and John, Sr., performed construction work and drank alcohol and used drugs together, but did not develop a closer bond.

After about a year, Travis returned to California. He did not attend school, and dropped out of high school in his junior year when he was about 17 years old.

Travis committed several burglaries, and went to North Carolina to again live with John, Sr., when he was about 18 years old to avoid an arrest warrant. Travis ultimately returned to California to turn himself in. He suffered a felony conviction for first degree burglary and served about 10 months in county jail. During this time, Travis was a jail "trustee," performing

such assignments as delivering the canteen to the women's lockdown.  Travis was released from jail when he was 19 years old.

Pamela was largely unaware of Travis's activities as an adult, and saw him little in 1990.   She did not know what he was like or what he doing in January 1991, the month Madden was murdered.  Pamela believed she had "disappointed [her] children a great deal" and "abandoned them" from their late teenage to their adult years.

Travis obtained the job at LeeWards in 1990, and worked there for about two months.  He once saw Madden's wife and daughter in the store.  Travis used drugs while on the job and at times did not show up for work.

At some point after leaving LeeWards, Travis became homeless and could not provide himself food or regular hygiene.  He felt empty inside, and spent his 21st birthday in the back of Spencer's car.   Travis considered committing crimes to get "money for [his] drug habit."  Travis had long stolen items, but he had never hurt anyone.

On about January 24, 1991, Jennings told Travis someone had taken his pager.  Travis confronted the man holding the pager, and the two fought.  Travis was hit in the face with brass knuckles, and received a cut lip and a broken nose.

D.S. saw Travis on about January 27, 1991.  His "eyes looked dead and he looked like he [had] lost his soul."   He appeared to be cold, distant and "mad at the world."  His nose was broken, his lip cut, and his clothes were bloody.  Travis told D.S. she did not have to worry about money anymore, or live like she was living.

### (2) Travis's testimony regarding the murder and jail

On the night of Sunday January 27, Travis told Silveria, Jennings, Spencer, and Rackley that whoever was working as the LeeWards manager would have to be killed because Travis did not want to be identified and go to prison. Silveria said, "No, no way," and left the discussion. Travis recalled no discussion of masks or other methods of hiding the perpetrators' identity. They drove to LeeWards that night but the store was already closed.

On Monday, January 28, Travis, Silveria, Spencer, Jennings, and Rackley again drove to LeeWards. Travis described confronting Madden, obtaining the store funds, and restraining Madden, and the telephone call with the alarm company. Travis turned to Spencer and quietly told him to kill Madden so that Madden would not overhear the command. Spencer was hesitant, so Travis repeated, "Kill him." Madden began to fidget.

Silveria said, "Let's go." Spencer cut Madden's throat, and then began stabbing him. Travis was excited, but not because he "enjoy[ed] it." Silveria used the stun gun on Madden while Spencer was stabbing Madden. Spencer then handed the knife to Travis and ran out. Travis repeatedly stabbed Madden. When Travis was done stabbing, he felt "empty."

Travis was able to kill Madden because "I didn't care about myself or anybody else," "I just gave up." Travis was "mad" and "wanted somebody to pay" for "[e]verything that happened in my life. . . . I was blaming others for the position I found myself in due to my own actions." Travis thought the money from LeeWards would give him a "new life, a new identity." Travis was not blaming Madden's murder on Travis's rage, poor

28

relationship with his father, or drugs and alcohol, but he believed "these are major factors that built up to something like this."

On cross-examination, a recording of Travis's statement to law enforcement was played for the jury. Travis said he wanted Spencer to stab Madden first to prove himself. When Travis told Spencer, "Kill him," Travis felt powerful.

During Travis's first nights in jail after he was arrested, he met an inmate who spoke to him about Jesus. Travis had put God "to the side" when he was 14 years old, because he had "wanted to live [his] own life, do what [he] wanted to do." Travis was tremendously affected by the inmate's words, explaining they "showed me just what type of person I had become."

Travis began to listen to a radio prison ministry by Chaplain Ray from Texas. He also read a book entitled "Will You Die For Me, Tex Watson as told to Chaplain Ray." In the book, Watson, a convicted murderer, follower of Charles Manson, and a drug addict, described his crime, his arrest, and his conversion to Christianity. Travis was impressed that a man of Watson's notoriety had "receiv[ed] Christ Jesus."

In September 1991, Travis wrote to Watson. Travis said he was also incarcerated for murder, and that "[t]hey used to call me 'Baby Manson' because of the power of mind control I had on my friends." Travis wrote that he had stabbed Madden "repeat[e]dly" and "enjoyed every moment of it." Travis also said, "As we fled, I felt this empt[i]ness inside me," and that he had "re-received Jesus Christ as [his] Lord and Savior" and repented of his sins. Travis felt a peace within, and knew he was forgiven for his sins, "even murder."

At the penalty retrial, Travis explained he wrote the letter because he and Watson were in the same situation, and Christ

had changed both of their lives. He said he had told Watson he enjoyed stabbing Madden because in Travis's confession to police he had minimized his participation in the murder by saying he had only stabbed Madden twice. Madden had been stabbed 32 times, not twice, and Travis was "judging myself, condemning myself and putting myself down and thinking I must have enjoyed this to do something so heinous like this." Rather, when Travis stabbed Madden, "I was releasing my anger . . . . my adrenaline[,] my paranoia, everything."

In 1992, about a year after writing Watson, Travis, Jennings, and several others planned an escape from jail. Travis was angry at God at this time because Travis's young nephew had died. Travis was shown a cell bar that had been cut half-way through, and he tried to cut the bar more using a wire from a chair. Travis also collected sheets to use as a rope. He did not plan to hurt anyone.

Before the escape plan was executed, one of the inmates reported the plan, and Travis was relocated. He was not charged with a crime as a result of his participation, and was subsequently made a trustee in his new jail location by Santa Clara County Department of Corrections Officer David Damewood. Travis had also been chosen by to be a trustee when housed in a different part of the jail, and had worked as a "trustee helper" for Officer Limbocker. He had not had any serious rule infractions in the four or five years preceding his testimony.

After the failed escape plan, Travis realized he had been "making the wrong decisions," and "started thinking real hard about what I want[ed] to do with my life." He began recovery and started learning about Alcoholics Anonymous (AA) and Narcotics Anonymous. He also began to work with Reverend

Charon. No AA meetings were available where Travis was housed.

Travis had also participated in the jail's Tutor Program, which helped inmates learn to read and do math. He often shared his message of recovery with these individuals. It was his "heart's desire . . . to help those who have been in the same situation I have."

Travis testified that he accepted the jury's guilt verdict and had admitted his responsibility for Madden's murder at the time of his arrest. His purpose in testifying was to tell the truth and to let the jury know "that I am remorseful for what I have done." He described what he had done as "heinous," and was "ashamed and humiliated" he had caused others pain. He had unsuccessfully asked his attorney if he could write to the Madden family or seek their forgiveness in court. He asked the jury to spare his life, and said the decision whether he went to death row was in God's hands.

### (3) Character witnesses

Pamela M. testified she did not visit Travis in jail for the first two years after his arrest for Madden's murder because she could not face the reality of the charges against Travis. She was now closer than ever to Travis. D.S. had visited Travis in jail, and "he's got . . . this glow," and there was hope in his eyes. She loved Travis "[w]ith all [her] heart."

Two correctional officers testified regarding Travis's behavior and activities in jail after his arrest for Madden's murder. Santa Clara County Department of Corrections Officer Keith Forster had known Travis about two years and had supervised him in jail. Travis treated staff respectfully and followed the rules. Officer Forster was of the view that although "there are individuals [who] absolutely deserve the death

penalty," here it would be "improper" because "there is definitely an opportunity to be used . . . to change lives," and to "maybe just have one individual change through his testimony and experience . . . would be well worth it."

Correctional Officer Damewood testified that in late 1992, after Travis's failed escape plan, Travis had been housed in the maximum security jail area where Officer Damewood worked. Travis was in this area for about three years. Officer Damewood selected Travis as a trustee, a position he held for about two years. His duties included cleaning and delivering paperwork and meals to inmates. Travis was responsible, easy to get along with, and did not misbehave or treat Officer Damewood disrespectfully. In his cell Travis was studious and quiet.

*(4) Expert witness testimony*

Reverend Charon, a certified alcohol and drug counselor, testified as an expert on the "identification of alcohol and drug-related problems and the recovery process." Reverend Charon met Travis in jail in late 1992 or 1993 when Travis attended his Bible study. Travis was diligent in attending, and Reverend Charon and Travis eventually began to meet one on one. Although Travis initially did not consider himself an addict, he eventually began working with Reverend Charon on the "The Twelve Steps" AA program. It was difficult to advance in a recovery program in jail because of the limited resources, and Reverend Charon had seen few people reach Travis's level of recovery.

Reverend Charon described Travis as a quiet individual who benefitted others by sharing what he had learned in recovery. Reverend Charon believed that Travis was sincere when he said he was following in the footsteps of the Lord. He was of the view that Travis had "made peace with God, is trying

to do it with everyone else, and that he is in genuine recovery." Travis appeared "very remorseful, and was earnestly seeking a way, under the circumstances, that he could express . . . his regret, and also, if there was anything that was possible [for him] to make amends, recognizing that you can never really make full amends."

Sharon Lutman, a registered nurse and licensed marriage and family counselor, testified as an expert regarding the assessment of chemically dependent people. On March 26, 1997, Lutman interviewed Travis for one and a half hours at the Santa Clara County main jail to assess him for the long-term effects of drug and alcohol use, and to evaluate whether he was in a state of recovery. The two did not discuss Madden's murder.

Travis said he had taken no mood-altering drugs since the fall of 1992. Travis was open and responsive, and did not hesitate to share his past use of drugs and alcohol, but had difficulty expressing his feelings.

Lutman concluded Travis was a "Type Two" alcoholic, or a man who has an alcoholic father and who begins to use drugs and alcohol early in life. This type of alcoholism was passed from father to child, and so her opinion would not change if she were aware Travis's mother did not drink or consume nonprescription drugs during her pregnancy with Travis. Failure to develop stress management coping skills and impulse control are indicative of Type Two alcoholism.

As to Travis's recovery from drugs and alcohol, Lutman observed that Travis was meeting with Reverend Charon, reading 12-step literature, and listening to "recovery oriented tapes." Travis understood his alcoholism and addiction would require treatment for the rest of his life. He had attempted to learn new techniques for resolving conflict and anger with

others, such as assessing his own responsibility for conflict and sharing his concerns with God and Reverend Charon, instead of "just act[ing] out" or suppressing his anger with alcohol and drugs. He had appeared sincere and the most emotional when discussing his desire to make amends to Madden's family.

Travis was interested in counseling other inmates with substance abuse problems, and in Lutman's opinion, had learned enough about addiction and recovery to assist others. Travis was also interested in studying pharmacology to learn more about addiction.

Dr. Timmen Cermak, a psychiatrist, testified as an expert in the field of addiction. Dr. Cermak had interviewed Travis five times between October 30, 1992, and March 15, 1997, including one telephone interview. Dr. Cermak had also interviewed Travis's sister D.S., his mother Pamela, and Reverend Charon. He had reviewed various documents including Travis's statement to police, the indictment, investigator reports regarding family members, several police reports, and letters to and from Travis.

Dr. Cermak diagnosed Travis as chemically dependent in forced remission. When Travis's chemical dependence had been active, it had "distorted his judgment pervasively." Travis was also suffering from posttraumatic stress disorder as a result of his childhood neglect and abuse. He was not schizophrenic or manic-depressive, and did not have an antisocial personality disorder.

Dr. Cermak had hired Dr. James Kurkjian, a clinical psychologist, to perform neuropsychological tests on Travis. Dr. Kurkjian also administered to Travis the Minnesota Multiphasic Personality Index, and intelligence quotient, Rorschach, and picture and sentence completion tests. Based on

the test results, Dr. Cermak concluded there was no organic brain damage, "nothing that would limit [Travis's] capacity." Travis had average to below average intelligence, and was in the normal range. Nothing in these test results indicated to Dr. Cermak that additional psychological testing was necessary.

Travis initially struck Dr. Cermak as "being immature, someone who had been very out of control, [a] chronically intoxicated adolescent who really had lost his moral compass . . . with very tragic results." Travis spoke incessantly about religion, and it appeared "religion was playing a very rigid and containing role in his life." Over the past four and a half years, Dr. Cermak had observed Travis begin to recover from his chemical dependence, be less rigid in his religious beliefs, and become more emotionally available. There had been "a slow increase in his maturity, his ability to contain impulses, his ability to talk about his emotional life." He had also received his General Education Diploma.

In Dr. Cermak's view, Travis had held a "highly distorted view of the injustices in his life." Travis felt shame as a result of his January 24, 1991 fight because he lost face before his friends, and was left with a facial injury that he believed would prevent him from ever again being "attractive to a woman." Travis believed that "someone had to pay." The murder was "a fatal act of attacking someone else in order to save himself and to . . . get away from the sense of inadequacy, failure[,] . . . shame, humiliation, . . . that sense of abject embarrassment that he . . . harbored within himself." By murdering Madden, Travis was "defending his honor, defending his sense of vulnerability . . . [and] reestablishing the sense of self that is less shamed, humiliated, vulnerable and inadequate."

Dr. Cermak was of the view that Travis's personality was largely formed in an atmosphere of sufficient parental neglect and family member abuse that it affected his development. Travis's chemical dependency allowed him to avoid feelings of shame and tension he experienced in his family. Individuals who ignore feelings of shame develop an increased sensitivity to that emotion and become less capable of "tolerating even small slights."

Methamphetamine was "commonly associated with violent behavior." "Paranoid delusions are almost a routine aspect of chronic" methamphetamine use. Although in general paranoia from methamphetamine use could contribute to the explosiveness of an event for a person who already felt shame and rage, here Dr. Cermak understood Travis and the other perpetrators had largely exhausted their methamphetamine supply four days before the murder.

Travis told Dr. Cermak that during the murder, "there was a buildup of fear and excitement and a sense of panic." When the murder took longer than expected, and Travis began to stab Madden, he felt a "sense of relief from the fear and the panic and the excitement." Travis said this "wasn't really pleasurable and yet it was a sense of relief." Dr. Cermak asked, "[I]s that . . . a positive feeling, maybe even a pleasurable feeling?" Travis replied, "Yes, that was a pleasurable feeling." Shortly thereafter, while still at the murder scene, Travis began to feel a sense of emptiness. Dr. Cermak acknowledged that Travis may have made these statements to try to lessen the damage of Travis's statement to Tex Watson that he had "enjoyed every moment" of the stabbing. In Dr. Cermak's view, when Travis spoke of enjoyment in the letter, "he was trying to

explain, make sense of the sense of relief that he felt following that murder."

### 3. *Prosecution rebuttal*

Santa Clara County Sheriff's Sergeant David Tomlinson testified that before February 1994, Silveria had claimed on a jail grievance form that he feared retaliation by an inmate and had successfully asked to be moved. Silveria and Travis were both housed in the "Third East Max" tier of the jail between September 21, 1993, and August 5, 1994. In February 1994, Silveria stated on a different grievance form that he had lied in his previous request to be rehoused and wanted to return to his former (less restrictive) housing assignment. Silveria said he had been "dishonest . . . in order [to] get next to my codefendant."

Sergeant Tomlinson also testified that simply because an inmate was a trustee did not mean he was trustworthy because the position varied widely in terms of the scope of responsibilities and freedom.

Cynthia Tipton testified that on the morning of January 28, 1991 (the day of Madden's murder), Silveria came to her home and asked to shower because he had contracted poison oak. He appeared uncomfortable because of the poison oak, but not otherwise ill or recovering from a recent illness. Nor did he tell Tipton he had recently been ill. After his shower, Tipton told Silveria she knew "you guys are doing the stun gun robberies." Silveria replied, "[T]hey don't know who we are and they don't know what we look like," and said that Tipton should not worry. He also told Tipton "they had something big that they were going to be doing that night." Silveria showed no reluctance to participate in this event, but appeared to be "in a

really good mood," and "looking forward to what was . . . going on for the rest of his day."

## II. DISCUSSION

### A. Guilt Phase Issues[6]

#### 1. Motion to Suppress

Travis contends the trial court erred in denying his motion to suppress. In particular he contends the police lacked reasonable suspicion to detain him, his arrest lacked probable cause, and the warrantless search of his vehicle was improper. We disagree.

"In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.)

#### a. Factual background

On January 25, 1991, San Jose Police Detective John Boyles caused the Quik Stop Market robbery video to be screened at a police briefing. A fellow officer told Detective

---

[6] "[A]s to many claims defendants allege for the first time that the error complained of violated their federal constitutional rights. To the extent that in doing so defendants have raised only a new constitutional 'gloss' on claims preserved below, that new aspect of the claims is not forfeited. However, '[n]o separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory . . . .' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant, Smith and Wheeler*).

Boyles that he recognized one of the perpetrators on the video as Troy Chapple and gave him Chapple's date of birth. Santa Clara County juvenile probation department records indicated that Troy Chapple was also known as Troy Rackley. Detective Boyles located a photograph of Rackley in the San Jose Police photo base, and observed Rackley appeared to be one of the perpetrators on the video.

On January 28, Detective Boyles contacted a juvenile probation officer, who identified Matthew Jennings as a second perpetrator on the videotape, and gave Jennings's home address to Detective Boyles. About 5:00 p.m. that day an unidentified female informant spoke to Detective Boyles on the telephone and said that "Danny, John, Matt, and Chris" were perpetrators of the stun gun robberies, and that "Troy" also associated with that group. Officer Boyles requested San Jose police communications dispatch a "Be on the Lookout" notice to all police units for Troy Rackley, Matthew Jennings, and "anybody associated with them with the names John, Chris, and . . . Daniel." He also shared the information on the stun gun robberies — including photographs of Jennings and Rackley, and a still shot photograph from the robbery videotape of a person later identified as Silveria — with San Jose Police Officer Brian Hyland.

That evening after Detective Boyles had gone home, San Jose Police Sergeant George McCall spoke with a female informant who said that the person involved in the stun gun robberies known as "Danny" had a last name of "Silveras" or "Silveria." The informant also said the robbery suspects were going to "pull another robbery that night" and would then be "leaving town," and might be driving a red and black Charger.

Sergeant McCall passed this information on that evening to Officer Hyland and at some point to Detective Boyles.

About 9:00 p.m. that night, Detective Boyles spoke with a woman who sounded like the informant to whom he had previously spoken. Detective Boyles also recalled that he asked the woman if she was the same person to whom he had previously spoken and she said yes. She identified herself as "Cynthia." Cynthia said she now had the last name of "Silveria" for "Danny," and "Jennings" for Matthew, and also gave him a home address for Jennings that matched the street and apartment number of the address Detective Boyles had received for Jennings from the juvenile probation officer. Detective Boyles requested that this additional information also be broadcast to the police patrol units.

On the evening of January 28, after speaking to Sergeant McCall, Officer Hyland visited the homes of Jennings, Spencer, and Silveria. Jennings's older brother told Officer Hyland that Jennings had packed a suitcase and left in a black and white Dodge Charger with two men named Christopher Spencer and John Travis, as well as Silveria and Rackley. A computer check revealed Travis had an outstanding misdemeanor warrant. Spencer's father told Officer Hyland that Silveria, Travis, and Rackley were friends of Spencer, and allowed him to search Spencer's room. There Officer Hyland found a citation with a Charger's license plate number. Silveria's brother likewise told the officer that Silveria had packed a suitcase, said he was going to live in the mountains, and left with Travis, Spencer, Rackley, and Jennings. Officer Hyland spoke with about seven total individuals, each of whom said Silveria, Travis, Jennings, and Rackley had been together for at least one day and were all planning to flee the San Jose area. Officer Hyland told everyone

to whom he spoke to call him or 911 if they saw Silveria, Travis, Rackley, Jennings, or Spencer.

On January 29 at 6:46 p.m., San Jose Police Department call intaker Joanne Schlachter received a 911 call from a man who asked to speak to Officer Hyland. Schlachter said the officer was not available, and asked if she could help. The caller said that the "guys . . . doing the robberies of the mini-marts with the taser guns" were at the San Jose Oakridge Mall arcade. He also said that one of the men, "Troy," was 18 or 19 years old, and a second man "Matt" was wearing a white shirt and black pants. The informant gave his name and appears to have given his phone number and a description of what he, the informant, was wearing. Schlachter sent the information to a police channel that routed it to the appropriate officers. Officer Hyland received the dispatch and recognized the informant as someone to whom he had spoken the day before. Oakridge Mall security was also alerted, and a security guard began to follow the suspects through the mall. The informant called again at 6:58 p.m., and told a different intake person that Troy was wearing green pants and black tennis shoes, and one of the two suspects was now "in Shirtique's" and was carrying a large sum of money. The other suspect was somewhere in the mall and "they [were] getting ready to go to Sacramento."

Dana Withers testified that on January 29 he was working as an Oakridge Mall security guard. He received information that caused him to follow two White men — who were joined by a third White man — through the mall to two silver vehicles, a Datsun 280ZX and a Honda Civic. The men entered the vehicles and a second security guard, Michael Graber, who was driving outside the mall, continued the surveillance and communicated

with the San Jose police dispatch. The suspects drove from the west to the north side of the mall where they were stopped.

On January 29, 1991, about 6:46 p.m., San Jose Police Sergeant Jean Edward Sellman received a radio dispatch to go to the Oakridge Mall arcade and look for two suspects in the stun gun robberies who were described in the dispatch. Sergeant Sellman did not see anyone matching the suspects' description in the arcade, but learned that a mall security guard was following the suspects through the mall. He subsequently received a dispatch that the suspects were entering a silver Honda and a silver either 240 or 280ZX Datsun in the north parking lot. Sergeant Sellman returned to his police car, which was also in the north lot, saw two cars matching the dispatched description, and noticed that the Honda Civic was closely following the Datsun. A second officer, Sergeant Kurt Brandt, blocked the row in front of the suspects' vehicles with his vehicle, and Sergeant Sellman blocked them with his vehicle from behind. Silveria was driving the Honda Civic. Travis was driving the Datsun, and Rackley was his passenger.

San Jose Police Officer James Werkema arrived at the scene, and was told by another officer that Travis was the driver of the Datsun. Officer Werkema had previously been told by Officer Hyland that Travis had an outstanding misdemeanor warrant and that Rackley had been positively identified as a perpetrator by one of the robbery victims. Officer Hyland arrived and observed that while Travis was detained in the parking lot, a warrant check was run and his misdemeanor warrant was confirmed. Rackley and Silveria were arrested for robbery and Travis was arrested for robbery and on an outstanding misdemeanor warrant.

Officer Werkema searched the Datsun 280ZX incident to the arrests of both Travis and Rackley. In the Datsun's backseat area he found two fanny packs, one that contained rolled coins and another that contained $1,313 and a motor vehicle purchase order made out to John Travis and Danny Silveria. In the rear of the vehicle he found a duffle bag containing two battery packets bearing a LeeWards price sticker. Sergeant Sellman searched Silveria's car and found a PARALI/AZER stun gun and a fanny pack containing $587. Both cars were impounded.

### b. *Analysis*

#### (1) Reasonable suspicion to detain

Travis contends that the police lacked reasonable suspicion to stop his vehicle and detain him. We reject the claim.

Travis asserts that the record fails to demonstrate how the security guard correctly identified robbery suspects "Troy" and "Matt" in the mall and followed them to their vehicles. Travis did not challenge the stop of his vehicle in the trial court, and the claim is therefore forfeited.

"[W]hen defendants move to suppress evidence under section 1538.5, they must inform the prosecution and the court of the specific basis for their motion." (*People v. Williams* (1999) 20 Cal.4th 119, 129.) Here, Travis's suppression motion and his argument on that motion challenged the legitimacy of the search incident to his arrest on a traffic warrant, his lack of opportunity to post bail after his arrest on the warrant, and the sufficiency

of his *Miranda* advisement.[7]  None of these claims informed the prosecution of the need to adduce greater detail as to how the robbery suspects were identified in the mall and followed to their vehicles.[8]  The suppression hearing, which concerned the suppression motions of four then codefendants, spanned nine days and consumes much of the first nine volumes of the reporter's transcript.  Had Travis asserted below that his detention lacked reasonable suspicion because of the absence of evidence of how the security guard initially identified the suspects in the mall, the prosecutor would have been on notice to adduce additional testimony more fully describing this event. (See *Williams*, at p. 130 ["if defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal"].)

The claim is also meritless.  "[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'  [Citations.] 'Although a mere "hunch" does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'

---

[7]  Travis also contended that the search of his car was "beyond the scope of [his] consent, and/or said consent was unlawful and/or withdrawn."  His supporting memorandum does not discuss this claim, which appears to arise from events after his vehicle was impounded.

[8]  Although Silveria challenged his arrest, his counsel expressly stated that he had "no quarrel with anything Officer Sellman did" before the arrest including his stop of the vehicles.

[Citations.] [¶] Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.' [Citation.] The standard 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.' [Citation.] Courts 'cannot reasonably demand scientific certainty . . . where none exists.' [Citation.] Rather, they must permit officers to make 'commonsense judgments and inferences about human behavior.' " (*Kansas v. Glover* (2020) __ U.S. __, __ [140 S.Ct. 1183, 1187–1188].)

Here, a person to whom Officer Hyland had spoken in person the day before called 911, identified himself, and said that the stun gun robbery suspects, including "Matt" and "Troy," were at a specific location within the Oakridge Mall. Critically, at the time Officer Hyland received the dispatch about this call, he already had probable cause to arrest Jennings and Rackley for the Quik Stop Market stun gun robbery because both of these men had been positively identified as perpetrators. Thus, unlike cases such as *Navarette v. California* (2014) 572 U.S. 393 (*Navarette*), in which the reliability of the informant's 911 report that a crime had occurred was in question, here Officer Hyland *knew* the stun gun robberies had occurred and also knew the names of at least two persons who had been identified as perpetrators in one of the crimes and implicated in the other. He also had the names of three other men who were alleged to be involved in the robberies. (Compare *Navarette*, at p. 404 ["Under the totality of the circumstances, we find the indicia of reliability in this case sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road," making it reasonable "for the

45

officer to execute a traffic stop"].)  The only question here was whether the informant was correctly reporting the location of these individuals.

Moreover, "a caller's personal knowledge," shown here by the informant's knowledge of the suspects' names, current location, and apparel, " 'lends significant support to the tip's reliability.' "  (*People v. Brown* (2015) 61 Cal.4th 968, 981, quoting *Navarette*, *supra*, 572 U.S. at p. 399.)  "[T]he caller's report was contemporaneous, a factor that 'has long been treated as especially reliable.' "  (*Ibid.*)  In addition, the caller identified himself and appears to have given his phone number and described what he was wearing, circumstances that enhanced his credibility.  (*Id.*, at p. 982 ["private citizens who report criminal activity generally have no bias or motive other than good citizenship, and therefore tend to be reliable"].)  His "use of the 911 emergency system" is a further "indicator of veracity" because the recording and tracing features of that system "provide some safeguards against making false reports with immunity."  (*Navarette*, at p. 400; see *Brown*, at p. 982.)  Based on the informant's report, a security guard was able to locate the suspects and follow them to their vehicles, which were then described to police and broadcast to responding officers.  Sergeant Sellman observed two vehicles matching this description, and further observed that one vehicle was closely following the other, and assisted Officer Brandt in stopping the vehicles.  "An officer may arrest or detain a suspect 'based on information received through "official channels." ' "  (*Brown*, at p. 983.)  The totality of these circumstances was sufficient to create a reasonable suspicion that the persons in the vehicles were stun gun robbery suspects and to detain them.

*(2) Probable cause to arrest*

Travis contends that there was no probable cause to arrest him other than on a misdemeanor warrant. However, the outstanding misdemeanor warrant was a sufficient basis for Travis's arrest. (§ 836, subd. (a) ["A peace officer may arrest a person in obedience to a warrant . . . ."]; *Utah v. Strieff* (2016) __ U.S. __, __ [136 S.Ct. 2056, 2062] [once the officer discovered the arrest warrant, he had an obligation to arrest the defendant].)

Moreover, probable cause existed to arrest Travis for the stun gun robberies. (*Maryland v. Pringle* (2003) 540 U.S. 366, 370 ["A warrantless arrest of an individual in a public place for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause"].) "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." (*Id.* at p. 371.) An arrest remains lawful under the Fourth Amendment even when the "criminal offense for which there is probable cause to arrest" is different from the "offense stated by the arresting officer at the time of arrest." (*Davenpeck v. Alford* (2004) 543 U.S. 146, 148, 153; see *id.* at p. 155 ["Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest"].)

Here, as noted, Officer Hyland had probable cause to arrest Troy Rackley for the Quik Stop Market stun gun robbery because he had been positively identified as a perpetrator by the victim. Moreover, we have previously concluded based on the same evidentiary hearing on which we rely here that informant Cynthia's January 28 report to Detective Boyles — which included information that "Danny" Silveria, "John," "Matt"

Jennings, and "Chris" were perpetrators of the stun gun robberies, and that "Troy" also associated with that group — was reasonably corroborated. (*People v. Spencer* (2018) 5 Cal.5th 642, 664–666 (*Spencer*).) This information about the four alleged perpetrators was broadcast to all police units on January 28. In addition, on January 29, a different informant, whose identity was known to Officer Hyland, told 911 that stun gun robbery suspects, including "Troy," were at the Oakridge Mall. This information, along with (1) the presence of Travis driving a car at the Oakridge Mall in which Troy Rackley was a passenger, and in which a large amount of cash in one fanny pack and rolled coins in a different fanny pack was found, and (2) the circumstance that Travis's car was closely followed by a car driven by Silveria that was found to contain a stun gun, the weapon used in the January 24, 1991 robberies, would likely persuade an objectively reasonable police officer that Travis had committed the felony of robbery. (See *Maryland v. Pringle*, *supra*, 540 U.S. at pp. 371–372 [given that the defendant was one of three men riding in a car in the early morning, $763 of rolled-up cash was in the glove compartment directly in front of the defendant, and baggies of cocaine were behind the backseat armrest and accessible to all three men, and none of the three men offered any ownership information with respect to the cocaine or money, it was "an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine," and thus "a reasonable officer could conclude that there was

probable cause to believe [the defendant] committed the crime of possession of cocaine, either solely or jointly"].)[9]

### (3) Search of Travis's vehicle

Travis asserts that the warrantless search of his vehicle was controlled by *Arizona v. Gant* (2009) 556 U.S. 332, and was not justified under that standard. We disagree.

At the time of Travis's 1991 arrest, prevailing United States Supreme Court law held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and any closed containers found within that space. (*New York v. Belton* (1981) 453 U.S. 454, 455, 460–461.) Travis does not argue that the search of his vehicle was invalid under *Belton*. Rather, he asserts this case is controlled by *Arizona v. Gant*, *supra*, 556 U.S. at pages 343, 351, in which the high court revisited *Belton*, and held that a warrantless search incident to the lawful arrest of a recent occupant is justified only (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" The 1991 search here was after *Belton* and before *Gant*. "[S]earches conducted in

---

[9] Because we conclude there was probable cause to arrest Travis for robbery, we need not address Travis's argument that because there was no probable cause to arrest him for robbery, and he was not provided an opportunity to post bail on his arrest for the misdemeanor traffic warrant, his subsequent statements to police should have been suppressed.

objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis v. United States* (2011) 564 U.S. 229, 232; see *id.* at pp. 239–240 [searches conducted after *Belton* and before *Gant*, and in compliance with *Belton*, are not subject to the exclusionary rule].)

In sum, the trial court properly denied the motion to suppress.

### 2. *Asserted Denial of Hardship Request*

Travis contends that the trial court erroneously denied Alternate Juror No. 1's hardship request. We reject the claim.

After Travis's jury and alternate jurors were sworn, and before opening statements, two jurors, including Juror No. 6, were discharged, and Travis and the prosecutor stipulated to reopen jury selection to choose two additional alternates.[10] Travis's remaining jury was called to the courtroom, and the court explained these developments. The court then asked: "Everybody's employer knows that you're here eight months? Nobody is going to have a problem with that?" Juror No. 12 asked what would happen if she were laid off during trial and described her work situation. At sidebar, the court gave counsel the opportunity to stipulate to her removal, which they declined.

---

[10] We have held that the trial court lacks discretion to reopen jury selection after the jury has been sworn. (*People v. Cottle* (2006) 39 Cal.4th 246, 249.) No challenge is raised on appeal to this procedure. Rather Travis simply challenges the seating of Alternate Juror No. 1 for a discharged juror, a procedure that was consistent with that described by Penal Code section 1089 and Code of Civil Procedure sections 233 and 234.

The court told Juror No. 12 her situation was too speculative to warrant her removal.

Alternate Juror No. 1, an engineer, informed the court that his employer had determined the project on which he was working was "expected to take additional time and will require that I keep working on it" because there was insufficient time to train someone else. He observed "[e]ngineers usually work between 80 to 100 hours a week," and that "during this time of the project . . . that means I will be working 50 hours outside of the courtroom, if there's a concern for attentiveness on the time off in the courtroom based on that information." In response to the court's inquiry, he identified his company, and explained he would be working on Monday through Sunday from 6:00 p.m. to 1:00 a.m. until the project was done. He was not asked how long the project was expected to last before completion.

Travis did not request that the court ask Alternate Juror No. 1 further questions, or seek his removal. Shortly thereafter, Alternate Juror No. 1 was selected, without objection, to replace Juror No. 6.

This claim is therefore forfeited on appeal. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212 (*Rangel*) [the defendant did not move for the juror's discharge and the claim is therefore forfeited on appeal].) Although in response to the court's inquiry Alternate Juror No. 1 described a development in his schedule, he did not request that he be discharged. Nor, although counsel had just met at sidebar regarding a different juror and had been offered the opportunity to stipulate to her removal, did Travis seek to have Alternate Juror No. 1 discharged after his new schedule was revealed, or object to the trial court later seating him in the place of Juror No. 6.

### 3. *Instructional Error*

Silveria contends the trial court erred in instructing the jury on first degree murder because the indictment, which charged him with murder in violation of section 187, only charged him with second degree murder. We have repeatedly rejected substantially similar claims, and Silveria cites no persuasive reason to revisit our conclusions. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 284–285; *People v. Contreras* (2013) 58 Cal.4th 123, 147–148.) Nor, as Silveria further contends, was greater specificity in pleading required under *Apprendi v. New Jersey* (2000) 530 U.S. 466. (*Ghobrial*, at p. 285; *Contreras*, at pp. 148–149.)

### B. Penalty Retrial Issues

#### 1. *Joint Penalty Retrial*

As noted, both penalty juries deadlocked, and defendants were retried before a single penalty jury. Defendants contend the trial court erroneously denied their severance motions seeking separate penalty retrials.[11] We conclude there was no abuse of discretion in denying defendants' severance motions, nor did any gross unfairness occur as a result of the joint penalty retrial.

#### a. *Factual background*

In support of their penalty retrial severance motions, defendants called two expert witnesses. Justice Charles Campbell, who sat as a visiting judge on the Texas trial and

---

[11] Defendants also sought separate juries, and to the extent they raise that claim on appeal, we reject it for the same reasons we conclude that the trial court did not abuse its discretion in denying defendants' motions for separate penalty retrials.

intermediate appellate courts, and who had previously served as a justice on the Texas Court of Criminal Appeals and as a Texas prosecutor, testified as an expert on capital cases. Justice Campbell stated it was common Texas practice to try each defendant in a capital case separately. In his view severance was necessary for each defendant to receive the jury's individual consideration, and either severance or separate juries "avoid[ed] the pitfalls" he had "noticed in the Supreme Court jurisprudence," and were preferable to a limiting instruction to separately consider the defendants. Justice Campbell opined that if two defendants were equally culpable for a heinous crime, but one had heinous post-arrest "activity," it would be more difficult for the jury to draw a distinction between the two defendants because the potential "spillover effect . . . is pretty great."

Charles Gessler, who had worked as a Los Angeles County deputy public defender for 31 years, testified as an expert on severance and on capital case defense tactics. He opined it was "more difficult for two defendants . . . joined together to get a fair and individualized determination by the jury than it is for an individual single defendant." He was also of the view that "if the culpability is about equal in the crime," and if the jury is "going to give death to one [defendant], it is very likely that they would then give death to the other [defendant] even if the aggravation and mitigation is different because the crime is the thing that they are most interested in." When the mitigating evidence is similar, it "loses all individuality" and is viewed by the jury as a "standard defense ploy." In his view, if two defendants remain friends in jail although one defendant misbehaves, jurors will view the continuing friendship as evidence that this misbehavior is condoned. Moreover, if both

defendants have a religious conversion, and there is evidence of hypocrisy by one defendant, "it would take the other person down with him." Gessler also believed it was difficult for some jurors to distinguish which mitigating and aggravating evidence applied to which defendant. In his view, no two capital defendants should be tried jointly before the same penalty jury, and the facts in this case "enhance the likelihood" of unfair jury verdicts.

The trial court denied the severance motions, and noted in so doing that it had found unpersuasive the expert testimony. It stated: "The Court believes that it is capable of properly instructing the jury and is capable of ensuring a fair jury, who will follow the Court's instructions, will be chosen. . . . [T]he Court believes that properly instructed jurors will give each defendant their individualized attention."

### b. *Analysis*

Section 1098 states in relevant part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." This section illustrates the Legislature's "strong preference for joint trials," including joint penalty phase trials. (*People v. Wimbush* (2017) 2 Cal.5th 402, 455; see *id.*at pp. 457–458; *People v. Ervin* (2000) 22 Cal.4th 48, 96 [penalty phase severance motion].) "Joint proceedings are not only permissible but are often preferable" when, as here, the "defendants' criminal conduct arises out of a single chain of events. Joint trial may enable a jury 'to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing,'" and conserves judicial resources. (*Kansas v. Carr* (2016) 577 U.S. __, __ [136 S.Ct. 633,

645].) "We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion." (*People v. Avila* (2006) 38 Cal.4th 491, 575.) "[E]ven if a trial court acted within its discretion in denying severance, ' "the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*).)

Silveria contends that section 1098 does not apply here because defendants were not "jointly charged" within the meaning of that section, but rather separate juries adjudicated their guilt and then deadlocked on penalty. There was one indictment jointly charging both defendants. The fact that separate juries adjudicated their guilt and deadlocked on penalty does not alter the fact that they remained jointly charged. "The use of dual juries is a permissible means to avoid the necessity for complete severance. The procedure facilitates the Legislature's statutorily established preference for joint trial of defendants and offers an alternative to severance when evidence to be offered is not admissible against all defendants. (§ 1098; *People v. Harris* (1989) 47 Cal.3d 1047, 1075.)" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1287; see § 190.4, subds. (b), (c), (e).) As the court stated in its pretrial ruling severing the trial of defendants from that of Spencer and Jennings: "By this ruling, the Court is not ordering four separate trials. The Court is hereby ordering two trials — two defendants in each trial. Each trial will have two separate juries and therefore, each defendant will have a separate jury."

Travis contends, based on the expert testimony at the severance motion hearing, that the trial court abused its

55

discretion in denying his motion because the jury was unable to make an individualized sentencing determination regarding Travis and Silveria. We have recently rejected "similar empirical evidence," concluding it does not "rebut the presumption that jurors are presumed to understand and accept the court's instructions." (*People v. Erskine* (2019) 7 Cal.5th 279, 301 (*Erskine*).) Moreover, Travis's argument has been largely foreclosed by the high court's 2016 conclusion that joint penalty trials do not violate the Eighth Amendment right to an individualized sentencing determination, and that limiting instructions such as those given here " 'often will suffice to cure any risk of prejudice.' " (*Kansas v. Carr, supra*, 577 U.S. at p. __ [136 S.Ct. at p. 645].) Nor, in particular, did the circumstance that Travis and Silveria both relied on Reverend Charon to testify regarding their religious conversion preclude an individualized sentencing determination. The fact that defendants were housed in the same county jail, and that jails may not employ numerous ministers, is one that would be easily understood by the jurors.

Travis asserts that the trial court acknowledged the jury would not be capable of following its admonitions regarding severance because it had previously denied his motion to allow a former juror and former alternate juror from the first penalty phase to testify at the penalty retrial. He asserts that if the jury could not follow instructions regarding the testimony of a former juror and alternate juror, then it could not follow instructions to individually assess each defendant's appropriate sentence. But Travis's comparison of the severance issue to the issue regarding testimony by former jurors is inapt: As we observe below, the trial court was reasonably concerned testimony by the former juror and alternate risked confusing the penalty retrial jury as

to its task, and opened the possibility that "the [prosecutor] could then call death voting jurors in rebuttal." (*Post*, at pt. II.B.5.a.2.) Travis does not explain what admonition would alleviate these concerns.

Nor did events at the joint penalty retrial cause such gross unfairness to defendants as to deprive them of a fair trial or due process of law. (*Thompson*, *supra*, 1 Cal.5th at p. 1079.) Silveria contends "there was a substantial risk that the single jury's penalty determination against Travis could improperly influence its penalty decision regarding" Silveria. Silveria contends that such prejudice was demonstrated by evidence that Travis, unlike Silveria, stabbed Madden repeatedly, and by evidence introduced only against Travis, such as Travis's plan to escape from jail, and his letter to a Manson family member describing how Travis "enjoyed every moment" of stabbing Madden.[12]

"In *Kansas v. Carr*, *supra*, 577 U.S. at p. __ [136 S.Ct. at p. 644], the high court rejected a similar claim.[13] *Carr* involved two defendants who were brothers. (*Id.* at p. __ [136 S.Ct. at p. 637].) The older brother claimed he was prejudiced at their

---

[12]     Silveria also contends that the joint penalty retrial allowed the jury to consider evidence of Travis's willingness to kill a jail guard during the planned escape, but we see no such testimony in the cited portion of the record. Rather, Travis replied, "No" when asked if there was "ever any plan to harm" the correctional guard for the area where the escape had been planned to occur, and that Travis only learned long after the escape plan had been thwarted that there had been a plan to harm the officer.

[13]     This discussion of *Kansas v. Carr* is drawn from our recent discussion of a similar claim in *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 600 (*Beck and Cruz*).

joint penalty trial 'by his brother's portrayal of him as the corrupting older brother,' and by his brother's cross-examination of their sister, who equivocated about whether the older brother had admitted to her he was the shooter. (*Id.* at p. __ [136 S.Ct. at p. 644].) The younger brother claimed that 'he was prejudiced by evidence associating him with his dangerous older brother, which caused the jury to perceive him as an incurable sociopath,' and by the jury's observation of his older brother in handcuffs. (*Id.* at p. __ [136 S.Ct. at p. 644; see *id.* at p. __ [136 S.Ct. at p. 644, fn. 4].)

"The high court held that joint capital sentencing proceedings do not violate the Eighth Amendment right to an individualized sentencing determination. (*Kansas v. Carr*, *supra*, 577 U.S. at p. __ [136 S.Ct. at p. 644].) Although the due process clause protects defendants against unduly prejudicial evidence that would render a trial fundamentally unfair, that standard was not met by the 'mere admission of evidence that might not otherwise have been admitted in a severed proceeding.' (*Id.* at p. __ [136 S.Ct. at pp. 644–645].) The high court observed that the trial court had instructed the jury that it must give ' "separate consideration to each defendant" ' and that evidence admitted as to one defendant should not be considered as to the other defendant. (*Id.* at p. __ [136 S.Ct. at p. 645].) The high court presumed that the jury followed these instructions, while observing such limiting instructions ' "often will suffice to cure any risk of prejudice." ' (*Ibid.*) Moreover, the high court concluded that the penalty verdicts were not a result of the challenged penalty evidence against one brother or the other, but of the guilt phase evidence of 'acts of almost inconceivable cruelty and depravity.' (*Id.* at p. __ [136 S.Ct. at p. 646].)" (*Beck and Cruz, supra,* 8 Cal.5th at p. 600.)

Likewise here, the trial court instructed the jury during the prosecutor's case-in-chief that evidence regarding Travis's letter to Watson "is limited to Mr. Travis only." At the end of the penalty phase, the court instructed the jury: "In this penalty trial of defendants Travis and Silveria, you must consider the penalty verdicts entirely separately for each of the two defendants. While you may consider the parts played by each of the two defendants in the murder and compare it to the part played by the other defendant, you absolutely may not determine a verdict for either of the defendants in terms of the verdict rendered to the other defendant. In other words, you may not allow your verdict as to one defendant to [a]ffect your verdict as to the other defendant. You must endeavor to reach separate verdicts as to each defendant in accordance with the aggravating and mitigating circumstances applicable to that defendant only, and in accordance with the rest of these instructions." It further instructed the jury as to evidence of Travis's escape preparations that "[u]nder no circumstances may you discuss or consider this evidence in any way as to Mr. Silveria." We presume it understood and followed these instructions.[14] (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178 (*Hajek and Vo*).)

In sum, defendants fail to demonstrate that the trial court abused its discretion in denying defendants' severance motions, or that gross unfairness occurred as a result of the joint penalty retrial.

---

[14] Silveria further contends that the denial of his severance motion precluded him from introducing mitigating evidence in his statement to police. We address and reject that claim in part II.B.5.c.

### 2. *Excusals for Cause*

Silveria contends that the trial court wrongfully excused for cause Prospective Juror No. J-56 based on his death penalty views. Silveria and Travis contend that the trial court wrongfully excused for cause Prospective Juror Nos. E-45 and F-77 on this same basis. We reject the claim.

A trial court should only dismiss a prospective juror for cause if the prospective juror's views on the death penalty would " 'prevent or substantially impair' " that person from performing the duties of a juror. (*People v. Caro* (2019) 7 Cal.5th 463, 481.) We review the trial court's sustaining of a challenge to a prospective juror based on views about the death penalty for substantial evidence. (*Beck and Cruz, supra*, 8 Cal.5th at p. 607; *Caro*, at p. 481.)

We consider each of the challenged excusals under these standards.

### a. *Prospective Juror No. J-56*

On his questionnaire, when asked if he had any "beliefs that would affect in some way [his] ability or willingness to serve as a juror in this case," Prospective Juror No. J-56 answered, "Yes," explaining, "I would have a difficult time saying that another human being should be put to death." When asked if there was "anything about the nature of this case that would make it difficult or impossible for [him] to be a fair and impartial juror," he answered, "Yes," explaining, "I do not think that I could assign the death penalty to someone." When asked his general feelings about the death penalty, he again answered: "I do not think that I could award the death penalty to someone. A person should not take another person's life." When asked under what circumstances he believed the death penalty was appropriate, he answered, "I cannot think of any circumstance

that the death penalty is appropriate." When asked if he felt "the death penalty should never be imposed for murder," he answered, "No," explaining, "There might be some combination that might lead me to believe that the death penalty is warranted. At the moment, I cannot think of one, and hope that I never do." J-56 answered "Yes" when asked if he could follow instructions to consider "all of the circumstances surrounding the crime" and "concerning the defendant and his background" before deciding on the penalty, but when asked what he would "want to know about a defendant before deciding" on penalty, he answered, "This is hard to explain since I cannot see myself ever awarding the death penalty," before giving examples of desired information. He answered "No" when asked if he could set aside his own personal feelings and follow the law, explaining: "[I]t would be hard to keep my feelings about sentencing another person to death from my final analysis (and yet follow[] the law as it was explained)." He answered "Yes" when asked if he had any home or work problems "that might interfere with [his] ability to concentrate during this trial," noting in part "the expected stress of knowing that I am part of the decision process for awarding [the] death penalty."

Before voir dire, the trial court explained to the prospective jurors, including Prospective Juror No. J-56, that the defendants had been found guilty of a murder that was not necessarily premeditated and that two special circumstances had been found true. It also identified the two possible penalties and the factors that the jury could consider in determining which penalty to choose, defined mitigating and aggravating evidence, described the weighing process, and explained that "to return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison

61

with the mitigating circumstances that it warrants death instead of life without the possibility of parole."[15]

On voir dire, Prospective Juror No. J-56 stated he would keep an open mind, listen to all of the evidence, and would not automatically vote for either penalty. When discussing his questionnaire, J-56 reiterated that he did not believe "somebody should be able to take somebody else's life." He added, "I think I also mentioned in there that there might be a situation where I think a death penalty would be — or somebody's life could be taken, but I can't think of any offhand." The court explained that under California law there was no presumption as to which penalty was appropriate and described the circumstances under which a juror could vote for the death penalty. It then asked, "If your personal beliefs or feelings were to be in conflict with the California law, do you think you'd be able to set aside your personal beliefs and feelings for this particular trial for this purpose, or do you think that's something you couldn't do?" J-56 replied, "I think it would be very hard for me to do."

In response to questioning by defense counsel, Prospective Juror No. J-56 explained that he could follow "the guidelines that the judge sets up for aggravated and mitigated . . . and come to a conclusion based on those. But even once I come to that conclusion, if it happens to be death, I would still have a hard time." In response to further questioning he said he would be capable of voting for the death penalty, adding, "But, like I said, it would be very hard for me to then go through with it and to cause another person to die because of the result." In response to questioning by the prosecutor, J-56 described

---

[15] Similar opening instructions were given before the voir dire of Prospective Juror Nos. E-45 and F-77.

himself as a "person who's reluctant to award the death penalty even though he . . . might decide that the facts and the guidelines are met."

The prosecutor challenged Prospective Juror No. J-56 for cause and trial court sustained the challenge, stating that "the juror could not tell us that . . . he was willing to temporarily set aside his own personal views.  It would be difficult, but he didn't say he could do that and that is consistent with his answers in the questionnaire. . . [T]he Court finds that he is substantially impaired."

No error appears in excusing Prospective Juror No. J-56 for cause.  Although he expressed a willingness to consider all of the evidence, keep an open mind, and follow the instructions, he also expressed concern he would not be a fair and impartial juror because of his views on the death penalty, and observed that he would find it difficult to vote for the death penalty even if he determined it was the appropriate verdict.  On his questionnaire, J-56 answered "No" when asked if he could set aside his own personal feelings and follow the law, explaining: "[I]t would be hard to keep my feelings about sentencing another person to death from my final analysis (and yet follow[] the law as it was explained)."  On voir dire he was asked, "If your personal beliefs or feelings were to be in conflict with the California law, do you think you'd be able to set aside your personal beliefs and feelings for this particular trial for this purpose, or do you think that's something you couldn't do?"  He replied, "I think it would be very hard for me to do."  He described himself as a "person who's reluctant to award the death penalty even though he . . . might decide that the facts and the guidelines are met."  Substantial evidence supports the trial court's finding that J-56's ability to follow the law would be

substantially impaired. (See *People v. Wall* (2017) 3 Cal.5th 1048, 1063 [upholding excusal of a prospective juror who "repeatedly expressed uncertainty not as to her own views on the death penalty or the appropriateness of the death penalty in any particular case, but as to her ability to impose a death sentence"]; *People v. Duenas* (2012) 55 Cal.4th 1, 12 ["Comments that a prospective juror would have a 'hard time' or find it 'very difficult' to vote for death reflect 'a degree of equivocation' that, considered 'with the juror's . . . demeanor, can justify a trial court's conclusion . . . that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror . . . .' " ' "].)

Moreover, the trial court was in a position, which we are not, to observe Prospective Juror No. J-56 as he gave his responses. (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors"].) Although Silveria asserts no deference should be accorded because the court did not expressly state that it had granted the challenge for cause because of J-56's observed demeanor, the court unquestionably weighed the prospective juror's credibility and qualification to serve in its thorough voir dire questioning and in relying on that voir dire to sustain the challenge. (See *People v. Flores* (2020) 9 Cal.5th 371, 388 (*Flores*) ["The trial court was in the best position to observe [prospective juror] S.M.'s demeanor, vocal inflection, and other cues not readily apparent on the record, and we reasonably infer that the trial court based its decision not only on what S.M. said, but also on how he said it"]; *People v. Stewart* (2004) 33 Cal.4th 425, 451 (*Stewart*) ["a trial judge who

observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record"]; see also *People v. Wilson* (2008) 44 Cal.4th 758, 835 (*Wilson*) ["In evaluating the testimony of the 12 jurors, the trial court necessarily had to assess their credibility"].)

Substantial evidence supports the court's ruling.

### b. *Prospective Juror No. E-45*

On his questionnaire, in response to the question, "Is there anything about the nature of this case that would make it difficult or impossible for you to be a fair and impartial juror here," Prospective Juror No. E-45 answered "Yes," and wrote, "[M]y views on the death penalty." When responding to a question about his "general feelings regarding the death penalty," E-45 wrote, "I do not believe that the death penalty is a deterr[e]nt to murder. I am not sure if we have the right to take a life for a life." He was "strongly against" the death penalty because he did not believe it "does anything to stop a crime and that being incarcerated for life is penalty enough." When asked whether his views about the death penalty had changed substantially in the last few years, he answered, "Yes," explaining, "I find myself thinking there 'may' be special cases where it should be considered." He answered, "Yes" when asked if he adhered to "any religious or philosophical principle that would affect [his] ability to vote for the death penalty as a judgment in this case," explaining, "I don't believe 'we' should play God." E-45 also answered, "Yes" when asked if he would always vote for life imprisonment without the possibility of parole and reject death, "regardless of the evidence presented" at the penalty retrial, explaining, "I don't believe that the death

penalty is the appropriate punishment." When asked "[u]nder what circumstances, if any," he believed "that the death penalty is appropriate," he answered, "It would have to be for someone who is the epitome of evil." When asked if he could see himself, "in the appropriate case . . . choosing the death penalty," he answered, "No," explaining, "I cannot at this time but if give[n] clear cases where it should be applied, I might be able to consider it."

On voir dire, the trial court asked Prospective Juror No. E-45, "[W]hen you initially went back there to deliberate, do you think you would be able to go back there with both penalties as possibilities?" E-45 replied, "Yes — well, I guess on the death penalty I have some issues with that, but I think I could look at what the law requires and — " The court asked, "Would you automatically be closed off as to one penalty when you initially went back there?" E-45 replied, "It's hard to say. Right now, yes, but I haven't seen . . . the evidence, the circumstances." The court said, "From reading your questionnaire, I gather that you do not favor the death penalty, necessarily?" E-45 answered, "Right." The court asked: "You would have more favor toward life without parole. What we want to make sure of is that jurors are not closed off to either penalty, that they actually could conscientiously consider both penalties as possibilities, again, without knowing anything about the facts of the case." E-45 said: "[P]robably the death penalty would be harder. I guess I would need to see more evidence than for the life in prison. So they're not equally balanced." The court subsequently asked: "Assume that the evidence in this case showed that the defendants had deliberately participated in the multiple stabbing of the victim in this case during the course of a robbery and the victim died. . . . [B]ased on that assumption: Do you

think that you would always vote for life without parole and reject the death penalty despite any aggravating evidence that may be presented during the course of the trial?" E-45 replied, "Yes, I think I would vote for life without parole, right." The court asked, "Do you think you would ever vote for death based on that assumption?" E-45 said, "Probably not at this point, no."

The prosecutor challenged Prospective Juror No. E-45 for cause. The court continued voir dire, asking E-45, "Going back to that assumption, the multiple stabbing during a robbery, the victim died and so on. In a situation like that, could you even consider the death penalty?" E-45 replied: "Personally, no. But I guess if I were instructed as far as what the law should be, then I might have to look at . . . changing my beliefs a little bit. I guess I could consider the death penalty." The court subsequently explained that California law "expresses no preference for either penalty. There is no presumption as to which penalty is appropriate in this case." After further colloquy it asked, "[D]o you think that the death penalty could be appropriate in a case such as this, without knowing anything about the case, other than that one assumption?" E-45 replied, "I guess, just with that one assumption, probably not appropriate." The court dismissed E-45, finding that he "is in fact substantially impaired because of his views on the death penalty and it would prevent him from fulfilling his role as a juror according to his oath and the instructions."

No error appears in excusing Prospective Juror No. E-45 for cause. On his juror questionnaire he stated he was "strongly against" the death penalty, and that he would always vote for life imprisonment without the possibility of parole and reject death, "regardless of the evidence presented" at the penalty retrial. Although he believed the death penalty was appropriate

for "someone who is the epitome of evil," he said on voir dire it was "probably not appropriate" for a stabbing death during a robbery. Moreover, "the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror" erroneous. (*People v. Martinez* (2009) 47 Cal.4th 399, 432 (*Martinez*.)

Travis asserts that Prospective Juror No. E-45 did not "indicate he could never vote for" the death penalty. Nonetheless, E-45's "answers provided substantial evidence that [he] could not fairly consider both sides." (*Thompson*, *supra*, 1 Cal.5th at p. 1075.) On his juror questionnaire, when asked, "Is there anything about the nature of this case that would make it difficult or impossible for you to be a fair and impartial juror here," E-45 answered "Yes," and wrote, "[M]y views on the death penalty." He answered "Yes" when asked if he adhered to "any religious or philosophical principle that would affect [his] ability to vote for the death penalty as a judgment in this case," explaining, "I don't believe 'we' should play God." E-45 also answered "Yes" when asked if he would always vote for life imprisonment without the possibility of parole and reject death, "regardless of the evidence presented" at the penalty retrial, explaining, "I don't believe that the death penalty is the appropriate punishment."

On voir dire, the court asked Prospective Juror No. E-45: "Assume that the evidence in this case showed that the defendants had deliberately participated in the multiple stabbing of the victim in this case during the course of a robbery and the victim died. . . . [B]ased on that assumption: Do you think that you would always vote for life without parole and reject the death penalty *despite any aggravating evidence that*

*may be presented during the course of the trial?*" (Italics added.) E-45 replied, "Yes, I think I would vote for life without parole, right." The court asked, "Do you think you would ever vote for death based on that assumption?" E-45 said, "Probably not at this point, no." The court subsequently asked, "[D]o you think that the death penalty could be appropriate in a case such as this, without knowing anything about the case, other than that one assumption?" E-45 replied, "I guess, just with that one assumption, probably not appropriate." This colloquy, particularly Juror E-45's response that he would always vote for life without parole "despite any aggravating evidence that may be presented," provides substantial evidence to support the trial court's ruling.

Moreover, " ' "[t]here is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497.) As the high court has observed, many prospective jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these [prospective jurors] may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Wainwright v. Witt* (1985) 469 U.S. 412, 424–426, fn. omitted (*Witt*).)

Substantial evidence supports the trial court's ruling.

### c. *Prospective Juror No. F-77*

On his questionnaire, when asked his general feelings about the death penalty, Prospective Juror No. F-77 answered, "Against it." He answered "Yes" when asked if he held any "religious or philosophical principle that would affect [his] ability to vote for the death penalty as a judgment in this case," explaining, "The involuntary taking of another's life is wrong." He answered "Yes" when asked if he had any beliefs that would affect his ability or willingness to be a juror, explaining: "I believe our [s]ociety might be better off without the Death Penalty. As a moral matter I do not see that the State has a right to take a life any more than an individual does. Some States have made mistakes. I doubt if the Death Penalty deters murder. I believe the existence of the Death Penalty gives a sanction to murder in [s]ociety." He answered "No" when asked if he would always vote for life imprisonment "regardless of the evidence presented," explaining, "I am open to the evidence." When asked under what circumstances he believed the death penalty was appropriate, he answered: "Hard to come up with any. Death Penalty appears to be state-sanctioned murder." He answered "Yes" when asked if he believed "the death penalty should never be imposed for murder." He answered "No" when asked if he could see himself rejecting life imprisonment and choosing the death penalty, explaining, "Sitting here now I cannot see it but I would always listen to other people's points-of-view." He answered "Yes" when asked if he could set aside any preconceived notions about each penalty and his personal feelings and follow the law.

On voir dire, in response to the court's inquiry, Prospective Juror No. F-77 said he would try to keep an open mind regarding penalty until after he had heard all of the evidence, counsel's

arguments, and the instructions. After noting that F-77 had said he was against the death penalty, the court asked if he would be able to vote for that penalty if after hearing the evidence and engaging in deliberation he thought it was appropriate. F-77 replied: "I would want to keep an open mind and I would listen to arguments. If my opinion on the matter is wrong and I'm persuaded that it's wrong, then I would change my opinion." When asked if he were "closed off" to the death penalty, F-77 observed, "If somebody were to present me with an argument that I found overwhelming and persuasive, then my opinion would change." He explained, "If I were persuaded by another person's argument that my position was wrong, then I would change my position." He identified Charles Manson, whom he described as "a monstrous person with no feelings of remorse," as a person for whom the death penalty might be appropriate "if one was going to make an exception and say one should have the death penalty." In response to the prosecutor's inquiry, F-77 affirmed that he considered the death penalty to be state sanctioned murder. The prosecutor subsequently asked F-77, "[I]t sounds like you already have a position that you would have to be talked out of; is that fair?" He replied, "I would want to listen to all the evidence and I would want to listen to how that evidence had impacted other people and I would see whether my position was wrong."

The prosecutor challenged Prospective Juror No. F-77 for cause, and the trial court sustained the challenge, stating: "[T]he Court finds that the juror is substantially impaired. He has a position and his position is that he would have to be convinced otherwise. He is not here with an open mind. And the Court finds that his attitudes and answers and feelings would make it impossible or at least substantially impair him

71

from being a juror in this case and properly acting as a juror in accordance with the law and his oath."

Travis contends that "the trial court erroneously believed that an acknowledged aversion to the death penalty automatically disqualified" Prospective Juror No. F-77. As can be seen, the record is otherwise and supports the trial court's finding that F-77 would not fairly consider both penalties. Although he answered "Yes" when asked on his questionnaire if he could set aside any preconceived notions about each penalty and his personal feelings and follow the law, and said on voir dire he would try to keep an open mind regarding penalty until after he had heard all of the evidence, counsels' arguments, and the instructions, F-77 made other statements that provided substantial evidence to support the trial court's ruling. On F-77's questionnaire he answered "Yes" when asked if he believed "the death penalty should never be imposed for murder." He also answered "Yes" when asked if he held any "religious or philosophical principle that would affect [his] ability to vote for the death penalty as a judgment in this case," explaining, "The involuntary taking of another's life is wrong." He answered "No" when asked if he could see himself rejecting life imprisonment and choosing the death penalty, explaining, "Sitting here now I cannot see it but I would always listen to other people's points-of-view." On voir dire, F-77 described the death penalty as "state-sanctioned murder." Although he said he would "keep an open mind," he also indicated he already had an opinion on the issue of penalty. He would require an "overwhelming and persuasive" argument during jury deliberations to change his view, an attitude that belies the concept of keeping an open mind while listening to the evidence and entering deliberations. Although he identified Charles Manson as one person for whom

the death penalty might be appropriate, again "the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror" erroneous. (*Martinez, supra,* 47 Cal.4th at p. 432.)

Nor, as Travis further contends, does the circumstance that in cases such as *People v. Ramirez* (2006) 39 Cal.4th 398, 448–449, in which we upheld the trial court's ruling retaining a prospective juror who favored the death penalty, but who "would not 'necessarily be committed from the outset to the imposition of the death penalty' " (*id.* at p. 449), and who "assured the court multiple times that he would not automatically vote for the death penalty and would, instead, reach a decision based upon all of the evidence" (*id.* at p. 448), demonstrate that F-77 was a "suitable juror[]." Although the prospective juror in *Ramirez* initially said that "if the defendant were convicted of first degree murder and found to be eligible for the death penalty, he would vote to impose the death penalty unless he were convinced otherwise" (*id.* at p. 447), upon further examination the prospective juror "acknowledged that he would weigh and consider the evidence presented and base his decision on that evidence and would not vote 'automatically' for anything," "denied that he would always vote to impose the death penalty for first degree murder 'no matter what the circumstances that led to that conviction,' " and "stated that he would not 'necessarily be committed from the outset to the imposition of the death penalty.' " (*Ibid.*) When asked by the trial court if the prospective juror found beyond a reasonable doubt a defendant guilty of first degree murder and found true a special circumstance allegation, " 'would that put you in a position where in every case would you always vote for the death

73

penalty,' " the prospective juror responded: " 'I don't think I could say in every case. I will have to judge each case by its own merits.' " (*Ibid.*) While there are some similarities between the statements in *Ramirez* and the statements at issue here, there are several crucial differences as well: Notably, unlike in *Ramirez*, Prospective Juror No. F-77, described the death penalty as "state-sanctioned murder," and stated that he would require an "overwhelming and persuasive" argument during jury deliberations to change his view.

### d. Standard for assessing substantial impairment

Silveria contends that the trial court erroneously used a different standard to assess whether Prospective Juror Nos. A-69, B-17, C-47, C-67, and G-68, who supported the death penalty, were substantially impaired, than for Prospective Juror Nos. J-56, E-45, and F-77, who opposed the death penalty. He claims for that reason the trial court's rulings are entitled to no deference. We reject the claim.

As a preliminary matter, we note that Silveria does not challenge the trial court's rulings denying his challenges for cause against Prospective Juror Nos. A-69, B-17, C-47, C-67, and G-68. Hence these rulings are not before us. Although he attempts to do so in a footnote in his reply, " '[i]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party.' " (*Rangel, supra,* 62 Cal.4th at pp. 1218–1219.) Even assuming for the sake of argument that the claim was preserved, none of the challenged jurors served on the penalty retrial jury, hence Silveria fails to demonstrate prejudice from any erroneous denial of his challenges for cause. (*People v. Bell* (2019) 7 Cal.5th 70, 94 (*Bell*) ["Where no challenged panelist actually

served on defendant's jury, ' "there is no basis for us to conclude that the jury empaneled was anything but impartial" ' "].)

Silveria does, however, more broadly assert that the trial court used a different standard to assess whether five prospective jurors who supported the death penalty were substantially impaired than it did for three prospective jurors who opposed the death penalty. In making this claim, Silveria essentially contends that the trial court was biased in its death-qualification rulings. He does not point to any place in the record where he objected below on the ground of judicial bias to the manner in which the trial court conducted voir dire for these prospective jurors. Indeed, following the voir dire of Prospective Juror No. B-17, Silveria's counsel expressly asserted that the trial court had been evenhanded in its application of the substantially impaired standard. Counsel also observed that earlier that day the court had excused on its own motion several prospective jurors who it had determined would automatically vote for the death penalty.

Assuming the claim is preserved on appeal, it is meritless. "*Witt* has long been the law and it is clear the court was aware of the appropriate standard to apply." (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) We have concluded, after careful review of the respective questionnaires and voir dire of Prospective Juror Nos. J-56, E-45, and F-77, that the trial court's rulings sustaining the prosecutor's challenges are supported by substantial evidence. (See *ante*, pt. II.B.2.a–c.) We have also reviewed the court's voir dire of Prospective Juror Nos. A-69, B-17, C-47, C-67, and G-68, none of whom served on the penalty retrial jury, and see no indication that the court showed bias in evaluating whether these prospective jurors or Prospective Juror Nos. J-56, E-45, and F-77 were substantially impaired.

Rather, as to each of these prospective jurors, the court conducted thorough voir dire examination to determine whether the prospective juror was qualified to serve and permitted counsel to ask further questions regarding possible disqualifying bias.

Silveria asserts that Prospective Juror No. A-69 was more adamant in his view favoring the death penalty than "some" prospective jurors (presumably referring to Prospective Juror Nos. J-56, E-45, and F-77) were in their view opposing the death penalty, but the court denied the challenge for cause as to A-69 because he said he could consider a life imprisonment penalty. Silveria asserts that the circumstance that the court sustained the challenge as to prospective jurors who opposed the death penalty, "even though they said they could consider the death penalty," demonstrates the court's bias against the defense. Silveria similarly claims that if Prospective Juror No. B-17 was not substantially impaired because he would not automatically vote for the death penalty, then Prospective Juror Nos. J-56, E-45, and F-77 who opposed the death penalty were not substantially impaired because they were not "automatically pro-life," and that if Prospective Juror No. "C-47's responses were sufficient to save him from exclusion . . . , then certainly the responses of the pro-life" Prospective Juror Nos. J-56, E-45, and F-77 "should have saved them as well." As to Prospective Juror No. G-68, Silveria simply asserts that the trial court denied the defense challenge "because, although G-68 was biased in favor of the death penalty, he was not so biased in this case."

These summary assertions fail to consider the prospective jurors' statements in the context of the entire voir dire. Prospective Juror No. A-69 said that although his mind was

leaning toward being closed off to the possibility of a verdict of life imprisonment "knowing that the defendants have been convicted of murder in the first degree and two special circumstances," he would want to hear the mitigating evidence before reaching a penalty decision, and he could conscientiously consider and weigh that evidence. He also explained that his questionnaire opposition to the penalty of life imprisonment without the possibility of parole had been based on a misunderstanding that parole was available for such a sentence. Having learned otherwise during voir dire, A-69 said a verdict of life imprisonment was now "definitely" more possible. Prospective Juror No. B-17 said that he would "have to listen to . . . the testimony" and "make a judgment based on that," agreed with the prosecutor he was "someone who would want to hear all the evidence in a case before rendering" a decision, could think of no reason why he could not be fair to both sides in the case, and said he had not provided an answer on the questionnaire regarding his reasons for supporting or opposing the death penalty because he had "no preference one way or the other." Although he had answered "Yes" when asked on his questionnaire whether the death penalty should be mandatory for murder, he said on voir dire there could be extenuating circumstances that would make the death penalty inappropriate and that he would want to hear and could conscientiously consider the mitigating evidence before reaching a verdict. Prospective Juror No. C-47, who supported the death penalty, agreed with the court that he would be able to "keep an open mind" and "not make up [his] mind until [he had] heard all the evidence in court and the arguments from the attorneys and the instructions on the law and had a chance to go back and deliberate with [his] fellow jurors." He also agreed with the

court that he would be able to "listen with an open mind to all the evidence that was presented" and "conscientiously consider both penalties as possibilities in this case at this point right now without knowing anything else."

By contrast, as delineated above, although Prospective Juror No. J-56 expressed a willingness to consider all of the evidence, keep an open mind, and follow the instructions, he also expressed concern he would not be a fair and impartial juror because of his views on the death penalty, and observed that he would find it difficult to vote for the death penalty even if he determined it was the appropriate verdict. Likewise, although he acknowledged there could be circumstances in which the death penalty would be appropriate, he was unable to articulate on his questionnaire or on voir dire what those might be. He also observed that the "stress" from knowing he would be participating in the decision whether to impose the death penalty would affect his ability to concentrate during the trial. Prospective Juror No. E-45 stated on his juror questionnaire that he was "strongly against" the death penalty, and that he would always vote for life imprisonment without the possibility of parole and reject death, "regardless of the evidence presented" at the penalty retrial. Although he believed the death penalty was appropriate for "someone who is the epitome of evil," he said on voir dire it was "probably not appropriate" for a stabbing death during a robbery. Prospective Juror No. F-77 described the death penalty as "state-sanctioned murder," and said he did not believe it should be imposed for murder. He would require an "overwhelming and persuasive" argument during jury deliberations to change his view, an attitude that is the antithesis of having an open mind while listening to the evidence and entering deliberations. Although he identified

Charles Manson as one person for whom the death penalty might be appropriate, again "the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror" erroneous. (*Martinez, supra,* 47 Cal.4th at p. 432.) And once again, many prospective jurors "simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear,' " but "[d]espite this lack of clarity in the printed record . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Witt, supra,* 469 U.S. at pp. 424–426.)

Silveria asserts that the trial court should have recognized that Prospective Juror No. A-69's credibility was suspect "when he claimed to have acquired a new understanding of the meaning of life without parole during voir dire" because the jury questionnaire described the sentence as "Life Without the Possibility of Parole." "Making such credibility determinations fell squarely within the trial court's province." (*Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 403; see *ibid.* ["The trial court's view that Number 80 would not automatically vote in a particular way does not establish that the court applied an improper or even a different standard than with other prospective jurors"].)

Silveria asserts that Prospective Juror No. C-67 never said "he could set aside his preconceived notions about the death penalty and follow the law," yet the defense challenge for cause was denied. By contrast "the judge granted the prosecutor's challenges for cause of three pro-life potential jurors even though they said they could put aside their preconceived notions about the death penalty."

The United States Constitution "does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729, italics omitted.) Considering Prospective Juror No. C-67's voir dire in its entirety, although he may not have said the precise statement that he could "set aside his preconceived notions about the death penalty and follow the law," he said "Yes" when asked by the court if he would "be able to keep an open mind," "not make up your mind until you've heard all the evidence from all the attorneys here in court, the arguments from the attorneys and the instructions on the law from the Court," and go to the jury room for deliberations "with both penalties as possibilities." Although he "lean[ed] in favor of the death penalty," C-67 answered "Yes" when asked by the court if he would be able to listen to the mitigating "evidence with an open mind and be able to conscientiously consider and weigh that evidence in reaching a penalty phase determination." C-67 also replied, "Yes," when asked by the prosecutor, "Would you be willing, if you are selected as a member of this jury, to consider all of the evidence that comes into this courtroom, listen to it with an open mind, listen to the law the Court instructs on, listen to the arguments of counsel and then go back into the jury room, evaluate that evidence during the process of deliberation and arrive at a verdict as to the appropriate penalty even if that's a difficult thing to do; could you do that?" When asked by the prosecutor, "Is there anything that would prevent you from being fair and impartial in this case?" C-67 replied, "I can't think of anything." Thus, contrary to Silveria's assertion, the circumstance that C-67 did not expressly state that he could "set aside his preconceived notions about the death penalty and follow the law" fails to demonstrate that the trial court used a

different standard to evaluate substantial impairment for C-67 than it did for Prospective Juror Nos. J-56, E-45, and F-77.

By contrast, as delineated above, Prospective Juror No. J-56 said, "[I]t would be very hard for me" when asked if he would be able to set aside "personal beliefs or feelings" that were "in conflict with the California law." He also observed that he could follow "the guidelines that the judge sets up for aggravated and mitigated . . . and come to a conclusion based on those. But even once I come to that conclusion, if it happens to be death, I would still have a hard time." Prospective Juror No. E-45 answered, "Probably not at this point, no," when asked if he would ever vote for the death penalty in a case where "the defendants had deliberately participated in the multiple stabbing of the victim . . . during the course of a robbery and the victim died." When asked if he could "even consider the death penalty" in that situation, E-45 replied: "Personally, no. But I guess if I were instructed as far as what the law should be, then I might have to look at . . . changing my beliefs a little bit. I guess I could consider the death penalty." Prospective Juror No. F-77 described the death penalty as "state-sanctioned murder," said he would require an "overwhelming and persuasive" argument during jury deliberations to change his view, and identified Charles Manson as one person for whom the death penalty might be appropriate.

Silveria asserts the trial court's rulings sustaining the prosecutor's challenges for cause are not entitled to deference because the court did not expressly state that it had granted the challenges for cause to Prospective Juror Nos. J-56, E-45, and F-77 because of their observed demeanor. As discussed above, the court unquestionably weighed the prospective jurors' credibility and qualification to serve in its thorough voir dire questioning

and reliance on that voir dire to both sustain the challenges to Prospective Juror Nos. J-56, E-45, and F-77 and to reject Silveria's challenges for cause to Prospective Juror Nos. A-69, B-17, C-47, C-67, and G-68. (See *Flores*, *supra*, 9 Cal.5th at p. 388 ["The trial court was in the best position to observe [prospective juror] S.M.'s demeanor, vocal inflection, and other cues not readily apparent on the record, and we reasonably infer that the trial court based its decision not only on what S.M. said, but also on how he said it."]; *Stewart*, *supra*, 33 Cal.4th at p. 451 ["a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record"]; see also *Wilson*, *supra*, 44 Cal.4th at p. 835 ["In evaluating the testimony of the 12 jurors, the trial court necessarily had to assess their credibility"]; see *ante*, at pp. 64–65.)

In sum, no judicial bias in evaluating whether Prospective Juror Nos. J-56, E-45, F-77, A-69, B-17, C-47, C-67, and G-68 were substantially impaired is demonstrated.

### 3. *Removal of Juror No. 4*

Silveria and Travis contend the trial court erroneously removed Juror No. 4. We reject the claim.

On her juror questionnaire, Juror No. 4 was asked if she knew or had heard of any anticipated witnesses appearing on a 10–page list, including "Leo Charon." She did not circle Reverend Charon's name. On February 13, 1997, Juror No. 4 told courtroom personnel during a recess that she now realized she knew Reverend Charon. After the rest of the jury had left for the day, and in a hearing with the court and counsel, Juror No. 4 explained that her husband had worked at CityTeam

Ministries in the recovery program with Reverend Charon. She had known Reverend Charon for about 10 years and had socialized with him. She said, "I don't know him intimately, but I just know he's a good man," adding "I didn't know if that would have any effect on me." Travis's counsel mentioned that Reverend Charon had been gone from CityTeam for about four to five years, and Juror No. 4 said, "So has my husband." The court asked, "Is there anything about your friendship or knowledge, your conversations or whatever with [Reverend] Charon that would affect your ability to be fair and impartial both to the prosecution and the defense in this case?" Juror No. 4 replied, "I don't think so." The court asked, "Would you be able to listen to Reverend Charon . . . with an open mind and if something he said seemed to ring true with you, fine, and if it didn't, fine the other way?" Juror No. 4 replied, "Yes." After consulting with counsel at sidebar, the court asked Juror No. 4, "Leo Charon was your husband's boss you think?" She replied, "I know he works side-by-side. . . . My husband could have been his boss." The court asked, "Is there anything about . . . your husband's relationship with Leo Charon that would affect you in this case; do you think?" Juror No. 4 replied, "No." The court thanked the juror and excused her until the next week.

On February 20, in a hearing held outside the presence of the jury, the prosecutor noted that Reverend Charon had stated to separate juries at the first penalty phase that each of the defendants was the most sincere convert he had encountered. Recounting Juror No. 4's statement that Reverend Charon was a good man, the prosecutor expressed concern that the juror had already formed an opinion as to his credibility. The prosecutor observed he was in the position of impugning the Reverend's credibility in front of a juror who had known him for 10 years

and believed him to be a good person. "The People . . . find themselves with a juror who has a close connection to a critical witness [who] the People will have to attack." The prosecutor also expressed concern that Juror No. 4 would be free to express her views regarding Reverend Charon during deliberations.

On March 12, 1997, a second hearing was held with Juror No. 4 after the rest of the jury had left for the day. In response to the court's question, she said she had seen Reverend Charon at a wedding a few months earlier. When asked if she was familiar with his personal life, she said she "thought he was a recovering alcoholic." When asked what she meant by him being a "good man," she explained the men at CityTeam seemed to be able to "talk to him and trust him." The court asked Juror No. 4, "[A]ssume Mr. Charon testifies . . . favorably for the defense. Based on what you know of Mr. Charon, if you were the prosecution, would you feel comfortable with a juror such as yourself based on what you know?" Juror No. 4 replied, "Well, I would definitely have some concerns." She explained: "Because I know him. What I know of him I just wouldn't believe that he would ever lie about any dealings with somebody. So as far as that would go, I would believe that what he was saying he would believe to be true." She answered, "Right," when the court asked, "[I]f Mr. Charon testified under oath you would not believe that he would be capable of telling a lie or misleading anybody?" She later added, "I would tend to believe that what he's saying he believes to be the truth. That doesn't mean you can't be wrong about something." Juror No. 4 also said she could follow the court's instruction not to disclose what she knew about Reverend Charon during deliberations. The court excused her for the day.

The court granted the prosecutor's motion to discharge Juror No. 4 for cause, stating: "The Court is convinced that there is absolutely no juror misconduct and Juror No. 4 did not realize she knew the witness, Mr. Charon, until February 13 of 1997 during the opening statements and then she notified the Court immediately. It's important to note that Mr. Charon's testimony is unlike most witnesses in that it consists not only of his observations and conversations but more importantly his opinion and the credibility of that opinion. . . . . Juror No. 4 . . . would . . . be judging his credibility on facts or factors that are not in evidence and that would be improper in and of itself. Also, just as important she would not be able to get involved in the deliberative process on the issue of Mr. Charon's credibility if and when that issue came up in deliberations. Juror No. 4 has stated . . . she does not believe that Mr. Charon would lie or even mislead anyone . . . . This shows that she has prejudged his testimony or opinion and could not look at it with an open mind."

"Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is 'found to be unable to perform his or her duty.' " (*People v. Bennett* (2009) 45 Cal.4th 577, 621.) A trial court's decision to remove a juror is reviewed by "asking whether the grounds for such removal appear in the record as a demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)

Here Juror No. 4 stated that she had already formed a positive opinion of Reverend Charon's credibility based on matters outside of the courtroom. The court asked Juror No. 4 to assume Reverend Charon testified favorably for the defense, and inquired, "[I]f you were the prosecution, would you feel comfortable with a juror such as yourself based on what you

know?" She replied, "Well, I would definitely have some concerns," explaining: "Because I know him. What I know of him I just wouldn't believe that he would ever lie about any dealings with somebody. So as far as that would go, I would believe that what he was saying he would believe to be true." She answered, "Right," when the court asked, "[I]f Mr. Charon testified under oath you would not believe that he would be capable of telling a lie or misleading anybody." Moreover, as the court recognized, she would not be permitted to engage in deliberations regarding his credibility or fully function as a juror if this issue arose during deliberations. For these reasons, the trial court had good cause to discharge Juror No. 4.

### 4. Challenged Admitted Evidence

#### a. Silveria's former testimony

Travis contends that the trial court erroneously admitted Silveria's first penalty phase testimony regarding the circumstances of Madden's murder at the joint penalty retrial. We conclude there was no error.

As noted, at the first penalty phase, Travis and Silveria had separate juries. As pertinent here, the trial court ruled that if Silveria or Travis testified, they would testify before both juries when discussing the circumstances of the crime. Silveria testified before both penalty juries regarding the circumstances of the capital crime, and was subject to cross-examination by Travis. Neither jury reached a penalty verdict. At the joint penalty phase retrial, Silveria chose not to testify, and the prosecutor introduced the portion of Silveria's prior testimony recounting the circumstances of the crime.

Travis contends that when there are penalty codefendants, "testimony given by a defendant at a [penalty]

trial that ends in a hung jury should not be available for use by the prosecution in its case-in-chief" against the codefendant at the penalty retrial.  Evidence Code section 240, subdivision (a) provides that a person is " 'unavailable as a witness' " when he or she is "(1) Exempted . . . on the ground of privilege from testifying concerning the matter to which his or her statement is relevant."  Evidence Code section 1291, subdivision (a) provides in relevant part:  "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:  [¶] . . . [¶] (2)  The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."**16**

These requirements for admission of the former testimony were satisfied here.  Silveria, having invoked his Fifth Amendment privilege against self-incrimination, was unavailable as a witness at the joint penalty retrial within the meaning of Evidence Code sections 240 and 1291.  (*People v. Butler* (2009)  46 Cal.4th  847,  866,  fn. 9 [the declarant's "invocation of his Fifth Amendment privilege made him unavailable as a witness"].)  Moreover, Travis had the opportunity to cross-examine Silveria at the first penalty phase

---

**16**    Evidence Code section 1291 further provides in relevant part:

"(b) The admissibility of former testimony under this section . . . is not subject to: [¶] . . . [¶]  (2) Objections based on . . . privilege which did not exist at the time the former testimony was given."

with a "motive and interest similar" to that which he had at the penalty retrial. (Evid. Code, § 1291, subd. (a)(2).)

Travis further asserts that Silveria's former testimony should not have been admitted at the penalty retrial because when there has been a hung jury, " 'the status is the same as if there had been no trial.' " "Assuming without deciding this rule applies to the grant of a penalty phase retrial rather than to an unqualified reversal of the entire underlying judgment in a capital case" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1162), it does not override specific statutory provisions such as Evidence Code section 1291, which allows the admission of former testimony when the requirements of section 1291 have, as here, been satisfied. (See *Ramos*, at pp. 1147, 1164 [prior testimony properly admitted at penalty phase retrial under Evid. Code, § 1291].) Although Travis asserts he had "no control" over Silveria's decision to testify at the first penalty phase, there is no such requirement in section 1291 for former testimony to be admissible.

Travis further asserts that even if the first penalty phase testimony of a defendant such as Silveria would generally be admissible against a codefendant such as Travis at their penalty retrial, it was not admissible here because Silveria objected to testifying before both first penalty phase juries, rather than to only his individual jury, regarding the circumstances of the crime, and the trial court erroneously overruled this objection. Travis notes that if defendants had been tried separately, each defendant could have asserted a Fifth Amendment privilege not to testify in each other's separate penalty trial. Travis contends that under these circumstances, Silveria's testimony against Travis was "obtained in an invalid manner" at the first penalty phase, and was therefore improperly introduced against Travis

at the penalty retrial. Travis acknowledges that because defendants were granted a penalty retrial when the first penalty phase ended with hung juries, Travis could not have been prejudiced by any error, and he asserts he does not make this claim "as a direct claim of error."

Even assuming a claim from the first penalty phase is properly before us, it is meritless. Silveria waived his privilege against self-incrimination by testifying at the first penalty phase, and Travis is not in a position to challenge the validity of Silveria's waiver. (See *People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett*) [it is settled that a defendant cannot "object to a violation of another's Fifth Amendment privilege against self-incrimination"].)

The People note that we have recognized a defendant may seek to exclude a *third party's* testimony on the ground "that the trial testimony is coerced [citation], and that its admission will deprive [the defendant] of a fair trial." (*Badgett*, *supra*, 10 Cal.4th at p. 344.) "[T]he primary purpose of excluding coerced testimony of third parties is to assure the reliability of the trial proceedings . . . ." (*Id.* at p. 347.) The "exclusion is based on the idea that coerced testimony is inherently unreliable, and that its admission therefore violates a defendant's right to a fair trial." (*Ibid.*, italics omitted; see *People v. Clark* (2016) 63 Cal.4th 522, 559–560; *People v. Jenkins* (2000) 22 Cal.4th 900, 966–967.) We need not decide whether these principles apply when a *codefendant* testifies because Travis does not rely on this line of authority or claim that Silveria's former testimony was coerced and therefore unreliable. (See *Badgett*, at pp. 346–348 [noting that different exclusionary principles and burdens of proof apply when courts

address a violation of a defendant's 5th Amendment right than when addressing that of a third party witness].)

Rather, Travis asserts that Silveria was offered an "invalid choice" at the first penalty phase by the trial court between not testifying at all or testifying before both juries, and that absent that erroneous ruling Travis would not have had the opportunity to cross-examine Silveria at the first penalty phase, and hence none of Silveria's former testimony would have been introduced against Travis at the penalty retrial when Silveria chose not to testify because it would not have been admissible under Evidence Code section 1291. We have already rejected above defendants' claim that they were entitled to separate penalty retrials, noting that the high court has held joint capital sentencing proceedings do not violate the Eighth Amendment right to an individualized sentencing determination. (*Kansas v. Carr*, *supra*, 577 U.S. at p. __ [136 S.Ct. at p. 644]; see *ante*, pt. II.B.1.) Given this precedent, it is difficult to discern any basis for deeming erroneous a ruling at the first penalty phase requiring either defendant who chose to testify regarding the circumstances of the capital crime to do so before both defendants' penalty phase juries.

Travis contends that if defendants had been tried separately each defendant could have asserted a Fifth Amendment privilege not to testify in each other's separate penalty trial. But the "mere admission of evidence that might not otherwise have been admitted in a severed proceeding" does not render a trial fundamentally unfair. *(Kansas v. Carr*, *supra*, 577 U.S. at p. __ [136 S.Ct. at p. 645; see *id*. at p. 644].) "While 'an important element of a fair trial is that a jury consider *only* relevant and competent evidence bearing'" on the issue of penalty, "a fair trial does not include the right to exclude

relevant and competent evidence." (*Zafiro v. United States* (1993) 506 U.S. 534, 540 [addressing evidence bearing on guilt or innocence].)

Nor, as Travis contends, did the admission of Silveria's former testimony in the prosecutor's case-in-chief at the penalty retrial unduly prejudice Travis by "allow[ing] the prosecutor to repeat the most damaging evidence about the circumstances of the . . . crime over and over again." Although Travis later testified in his penalty retrial defense case and described Madden's murder in detail similar to that provided in Silveria's former testimony, that event could not render Silveria's earlier admitted former testimony "cumulative."

In sum, the trial court properly admitted Silveria's former testimony regarding Madden's murder at the joint penalty retrial.

### b. *Pathologist's testimony*

Silveria and Travis contend that the trial court erroneously permitted Dr. Pakdaman, the pathologist who had performed Madden's autopsy, to opine that Madden's murder was "one of the most atrocious cases" he had ever seen. We reject the claim.

Dr. Pakdaman testified he had performed about 7,000 autopsies during his career, and did not recall each one. The prosecutor asked, "Is this case one that you will ever be able to forget?" Over defendants' unsuccessful objection, Dr. Pakdaman replied, "I've been to court nine times on this case and every time you ask this question I get upset." He explained, "This is one of the most atrocious cases that I've ever seen."

Even assuming the pathologist's opinion that the murder was "one of the most atrocious cases" he had ever seen was

inadmissible, there is no reasonable possibility different penalty verdicts would have resulted absent admission of this statement. (*People v. Lancaster* (2007) 41 Cal.4th 50, 94 [the standard that an "error is reversible if there is a reasonable possibility it affected the verdict . . . is essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24"]; see *People v. Brown* (1988) 46 Cal.3d 432, 448 [the reasonable possibility standard applies "when assessing the effect of state-law error at the penalty phase of a capital trial"].) His statement was brief and isolated. More compelling was his detailed description of Madden's 32 "slash-like superficial cuts" and "stab-like wounds" in his neck, chest, and abdomen, including stab wounds that penetrated his heart and fractured his ribs, and Dr. Stratbucker's testimony that marks made by the stun gun on Madden's thigh were inflicted while he was alive, and that Madden remained conscious "to the bitter end." Given this graphic evidence of defendants' attack on Madden, any error in admitting Dr. Pakdaman's opinion regarding atrociousness was harmless beyond a reasonable doubt.

### c. *Evidence of lying in wait and torture*

Silveria and Travis contend that the trial court erred in allowing the prosecutor to present evidence of and argument on torture and lying in wait at the penalty retrial because Silveria's guilt phase jury had found not true the lying-in-wait special circumstance allegation and had deadlocked on the torture-murder special-circumstance allegation, and Travis's guilt phase jury had found not true the torture-murder special-circumstance allegation, and had deadlocked on the lying-in-wait special-circumstance allegation. We reject the claim.

Evidence of lying in wait and torture was part of the circumstances of the crime and hence admissible under section 190.3, factor (a). Indeed, the high court has held that when a special circumstance the jury has found true is set aside on appeal, no constitutional violation occurs if "one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (*Brown v. Sanders* (2006) 546 U.S. 212, 220; see *id.* at pp. 214–215.)

In *Brown v. Sanders*, the high court considered whether the circumstance that a California jury had found true four special circumstance allegations, including two that were later set aside on appeal, rendered the death judgment "unconstitutional by reason of its adding an improper element to the aggravation scale in the jury's weighing process." (*Brown v. Sanders, supra,* 546 U.S. at p. 214; see *id.* at p. 215.) It observed that under section 190.3, factor (a), the trial court instructed the jury to consider and weigh " '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.' " (*Brown v. Sanders,* at p. 214; see *id.* at p. 215.) The high court reasoned that "because all of the facts and circumstances admissible to establish" the two later invalidated special circumstance allegations "were also properly adduced as aggravating facts bearing upon the 'circumstances of the crime' sentencing factor, . . . [t]hey were properly considered whether or not they bore upon the invalidated eligibility factors." (*Id.* at p. 224.)

Likewise here, all of the aggravating facts and circumstances underlying the special circumstance allegations on which the jury hung or found not true were also properly admitted and considered by the jury as evidence of the

circumstances of the crime under section 190.3, factor (a). Moreover, because this evidence was properly admitted, the prosecutor was free to rely on it in his closing argument. (*People v. Rhoades* (2019) 8 Cal.5th 393, 448 (*Rhoades*) ["The fact that the guilt jury did not unanimously find kidnapping proved beyond a reasonable doubt did not preclude the prosecution from arguing, as a circumstance of the capital crime (Pen. Code, § 190.3, factor (a)), that defendant had in fact abducted the victim . . . ."].)

Travis asserts evidence of torture was precluded by section 190.3, which provides in pertinent part:  "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, . . . the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence . . . . [¶] . . . [¶]  *However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted.*"  (Italics added.)  The italicized language on which Travis relies concerns alleged *prior* criminal activity, not evidence of the circumstances of the capital crime.  Here Travis was found guilty — not acquitted — of the first degree murder of Madden.

Travis asserts there is no rational basis for treating evidence of a special circumstance allegation found not true differently than evidence of a prior crime for which the defendant has been acquitted.  The electorate could rationally conclude that the sentencing jury should consider all of the circumstances of the capital offense even if it or a prior jury had

previously found these circumstances did not satisfy the elements of a special circumstance allegation, but that a prior crime for which the defendant had been acquitted lacked similar relevance.

Silveria asserts that the admission of evidence of torture and lying in wait "retr[ied]" the torture-murder and lying-in-wait special-circumstance allegations and placed him in double jeopardy with respect to those allegations. Not so. The penalty retrial jury was not asked to make findings on whether the elements of these special circumstance allegations had been satisfied. Nor, for this same reason, and contrary to Silveria's further claim, did the admission of torture evidence at the penalty retrial, without first successfully retrying the torture-murder special-circumstance allegation on which Silveria's guilt jury hung, and which was later struck, violate Silveria's right to a speedy trial on that allegation. Once again, evidence of torture and lying in wait was properly admitted at the penalty retrial as a circumstance of the capital crime despite the fact that the guilt phase jury was unable to reach a verdict on or found not true these allegations.

Travis contends that the court erred in not instructing the penalty retrial jury, or allowing him to inform the jury during closing argument, that Travis's guilt phase jury had found not true the torture-murder special-circumstance allegation. There was no error. We have previously held that the "fact that a first jury deadlocked . . . is irrelevant to the issues before the jury on a penalty retrial" (*People v. Thompson* (1990) 50 Cal.3d 134, 178) because such evidence has no bearing on a defendant's character or record, or on the circumstances of the offense (*People v. Hawkins* (1995) 10 Cal.4th 920, 968). For these same reasons, and given evidence of torture was properly admitted at

the penalty retrial, evidence that Travis's guilt phase jury found that the elements of the torture-murder special-circumstance allegation had not been satisfied was irrelevant.

Travis notes that the first penalty jury had also decided Travis's guilt, and so was aware when hearing evidence of torture at the first penalty phase that it had previously found the torture-murder special-circumstance allegation not true. He argues that not informing the penalty retrial jury that the guilt phase jury made this finding unfairly placed the prosecutor in a stronger position and was inconsistent with the general principle that after a jury deadlocks the parties are placed in the same position at retrial as if there had been no original trial. We disagree. In *Brown v. Sanders*, the trial court instructed the jury to consider as one of the sentencing factors " 'the existence of any special circumstances . . . found to be true,' " thus giving the facts underlying the special circumstances "special prominence." (*Brown v. Sanders, supra*, 546 U.S. at p. 224, quoting § 190.3, factor (a).) The high court concluded that even assuming this instruction caused the jury to give somewhat greater weight to those facts underlying a later invalidated special circumstance, any such impact was " ' "inconsequential" ' " and could not " 'fairly be regarded as a constitutional defect in the sentencing process.' " (*Brown v. Sanders*, at p. 225; see *id.* at p. 224.) By analogy, the same lack of consequence would result when the first penalty jury knew as it considered evidence of torture at the first penalty phase that it had previously found the torture-murder special-circumstance allegation not true, but the penalty retrial jury did not have this knowledge when it considered that same evidence.

In sum, the trial court properly admitted evidence of lying in wait and torture.

### d. School loan money scam evidence

Silveria contends the trial court erred in admitting evidence of a loan money scam. We reject the claim.

During the prosecutor's case-in-chief at the penalty retrial, he introduced Silveria's testimony from the first penalty phase recounting that Silveria had attended the Technical Training Center computer school for several months as a full-time student. Silveria explained he had been "attracted" to the school because he would be "able to get some type of loan and there was some type of . . . scam involved at least from the person . . . who brought this up. . . . [Y]ou get this loan and . . . you're supposed to get the balance or something like that. So . . . it sounded good to me." On Travis's cross-examination at the penalty retrial, the prosecutor asked whether he and Silveria had attended computer training school. Travis replied that he, Silveria, and a friend named Pete Rosa had attended the Technical Training Center. Travis explained Rosa, "had come up with a scam to get some type of loan money through this school and asked if we were willing to go with him." The men erroneously assumed they were going to be paid the full amount of a school loan up front, and planned to "quit school" and use the money to buy drugs. After defendants learned they would not receive full loan checks in advance, they decided to "stay anyway," and attended about two months of classes before leaving the school.

On appeal, Silveria contends the trial court erred in permitting Travis's testimony that Silveria had participated in a "scam" to obtain money from a computer school because it was not relevant to any of the factors in section 190.3 or as rebuttal to Silveria's penalty defense case. As noted, Silveria appeared to also describe the loan as a "scam" during his first penalty

phase testimony that was admitted at the penalty retrial. Even assuming for the sake of argument Travis's additional detail regarding the failed monetary scheme was improperly admitted, there is no reasonable possibility the penalty verdict would have been different in the absence of this evidence. The prosecutor did not mention the loan scam in his closing argument, and the evidence was of marginal probative value when compared with the capital crime.

### e. Stun gun evidence

Silveria contends the trial court erred in allowing the prosecutor to attempt to elicit evidence of Silveria's use of a stun gun several days before Madden's murder. He also presents this claim as one of prosecutorial misconduct. We reject the claim.

On direct examination, Travis testified that on about January 24, 1991, several days before Madden's January 28 murder, Travis engaged in a fist fight with a man whom he believed had stolen a "beeper" from Jennings. On cross-examination, the prosecutor asked Travis whether before the fight Silveria, Jennings, or Spencer had "display[ed] the stun gun." Travis answered, "I don't recall seeing the stun gun." The prosecutor subsequently asked whether before the fight Travis, Silveria, Spencer, Jennings, or Rackley had displayed a stun gun and repeatedly hit the "test button." Travis replied, "I don't recall seeing the stun gun there, no." Nor did Travis's review of a document shown to him by the prosecutor refresh his recollection as to whether before the fight he or one of his friends had "displayed a stun gun and kept hitting the test button."

Silveria contends the prosecutor committed misconduct by intentionally seeking "to elicit false stun gun evidence" against Silveria that was inadmissible under section 190.3, and that was misleading because the prosecutor "knew that Rackley was the

person who pulled the stun gun during this incident." He further contends that the trial court erred when it permitted the prosecutor to attempt to elicit this testimony.

There was no misconduct or trial court error. Contrary to Silveria's characterization, the prosecutor's questions regarding the display of a stun gun were not limited to Silveria, and did not imply that Silveria "had committed untoward and possibly criminal . . . acts." Nor, given that Travis had testified regarding the fight on direct examination, did the trial court err in allowing the prosecutor to explore on cross-examination the circumstances surrounding the fight. Even if we were to assume error for the sake of argument, it was harmless beyond a reasonable doubt. Travis repeatedly testified that he saw no one before the fight with a stun gun, and the court instructed the jury at the end of the penalty retrial that "[s]tatements made by the attorneys during the trial are not evidence."

### f. Statutory rape evidence

Silveria contends the trial court erred in allowing the prosecutor to present evidence that Silveria had impregnated Travis's sister when she was 15-years old. We reject the claim.

On cross-examination of D.S., Travis's younger sister, in Travis's penalty defense case, the prosecutor asked D.S. about different events that occurred during a time period when D.S. was 14 or 15 years old. At one point, the prosecutor asked D.S. whether she had "a relationship with [Silveria] at that time?" She replied, "Yeah, I did." The prosecutor asked, "[H]ow was it that you and Danny [Silveria] started going together?" D.S. replied, "Well, he was at my house and . . . I was attracted to him." The prosecutor then asked, "[H]ow old were you at that time?" D.S. replied, "Fifteen is when I got pregnant." The

prosecutor asked, "By Danny?" D.S. replied, "Yes." Silveria's foundation objection was overruled.

Silveria contends statutory rape is not admissible as aggravating evidence under section 190.3, factor (b) or on rebuttal. Assuming Silveria's claim is preserved on appeal by his foundation objection below, it is meritless. Nothing in the prosecutor's question asking D.S. how old she was when she dated Silveria reasonably elicited D.S.'s response that she had been 15 years old when she became pregnant. The prosecutor's brief follow up question simply clarified D.S. meant Silveria was the father, hence she was 15 years old when she dated Silveria. Moreover, the trial court instructed the jury that other than evidence of the robberies of Youssef at Quik Stop Market and Graber at Gavilan Bottle Shop, a "juror may not consider any evidence of any other criminal acts or activity as an aggravating circumstance" under section 190.3, factor (b). We presume the jury understood and followed this instruction. (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1178.)

### g. *Attempted murder evidence*

Silveria contends the trial court erred in admitting evidence of a "highly inflammatory and prejudicial attempted murder by" the Nuestra Familia, "a notorious prison gang." We reject the claim.

At the end of Correctional Officer Lausten's direct examination in Silveria's defense case, he opined that fellow Correctional Officer Jeanine Powell at times lacked an ability to get along with and be an effective correctional officer to the inmates because she engaged in verbal confrontations with inmates and then lost control in the module. She also overreacted to the behavior of mental health patients.

On cross-examination, the prosecutor asked Correctional Officer Lausten if he considered himself an effective correctional officer. Officer Lausten replied, "Yes, sir, I certainly do." The prosecutor then asked whether Officer Lausten knew "who Gabriel Coronado was," and the officer replied, "Yes." When the prosecutor asked how Officer Lausten knew Coronado, Travis objected.

At sidebar Travis's counsel recalled an attack on Coronado had been carried out by four Nuestra Familia members. The trial court ruled that Silveria had opened the door to the evidence, and overruled the objection.

In front of the jury, the prosecutor asked Officer Lausten, "[D]id Gabriel Coronado have his throat cut in your module when you were nearby?" Officer Lausten agreed, clarifying it had been the side of Coronado's neck and not his throat, and that although Officer Lausten had been nearby, he had not seen anything until after the incident because the attack happened quickly and he had been on the telephone with another officer. He further agreed with the prosecutor that events in a jail setting can happen quickly and unpredictably, and said it was "very possible" that sometimes correctional officers do not observe "everything that happens."

On cross-examination by Travis, Officer Lausten agreed with defense counsel that "there were four gang members who hit" Coronado, and that the assault was "very unusual." In Officer Lausten's nine years at the jail no similar assault had occurred.

As can be seen, no reference to the Nuestra Familia prison gang was made before the jury. Rather the gang was only mentioned by Travis's counsel during the bench conference. The import of the prosecutor's line of inquiry on cross-examination

101

was simply to demonstrate that Officer Lausten may have similarly been unaware of events legitimately shaping Officer Powell's reaction to inmates. Although Officer Lausten agreed with Travis's counsel that four gang members had attacked Coronado, the gang to which they belonged was never identified.

In Silveria's reply brief, he acknowledges that the record does not demonstrate that the jury heard the reference to the Nuestra Familia gang. He asserts that "evidence of an unrelated attempted murder by means of a sharp instrument which resulted in cuts to the victim's throat are nevertheless prejudicial since this attack is very similar to the manner in which Mr. Madden was killed." But nothing in Officer Lausten's testimony indicated Silveria was present at or in any way connected to the attack on Coronado.

### 5. *Excluded Mitigating Evidence*

Defendants contend the trial court erred in excluding certain mitigating evidence. We reject the claim.

" 'The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' [Citation.] 'Nonetheless, the trial court still " 'determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury.' " ' (*People v. Williams* (2006) 40 Cal.4th 287, 320 [52 Cal.Rptr.3d 268, 148 P.3d 47]; see *Romano v. Oklahoma* (1994) 512 U.S. 1, 12 [129 L.Ed.2d 1, 114 S.Ct. 2004]

['The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings.']; *Lockett v. Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 98 S.Ct. 2954] ['Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.'].) 'The meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' from what it is in any other context. (*McKoy v. North Carolina* (1990) 494 U.S. 433, 440 [108 L.Ed.2d 369, 110 S.Ct. 1227].) Thus, ' "[r]elevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." ' (*Ibid.*; see Evid. Code, § 210.)" (*People v. Farley* (2009) 46 Cal.4th 1053, 1128.)

### a. *Former juror and alternate juror*

Travis contends that the trial court erroneously excluded testimony by former Travis Juror No. 8 and former Travis Alternate Juror No. A-4 from the guilt and first penalty phase. We conclude there was no abuse of discretion.

### *(1) Factual background*

Travis's first penalty phase ended on February 21, 1996. On November 25, 1996, during a hearing held before the penalty retrial, Travis's counsel made an offer of proof regarding his motion to admit the testimony of former Juror No. 8 and former Alternate Juror No. A-4. He observed that since the mistrial, No. A-4 had visited Travis in jail "probably a couple of times a month." In counsel's view, A-4 knew "more about John Travis than probably anybody else on the face of this earth." A-4 was

expected to testify on "the issue of rehabilitation," and opine that Travis should not be executed because he "can do some concrete, constructive things in his life." "[S]ome months" before the hearing, former Juror No. 8, who had been the jury foreperson and one of two jurors to vote against the death penalty, told Travis's counsel that she also wanted to visit Travis. She had apparently done so, and had "discussed some of the things that [were] important" to Travis. She was expected to testify that Travis was "sincere in what he says," and had "matured beyond" his level at the time of Madden's murder. Both potential witnesses had observed that Travis had "transformed way beyond" the person he was when he murdered Madden. Counsel observed that although Travis had "recently reestablished his relationship with his mother," he "has had in almost six years of custody virtually no visitation from outside people." The trial court precluded testimony by the former juror and former alternate juror.

The court stated: "[T]he Court has gone to great lengths, both in reworking the questionnaire and will in its own voir dire, to keep from the jury in this penalty phase trial the fact of a prior penalty phase, its inability to reach a verdict, the numerical split, and which way the voting went. For the sake of convenience the Court will call this 'prior jury results.' The Court has already ruled that these prior jury results are inadmissible and that witnesses must be warned by counsel not to let these facts come out. And counsel have agreed to this. [The prosecutor] was correct when he stated that calling prior jurors as witnesses is 'fraught with peril.' Calling these jurors increases the possibility of the prior jury results leaking out at least a hundredfold on direct examination alone. The fact and rule of law that cross-examination could rightly go into the basis

of any opinion that a juror would give as to character, reputation, . . . and how they know the defendant, raises the possibility of a leak even more. Add to that fact that the [prosecutor] could then call death voting jurors in rebuttal makes the . . . idea intolerable and completely improper. Once this prior jury result is out the biggest danger of all can be seen. The current jury would be tempted to and could actually abdicate its own duty in favor of a prior jury's findings, even though there was a mistrial. No one could possibly say that this would be proper. For these reasons alone neither the People nor the defense will be allowed to call as witnesses any prior juror, including alternates."

### (2) Analysis

Travis contends that if former Travis Juror No. 8 and former Travis Alternate Juror No. A-4 "had been permitted to testify, the [penalty retrial] jury would have learned that these two witnesses had received detailed information about John Travis' background and about his crimes, from various witnesses who testified at the guilt and penalty phases of the first trial [and] . . . then took it upon themselves, with no expectation of compensation or other benefit, to visit John Travis in the jail on a regular basis, and had continued to do so over a long enough period to give them meaningful insight into the sincerity of his religious conversion, his recovery from addiction, and his desire to help other inmates."

As a preliminary matter, Travis's counsel did not represent at the hearing that the former juror and alternate juror would testify to the "sincerity of [Travis's] religious conversion, his recovery from addiction, and his desire to help other inmates." Rather, counsel broadly described the anticipated testimony: A-4 was expected to testify regarding

"the issue of rehabilitation," and opine Travis should not be executed because he "can do some concrete, constructive things in his life." In counsel's view, A-4 knew "more about John Travis than probably anybody else on the face of this earth." Former Juror No. 8 had "discussed some of the things that [were] important" to Travis, and was expected to testify that Travis was "sincere in what he says." Both potential witnesses had observed that Travis had "transformed way beyond" the person he was when he murdered Madden.[17]

Moreover, Evidence Code section 352 gives the trial court wide latitude to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." When, as here, the potential witnesses and penalty retrial jury share the unique role of jurors (and alternate jurors), a trial court may be legitimately concerned that the proffered character testimony could unduly influence the penalty retrial jury or encroach on its own deliberative process. (See *People v. Peoples* (2016) 62 Cal.4th 718, 758–759 (*Peoples*) ["The trial court could have reasonably concluded that the admission of [the four former jurors'] testimony would be more prejudicial than probative and would confuse jurors for the penalty retrial about the ultimate task"].)

Although Travis contends the trial court did not rely on Evidence Code section 352, it implicitly did so by considering the

---

[17] Travis also cites to a letter dated May 30, 1997, from former Travis Alternate Juror No. A-4 to Travis's probation officer. This information, of course, was not before the trial court when it ruled in 1996.

possibility that allowing Travis to present a former juror and alternate juror could unduly influence the jury and impede the performance of its duty, and lead to time-consuming rebuttal testimony by former jurors who had voted in favor of the death penalty. Nor is a trial court required to " 'expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows,' " as here, that " 'the court was aware of and performed its balancing function under Evidence Code section 352.' " (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.)

For these same reasons we reject Travis's oral argument assertion that the trial court could not make a ruling under Evidence Code section 352 without holding an evidentiary hearing. The primary concern here was not what these witnesses would say when testifying, but who they were. Travis makes no effort to explain how testimony at such a hearing by the former juror and alternate juror would have mitigated the inherent concern that potential witnesses who had previously shared the same unique role as the penalty retrial jury (and its alternates) could unduly influence the penalty retrial jury or encroach on its deliberative process.

In addition, the possibility that allowing such testimony would lead to time-consuming rebuttal testimony by former jurors who had voted in favor of the death penalty or who had a negative view of Travis's character further demonstrates that the trial court acted well within its discretion. (*Peoples*, *supra*, 62 Cal.4th at p. 759 ["The trial court also could have reasonably concluded that their testimony would have opened the door for the prosecution to call other individuals who attended the first penalty trial, thus expending an undue amount of the court's time"].) Although Travis contends that the trial court could

have avoided any prejudice by admonishing the penalty retrial jury "to give no greater weight to the testimony of the proffered witnesses just because they had formerly been a juror and an alternate juror," he did not suggest such an admonition below, nor would its availability eliminate the trial court's discretion to weigh other factors and preclude the testimony.

Nor, as Travis contends, was the preclusion of this testimony *Skipper* error. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 3–5.) In *Skipper*, the high court found prejudicial error in the exclusion of two jailers and one " 'regular visitor' " who would have testified that the defendant had " 'made a good adjustment' during his time spent in jail." (*Id.* at p. 3.) It rejected the argument that the testimony was merely cumulative to similar testimony by Skipper and his former wife, noting that the latter testimony was "the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses — and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges — would quite naturally be given much greater weight by the jury." (*Id.* at p. 8; see *id.* at p. 7.) Here, Travis presented the testimony of two jailers, Correctional Officers Forster and Damewood, regarding his respectful and studious jail behavior, his faithful work as a trustee, and his potential to change the lives of other inmates. (See *ante*, pp. 31–32.) Thus Travis was accorded the most crucial testimony Skipper was denied. (*Skipper*, at p. 8.) For the reasons noted, percipient witness testimony by former jurors and alternate jurors is qualitatively different and inherently more problematic than the jailer or visitor testimony favorably discussed in *Skipper*.

Travis further contends that testimony by a juror is contemplated by Evidence Code section 704.[18] This section provides that when one party calls a sitting juror as a witness, and the other party objects, a mistrial is declared. (Evid. Code, § 704, subds. (b), (c).) Section 704 does not address the circumstances under which the now former juror may testify at any retrial, or limit the trial court's discretion to exclude such testimony under Evidence Code section 352. Here we conclude that when those circumstances involve calling a former guilt and penalty phase juror and alternate juror to testify as character witnesses at the penalty retrial, the trial court acts well within its discretion in precluding such testimony.

---

[18] Evidence Code section 704 provides: "(a) Before a juror sworn and impaneled in the trial of an action may be called to testify before the jury in that trial as a witness, he shall, in proceedings conducted by the court out of the presence and hearing of the remaining jurors, inform the parties of the information he has concerning any fact or matter about which he will be called to testify.

"(b) Against the objection of a party, a juror sworn and impaneled in the trial of an action may not testify before the jury in that trial as a witness. Upon such objection, the court shall declare a mistrial and order the action assigned for trial before another jury.

"(c) The calling of a juror to testify before the jury as a witness shall be deemed a consent to the granting of a motion for mistrial, and an objection to such calling of a juror shall be deemed a motion for mistrial.

"(d) In the absence of objection by a party, a juror sworn and impaneled in the trial of an action may be compelled to testify in that trial as a witness."

In sum, the trial court acted within its discretion in excluding testimony by former Travis Juror No. 8 and former Travis Alternate Juror No. A-4.

### b. *Defense counsel's proposed testimony*

Travis contends that the trial court erred in placing unreasonable conditions on proffered testimony by his trial counsel. We conclude any error was harmless beyond a reasonable doubt.

### (1) Factual background

After the trial court precluded testimony by the first penalty phase juror and alternate juror, and before the start of the penalty retrial, Travis moved to have his trial counsel, James Leininger, either testify on his behalf or withdraw. Travis sought to have Leininger testify "to the issue of [Travis's] moral character[,] to wit: his recovery from alcohol and drug addiction, his commitment to the maintenance of this recovery through the twelve steps of Alcoholics Anonymous, and the practice of these steps in his everyday life, thus reflecting a marked departure from the moral and spiritual bankruptcy he experienced at the time of the crime to [his] present day status of being a child of God in good standing with his Creator." He asserted that "[i]f such testimony is not allowed, John Travis will have no witnesses of his choosing to . . . show[] the change in his moral character." "The true character of the real John Travis who has risen from the grasp of moral depravity to become a remorseful, loving person who can and does every day seek to implement the will of God will never be known to the jury."

At the February 5, 1997 motion hearing, Leininger asserted that Reverend Charon, not Leininger, would testify as

to Travis's "religious progress." Leininger intended to testify about "what [Leininger had] observed about Mr. Travis over a period of years, what [Travis] was like the first couple of years [Leininger] dealt with him, [and] what he was like after that." Leininger asserted that he, Leininger, was the only known witness "who has had any consistent contact with Mr. Travis over the last six years [and] who has any knowledge of recovery or what Mr. Travis is going through." The prosecutor objected to testimony by defense counsel.

The court stated no case precluded Leininger from testifying, but the court believed "it's a completely foolish idea." It observed that in a penalty phase, "the argument to the jury is almost as important as the evidence itself, and if an attorney cannot do that with credibility" because he had previously lost credibility while testifying as a witness, "then that goes to the defendant's definite detriment." The court took the matter under submission, offering the parties guidelines or "pitfalls" to consider before it ruled the following week. Travis would be required to completely waive his attorney-client privilege; if Leininger qualified as an expert, "he will only be able to testify as an expert regarding recovery as a certified alcohol and drug counselor," not regarding religion or "as a character witness"; the prosecutor could request to interview Leininger, and if Leininger refused, the prosecutor could mention that refusal during closing argument; if the prosecutor sought discovery, Leininger's files would "probably" have to be turned over to the court for in camera review; it would be improper for Leininger to argue his own credibility during closing argument; and no continuance would be granted for opening statements scheduled to begin about one week later.

At the next hearing on February 11, 1997, Leininger said he had "sought the advice of others and conveyed this to Mr. Travis and we have had a significant opportunity to talk about the pros and cons. . . . Given the restriction of moral and character evidence not being testified to," Leininger would not testify, but would get another person to assess Travis, and "do the recovery work with [that] professionally-trained person."

### (2) Analysis

We have held that "a trial court may not deny the defendant the right to present . . . evidence through the testimony of his counsel, notwithstanding the provisions relating to testimony by counsel in the Rules of Professional Conduct."[19] (*People v. Marquez* (1992) 1 Cal.4th 553, 574.) Here, the trial court recognized it could not prohibit Leininger's testimony, but Travis argues that the court placed conditions on that testimony that were so onerous they deprived him of critical mitigating evidence.

Assuming for the sake of argument that the trial court imposed these conditions should Leininger testify, and that this imposition was improper, any error was harmless beyond a reasonable doubt. (*People v. Earp* (1999) 20 Cal.4th 826, 879 [any error in barring defense counsel from testifying was harmless in light of other evidence].) Travis asserts that he "intended to offer character evidence in two very narrow areas — [his] recovery efforts and his remorse for the homicide."

---

[19] Rules of Professional Conduct, rule 3.7 provides as relevant: "(a) A lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless: [¶] . . . [¶] (3) the lawyer has obtained informed written consent from the client."

Travis also notes that Leininger's testimony regarding Travis's recovery process "would have added nothing to the similar testimony from Dr. Cermak, [Reverend] Charon, and Sharon Lutman."

We therefore consider whether Leininger would have provided critical evidence on the issue of Travis's remorse. We conclude ample other evidence of remorse was presented. Travis testified at the penalty retrial that he accepted the jury's guilt verdict and had admitted his responsibility for Madden's murder at the time of his arrest. His purpose in testifying was to tell the truth and to let the jury know "that I am remorseful for what I have done." He described what he had done as "heinous," and was "ashamed and humiliated" he had caused others pain. He had unsuccessfully asked his attorney if he could write to the Madden family or seek their forgiveness in court. In addition, Reverend Charon, who had known Travis for about four years, testified that Travis appeared "very remorseful, and was earnestly seeking a way, under the circumstances, that he could express . . . his regret, and also, if there was anything that was possible [for him] to make amends, recognizing that you can never really make full amends." Defense expert Lutman testified Travis had appeared sincere and the most emotional when discussing his desire to make amends to Madden's family. Although this testimony by Travis, Reverend Charon, and Lutman could be viewed by the jury as self-serving or biased, Leininger — who had represented Travis for six years — would have also reasonably been viewed as closely aligned with Travis and not as an objective and disinterested witness.

To the extent Travis asserts Leininger would have testified regarding Travis's transformation in jail, ample

evidence in this area was also otherwise adduced. Two jailers, Correctional Officers Forster and Damewood, testified regarding Travis's respectful and studious jail behavior, his faithful work as a trustee, and his potential to change the lives of other inmates. (See *ante*, pp. 31–32.) In addition, Travis testified that after the failed escape plan, he realized he had been "making the wrong decisions," and "started thinking real hard about what I want[ed] to do with my life." He began recovery and started learning about AA and Narcotics Anonymous, although no AA meetings were available where Travis was housed. Travis further testified that he also began to work with Reverend Charon. He said he had participated in the jail's Tutor Program that helped inmates learn to read and do math. He often shared his message of recovery with these individuals. It was Travis's "heart's desire . . . to help those who have been in the same situation I have." Travis's sister D.S. testified she saw Travis shortly before Madden's murder, and said his "eyes looked dead and he looked like he [had] lost his soul," and he appeared to be cold, distant and "mad at the world." By contrast, D.S. had visited Travis in jail, and testified, "[H]e's got . . . this glow," and there was hope in his eyes.

In sum, we conclude any assumed error in any conditions placed on defense counsel Leininger's proposed testimony was harmless beyond a reasonable doubt.

### c. *Silveria's statement to police*

Silveria contends that the trial court erroneously excluded his statement to police, and thus mitigating evidence that on the night of his arrest he had acknowledged his involvement in and expressed remorse for Madden's murder. He further claims that the exclusion of this evidence is a consequence of the trial court's

erroneous denial of his penalty retrial severance motion. (See *ante*, pt. II.B.1.b.) We reject the claim.

At the guilt phase, each defendant's statement was played for his jury. When the trial court denied Silveria's penalty retrial severance motion, it ruled that the prosecutor could not introduce Silveria's (or Travis's) statement to police in his case-in-chief because of confrontation clause concerns,[20] but could

---

[20] We have previously assumed without deciding that the confrontation clause applies to penalty phase evidence. (*Rangel*, *supra*, 62 Cal.4th at p. 1232; *People v. Fuiava* (2012) 53 Cal.4th 622, 720; see *Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1165, 1176 [applying the *Aranda/Bruton* rule to cross-examination by the prosecutor of Hajek's penalty defense expert, a clinical psychologist, who repeatedly testified on cross-examination that Hajek had denied killing the victim]; *id.* at p. 1177 [holding Hajek's statement to his psychologist that he did not kill the victim did not facially incriminate Vo because its "incriminatory effect depended entirely on its linkage to other evidence"].) We do so again here.

In *Bruton v. United States* (1968*)* 391 U.S. 123, 127–128, 137, as later limited by *Richardson v. Marsh* (1987) 481 U.S. 200, 208–209, the United States Supreme Court held that the admission into evidence at a joint trial of a *nontestifying* codefendant's confession incriminating the defendant on its face violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. We reached a similar conclusion in California three years before *Bruton* in *People v. Aranda* (1965) 63 Cal.2d 518. We have, however, held that "[t]o the extent that our decision" in *People v. Aranda*, regarding redaction or exclusion of the out-of-court confession of a defendant that implicates a codefendant, "constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the

introduce portions of Silveria's first penalty phase testimony for which Travis had been present and had the opportunity to cross-examine Silveria. (Evid. Code, § 1291, subd. (a); see *ante*, p. 87; *People v. Stevens* (2007) 41 Cal.4th 182, 199 ["The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination"]; see *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 (*Crawford*).) The court subsequently raised the issue that this former testimony might at times refer to Silveria's excluded statement to police. After hearing argument by the parties, the court barred any reference to Silveria's statement to police during the reading of the transcript of Silveria's former testimony.

In light of the court's ruling barring any reference to Silveria's statement to police during the prosecutor's presentation of Silveria's former testimony, and apparently to avoid opening the door to other portions of Silveria's statement to police being admitted, Silveria withdrew his own pending motion to introduce Silveria's statement to police. Silveria's counsel asked that Silveria simply be permitted to ask Santa Clara Sergeant Ted Keech, who had interviewed Silveria after his arrest and would at that point need to be recalled as a witness, whether Silveria had admitted his participation in the LeeWards robbery and murder. The court ruled that Silveria would be permitted to ask this question, and also ruled that the prosecutor would be permitted to ask Sergeant Keech one question regarding whether Silveria had minimized his

---

'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d) [now § 28, subd. (f)(2)])." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

participation in the crime. Sergeant Keech was not recalled, and hence was not asked whether Silveria had admitted his participation in the LeeWards robbery and murder.

There was no error. The record reveals that once the court had barred all reference to Silveria's statement to police during the reading of Silveria's former testimony, Silveria understandably sought to avoid opening the door to evidence of the damaging portions of his statement to police, such as inconsistencies between his statement and his former penalty phase testimony, and withdrew the motion to admit the statement. Moreover, Silveria received the opportunity to present the evidence he now claims was precluded. Thus, the trial court ruled that Silveria could ask Sergeant Keech, who had interviewed Silveria on the night of his arrest, whether Silveria had admitted his participation in the LeeWards robbery and murder. Silveria chose not to ask this question.

For these same reasons we reject Silveria's further arguments that exclusion of his statement to police was "fundamentally unfair under the Fourteenth Amendment," and that denial of his penalty retrial severance motion erroneously precluded him from presenting mitigating evidence in his statement to police of his "early acknowledgement of guilt" and "expressions of remorse for the murder on the night of his arrest." In his reply, Silveria asserts that during deliberations the jury asked to see his confession, demonstrating it "was important to the jury's determination of penalty."[21] As can be seen, Silveria withdrew his motion to admit his statement to police, and failed to recall Sergeant Keech as a witness to ask

---

[21]     In the note, the jury requested "[a]ny police reports from his initial arrest — confession?"

him whether Silveria had admitted his participation in the LeeWards robbery and murder.

Moreover, even assuming for the sake of argument there was error, there was no reasonable possibility Silveria was prejudiced. Silveria's introduction of his early acknowledgement of guilt in his statement to police would have allowed the prosecutor to introduce the remainder of Silveria's statement, including his initial repeated denials of involvement in Madden's murder and inconsistencies between the statement and Silveria's former testimony regarding his description of the murder. In addition, Silveria presented other evidence of his early acknowledgement of guilt. On direct examination at the penalty retrial, Sergeant Keech testified that after meeting Silveria (and his coperpetrators), he had received certain information that caused him to direct an officer to return to LeeWards to seize a gas can. On cross-examination by Silveria, Sergeant Keech testified that he had interviewed Silveria early on the morning of January 30, and agreed with defense counsel that it was during this interview that Sergeant Keech first learned of the significance of the gas can and where it was located.[22] This indicates that Silveria had acknowledged involvement with the murder during the interview.

Silveria also presented ample evidence of his remorse. His former testimony that was read to the jury at the penalty retrial recounted that Silveria did not believe causing Madden pain with the stun gun was "right," and felt "horrible for doing it,"

---

[22] In his first penalty phase testimony that was introduced at the penalty retrial, Silveria said the perpetrators brought a gas can to burn the store down, but Silveria decided it was not needed and the can was left outside near a trailer.

that Silveria felt "sick" about participating in Madden's murder, and "horrible" about the effect of the murder on Madden's family. Silveria did not feel that anything that had happened to him in his life was an excuse for what he did on the night of Madden's murder, but rather that he "should be held accountable for what [he] did," and "deserve[d] whatever punishment [was] given to" him. In addition, Patricia Gamble testified that on several occasions Silveria said that he was sorry, was praying for the Madden family, and "knows how it feels to grow up without a father and that it hurt him to know that Julie [Madden's daughter] now would not have a father to grow up with." Morrella, Silveria's former girlfriend, testified that Silveria said he felt "very bad about the fact that Julie," Madden's young daughter, "was going to grow up without a father," that "he had been praying for the family and that he . . . felt terrible and that he was just continuously praying for them. He was very remorseful." Correctional Officer Bergado recalled Silveria appearing distraught and explaining to the officer, "I'm just really . . . sad . . . for the family of the victim," he was "asking for forgiveness and he's sorry for what he did and he feels sorry for the family of his victim and his family." Reverend Charon testified that he and Silveria periodically discussed Silveria's remorse about Madden's murder and Silveria's concern for Madden's wife and family. Thus, Silveria fails to demonstrate that denial of his severance motion or any assumed denial of his motion to introduce his statement to police precluded him from presenting "important mitigating evidence."

### d. *Spiritual evidence*

Silveria contends that the trial court erroneously excluded mitigating evidence of his interest in Christianity and the Bible. We reject the claim.

During the testimony of Julie Morrella, Silveria's former girlfriend who visited him in jail after his arrest, the trial court sustained hearsay objections on several occasions when she recounted Silveria's statements to her. Even assuming for the sake of argument that these rulings were erroneous or a "mechanistic" application of the hearsay rule, as Silveria asserts, he was not thereby precluded from introducing mitigating evidence of his interest in Christianity and the Bible. Rather, Morrella testified that at some point she and Silveria began to discuss Christianity, and these conversations occurred at least once a week over a period of time. Silveria was very excited about Christianity and animated during their religious discussions. He quoted scripture and began to bring the Bible and other Christian literature to their meetings. In Morrella's view, Silveria responded "appropriate[ly]" when Morrella told him she was a Christian and that she had a "real sense of peace with the Lord by [her] side." They discussed the relevance of the Bible today and the "ways that it could actively work in [their] lives," including its relevance to Silveria's life in jail.

This testimony was similar to the excluded testimony that Silveria told Morrella "he was really excited because he had started reading the Bible, Silveria "mentioned that he was starting with the Old Testament," Silveria said, " 'Gosh, I just read a really good book,' " and Morrella's testimony, "[S]ince he started reading the Bible, he would bring in something" and "He would usually discuss with me what he had been reading, what he had been learning." Thus, even assuming exclusion of these statements was erroneous, there is no reasonable possibility the penalty verdict would have been different had this testimony been admitted. (See *People v. Brown, supra,* 46 Cal.3d at p. 448.)

### e. *Limitation on time period of Morrella's testimony*

Silveria summarily contends the trial court erred in precluding Morrella from testifying regarding any jail visits to him between the end of the first penalty phase in February 1996 and the time of her testimony at the penalty retrial in March 1997 under Evidence Code section 1252.[23] He does not identify when this ruling was made or note whether he objected to it. He simply quotes a sidebar discussion during Morrella's testimony in which the trial court stated without objection: "I won't tolerate any evidence or accept any evidence of visits between this witness and the defendant between February of '96 and the present under 1252." No prejudicial error is demonstrated.

"Although defendant had a constitutional right to have the jury hear all mitigating evidence counseling against the death penalty, 'a capital defendant has no federal constitutional right to the admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination.' " (*Peoples*, *supra*, 62 Cal.4th at p. 757.) Thus, "statements by a defendant to a third party regarding the defendant's state of mind can be admissible, but not when made under circumstances that indicate a lack of trustworthiness. (Evid. Code §§ 1250, 1252.)" (*Ibid.*)

In *Peoples*, we held that the trial court could reasonably conclude the defendant's hearsay statements of remorse made

---

[23] Evidence Code section 1252 provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

to two pastors after the defendant's attorneys had begun working on the case were unreliable. (*Peoples*, *supra*, 62 Cal.4th at pp. 755, 758.) Similarly here, the trial court could reasonably find that statements made by Silveria to Morrella while he awaited his penalty retrial were made under untrustworthy circumstances. Moreover, as can be seen, Morrella was permitted to testify regarding Silveria's expressions of remorse and religious commitment made during a different period of his incarceration, hence any assumed error was harmless beyond a reasonable doubt.

### f. Letter to Morrella

Silveria contends the trial court erroneously excluded mitigating evidence of a letter he wrote to Morrella expressing remorse about the capital crimes. We reject the claim.

The letter does not meaningfully differ from Morrella's testimony about Silveria's statements of remorse. In the letter Silveria states: "I wrote the victim[']s (Jim's) family a letter expressing how [I] feel about the tragedy I've caused them. It was written from the heart and is how I feel. I just hope they are receptive when the[y] get it. Julie it was very hard for me to write it[.] But I wanted them to know that I'm not insensitive to their feelings." Morrella testified that during their jail visits, Silveria told Morrella he felt "very bad about the fact that Julie," Madden's young daughter, "was going to grow up without a father." Silveria told Morrella "he had been praying for the family and that he . . . felt terrible and that he was just continuously praying for them. He was very remorseful." Given Morrella's testimony, any assumed error in precluding admission of the letter from Silveria to Morrella was harmless beyond a reasonable doubt.

### g. *Letters to Munoz and the Madden family*

Silveria contends that the trial court erroneously excluded mitigating evidence contained in his letters to Elizabeth Munoz (the Heberts' neighbor) and to the Madden family. We reject the claim.

Silveria did not testify at the penalty retrial. Munoz identified a letter dated April 10, 1995 as one she had received from Silveria, but she was not asked to testify regarding its content. There was no testimony regarding the letter to the Madden family. Silveria attempted to show the Madden family letter to Reverend Charon during Travis's penalty retrial defense case, but the trial court ruled he would need to recall Reverend Charon as a witness. Reverend Charon was not recalled. At the end of the penalty retrial, Silveria sought to have both letters admitted, and the court excluded them because they lacked foundation.

Silveria contends that the trial court "knew full well" that Silveria had written the letters and had laid the foundation for their admission during the original penalty phase. Even if correct, Silveria was still required to lay a foundation for the letters at the penalty retrial. (See *People v. Mattson* (1990) 50 Cal.3d 826, 849–850 [At a new trial, "[a]bsent a statutory provision precluding relitigation, a stipulation by the parties, or an order by the court that prior rulings made in the prior trial will be binding at the new trial, . . . the court must consider the admissibility of . . . evidence at the time it is offered"].) Silveria nonetheless asserts the trial court "relied upon a mechanistic application of the rules of evidence to prevent the jury from considering mitigating evidence of [Silveria's] background, his

shame, remorse, and request for forgiveness from the Madden family."

As to the Madden family letter, there is no name to whom the letter is written in the salutation, nor does Silveria use the names of Madden's wife or daughter in the letter. Nor was there evidence that the letter was ever even mailed. In the letter, Silveria states that "one act of violence does not portray or even remotely describe how I've [b]een raised or the person I am today"; he prays for the family frequently; he's "not insensitive to your family's feelings and it's very hard for me to think of a certain little girl growing up without a Dad — I do know how that feels"; he wants "you, your daughter, and loved ones to know that I'm at a loss for words when trying to describe how ashamed and saddened I feel now and every time I think of Jim and your family"; he would "welcome a life in prison over the misery I've caused you and both our families"; and he asks for their forgiveness.

In the five-page Munoz letter, Silveria discusses a variety of topics. As to his spiritual life, he stated "the Father Jesus has done [immensely] more than make up for any pain and suffering that I may [have] gone through growing up"; that despite the "pain and suffering" that Silveria had caused others, "the Lord has given me the greatest gift of all, eternity with Him and a peace and joy now that is [inexpressible]"; recounted a line from a Christian song he liked; and noted two men whose sermons he enjoyed.

There was no error. The letters lacked foundation and were inadmissible hearsay. Moreover, as noted, "[a]lthough defendant had a constitutional right to have the jury hear all mitigating evidence counseling against the death penalty, 'a capital defendant has no federal constitutional right to the

124

admission of evidence lacking trustworthiness, particularly when the defendant seeks to put his own self-serving statements before the jury without subjecting himself to cross-examination.' " (*Peoples*, *supra*, 62 Cal.4th at p. 757.)

In addition, any assumed error in excluding these letters was harmless beyond a reasonable doubt. As to the letter to Madden's family, significant evidence of Silveria's remorse and spirituality was presented at the penalty retrial. Evidence of remorse included Silveria's first penalty phase testimony that after his arrest, he assisted Officer Hyland in apprehending Spencer and Jennings; that Silveria did not believe causing Madden pain with the stun gun was "right," and felt "horrible for doing it"; that Silveria felt "sick" about participating in Madden's murder, and "horrible" about the effect of the murder on Madden's family; and Silveria did not feel that anything that had happened to him in his life was an excuse for what he did on the night of Madden's murder, but rather that he "should be held accountable for what [he] did," and "deserve[d] whatever punishment [was] given to" him. In addition, Morrella, Silveria's former girlfriend, testified that Silveria said he felt "very bad about the fact that Julie," Madden's young daughter, "was going to grow up without a father," that "he had been praying for the family and that he . . . felt terrible and that he was just continuously praying for them. He was very remorseful."

As for Silveria's spirituality in jail, the evidence included Reverend Charon's testimony that it "would be very difficult" to feign the level of study and depth of interest Silveria had shown over the years in Christianity. Patricia Gamble testified that she and Silveria both studied the Bible and shared with each other what they had learned. Silveria exhibited "an excitement

and a real joy about what he was learning." Morrella testified that Silveria was very excited about Christianity and animated during their religious discussions. Correctional Officer Bergado and Silveria had for several years discussed Christianity and lessons Silveria had learned from the Bible.

### h. Psychiatric expert

Silveria contends that the trial court erred in limiting the testimony of Dr. Kormos, his psychiatric expert and thereby precluding evidence that would have demonstrated "how the neglect, deprivation and physical and sexual abuse [Silveria] suffered throughout his childhood affected his conduct on the day of the crimes," how Silveria's "relationship with co-appellant Travis, and the other co-defendants, affected [Silveria's] conduct at the time of the crimes," and how Silveria had positively developed in the six years since the crimes. He also claims that the trial court erred in allowing the prosecutor to ask Dr. Kormos about Madden's murder. We reject the claim.

### (1) Factual background

Dr. Kormos testified at the first penalty phase before only Silveria's jury. At the joint penalty retrial, Dr. Kormos testified that he had relied in part on Silveria's first penalty phase testimony in forming his opinion that Silveria suffered from a continuing condition of child neglect. Dr. Kormos's testimony for that day ended.

In hearings outside the jury's presence, the question arose whether Dr. Kormos could rely on Silveria's former testimony as a basis for his opinion given portions of this former testimony regarding Silveria's childhood had not been admitted at the penalty retrial. The parties also broadly discussed whether the circumstance that Dr. Kormos had reviewed Silveria's and

126

Travis's statements to police — which had also been excluded at the penalty retrial — would give rise to *Aranda/Bruton* or confrontation clause issues for Travis (see *ante*, p. 115, fn. 20) and unduly limit his and the prosecutor's cross-examination of Dr. Kormos because they could not cross-examine Dr. Kormos about the excluded statements to police. Silveria's counsel, Mr. Geoffrey Braun, asserted he did not intend to ask Dr. Kormos about defendants' statements to police and argued that there were no confrontation clause issues with the unadmitted portion of Silveria's former testimony because none of his statements concerning "what [had] happened in his life" implicated Travis. The prosecutor disagreed, asserting that to properly cross-examine Dr. Kormos as to whether Silveria had an antisocial personality disorder rather than a condition of child neglect, he would need to point out inconsistencies Silveria had made in his former testimony and Silveria's statement to police.

The court expressed concern to Silveria that the prosecutor "cannot properly and fully cross-examine your witness, because he cannot get into the areas and some of the documents that your witness has considered" because of Travis's "constitutional rights." The trial court stated Silveria had two choices, i.e., to either have the court strike Dr. Kormos's testimony from the previous day or to pause Dr. Kormos's testimony until Silveria decided whether he would testify.[24]

---

[24] If Silveria testified, *Aranda/Bruton* would not bar the jury from hearing evidence of Silveria's statement to police that inculpated Travis because Travis could cross-examine him regarding it. (See *Crawford, supra*, 541 U.S. at p. 59, fn. 9

The prosecutor suggested as a compromise that Dr. Kormos make no reference to having considered the defendants' statements to police, which again had not been admitted at the penalty retrial, and not discuss what Silveria had said about Travis, and that the prosecutor and Travis inquire "into inconsistencies without specifying that they came from a source the jury is not to know about." The prosecutor acknowledged that "the People's right of full cross-examination would be restricted, but so long as we are allowed the opportunity to develop from the witness that . . . there have been inconsistencies in what Silveria has related," and Dr. Kormos was subject to recall, he was prepared to proceed.

Silveria rejected this option. The trial court stated Silveria had three options. He could (1) strike Dr. Kormos's testimony, (2) give Silveria time to consider whether he would testify, or (3) agree to the prosecutor's proposal.

After the parties privately negotiated, they agreed to a fourth option that included the following terms. Dr. Kormos would not testify regarding Madden's murder on either direct or cross-examination. Silveria had turned 21 years old on December 22, 1990, the month before Madden's murder. To avoid recounting any statements about the January 1991 crime, Silveria's counsel would limit any diagnosis by Dr. Kormos to information up to December 22, 1990 or Silveria's 21st birthday. Silveria's counsel stated: "I need not ask the doctor questions about his diagnosis of Mr. Silveria subsequent to the time of the

["[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements"].)

128

crime, that is, during the time he was in jail." The People would "be allowed to cross-examine regarding any possible differential diagnosis up to that same point in time based on the same information." Dr. Kormos would be subject to recall. The parties agreed to this stipulation, and Dr. Kormos's direct testimony resumed.

The prosecutor reserved his cross-examination. On redirect examination, Silveria asked Dr. Kormos whether he believed persons who had suffered about the same "degree of abuse that Mr. Silveria suffered according to what you know about his life, . . . would indeed suffer from severe psychiatric and psychological problems later in life." Dr. Kormos replied: "Yes. I would estimate a solid majority." Silveria also asked, "Would it include criminality?" Dr. Kormos replied, "It could very well include criminal behavior." Silveria also asked Dr. Kormos whether "that kind of a background would impair Mr. Silveria's, or anyone who has grown up with a similar background, ability to make rational choices later in life." Dr. Kormos replied: "Yes. I think that there would likely be such distortions in his views of the world that his decisions are likely to be skewed." He subsequently added, "I think their entire world view would be impaired, and that would certainly have an effect on all decisions they make." At sidebar, the court indicated it did not "think anybody has gone beyond the agreement." Silveria rested.

After Travis testified and rested his defense case, the trial court allowed the prosecutor to recall and cross-examine Dr. Kormos limited to "what was brought up on direct examination" by Silveria and cross-examination by Travis. The prosecutor asked whether Dr. Kormos had spoken with Silveria "about the circumstances of the crime." Silveria objected. At

sidebar, Silveria's counsel asserted that "what Mr. Silveria may have said about the crime . . . creates insurmountable Sixth Amendment problems." The court ruled that because Silveria had asked "later in life" questions, he had opened the door, and the prosecutor could explore, after laying an appropriate foundation, whether Silveria had been inconsistent in his statements regarding the circumstances of the crime.

The prosecutor asked, "In formulating the opinions that you've testified about your assessment and diagnosis of Mr. Silveria would it be important to you if he lied to you . . . about aspects of how he committed this crime?" Dr. Kormos replied, "[I]t would be important to me to know whether Danny Silveria lied to me, but . . . I would also consider it important as to why he lied and how he lied." The prosecutor subsequently said to Dr. Kormos that he would be asking him "in a moment about what Mr. Silveria told you that he did in a particular aspect of the commission of the crime," and asked Dr. Kormos if he understood. Dr. Kormos said "Yes." The prosecutor said he was not asking Dr. Kormos "about anything that [Silveria] said anyone else did," and Dr. Kormos again said he understood. The prosecutor then asked, "What did Mr. Silveria tell you about his use of the stun gun on Jim Madden during the commission of this crime?" Dr. Kormos replied, "Danny told me that he had used the stun gun . . . on the victim while the crime was being committed," and clarified that he had used the stun gun while the stabbing was being carried out. Dr. Kormos also agreed with the prosecutor he was aware of sworn testimony by Silveria in which he said he had "used the stun gun in some type of an effort to knock Mr. Madden out before any stabbing," and replied, "[Y]es," when asked if these two statements appeared to be inconsistent. The prosecutor then asked if that inconsistency,

and the fact that deceit and manipulation are central features of an antisocial personality disorder, caused Dr. Kormos to change his opinion that the best diagnosis of Silveria was child neglect rather than antisocial personality disorder. Dr. Kormos replied: "No. It would not change my opinion."

### *(2) Analysis*

As described above, the trial court sought (in light of confrontation clause concerns) to preclude statements by Silveria to law enforcement or to Dr. Kormos, or made in the unadmitted portion of Silveria's first penalty phase testimony, that implicated Travis, and to assure adequate cross-examination by the prosecutor and Travis. Silveria asserts that the trial court erred in limiting Dr. Kormos's testimony to the period before December 22, 1990, or Silveria's 21st birthday. Silveria contends that this limitation was improper because there was no risk that Travis's confrontation clause rights would be violated by testimony (1) explaining how the neglect and abuse Silveria suffered as a child, and his relationship with Travis and the other perpetrators, affected his conduct on the day of Madden's murder, and (2) delineating Silveria's positive development in the six years since the crime. He asserts, relying on *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), that the trial court erred in not specifically considering Dr. Kormos's proposed testimony and excluding "only those portions that would have 'presented, as facts, the contents of the testimonial hearsay statements.' "[25]

---

[25] "Although the court in *Crawford* 'did not offer an exhaustive definition of "testimonial" statements,' the court has since clarified that 'a statement cannot fall within the

As described above, the record demonstrates that the parties broadly focused on finding a solution that would keep Dr. Kormos as a witness, allow Travis and the prosecutor adequate cross-examination, and avoid infringing on Travis's

---

Confrontation Clause unless its primary purpose was testimonial' (*Ohio v. Clark* (2015) 576 U.S. ___, ___–___ [135 S.Ct. 2173, 2179–2180 [192 L.Ed.2d 306, 135 S.Ct. 2173, 2179–2180]]) — that is to say, unless the statements are given in the course of an interrogation or other conversation whose ' "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." ' " (*Rangel, supra,* 62 Cal.4th at p. 1214.) "Under this test, '[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.' " (*Ibid,* quoting *Ohio v. Clark, supra,* 576 U.S. 237, 249.)

In *Sanchez, supra,* 63 Cal.4th at page 686, this court held that an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (See *People v. Powell* (2018) 6 Cal.5th 136, 175, 177 (*Powell*) [trial court acted within its discretion in precluding the defendant's psychologist from testifying at the penalty phase about the defendant's self-serving statements to him that were offered for their truth].) "If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez,* at p. 686.) In *Sanchez,* we disapproved *People v. Gardeley* (1996) 14 Cal.4th 605, which had been recently decided at the time of the March 1997 hearing below, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez,* at p. 686, fn. 13.)

confrontational rights.  Moreover, the trial in this case preceded the high court's 2004 decision in *Crawford*, *supra*, 541 U.S. 36, hence the parties did not use the term "testimonial."  For these reasons the trial court was not asked to rule on whether any specific statement by Silveria was testimonial, and therefore could not have erred in failing to do so.

Silveria asserts that the prosecutor and Travis knew when Dr. Kormos testified at the first penalty phase that he had reviewed defendants' statements to police, but at that time expressed no concern for Travis's "rights," or presumably Travis's right not to be implicated by Silveria's testimonial hearsay statements and his right to adequate cross-examination.  (See *ante*, p. 131, fn. 25.)  Dr. Kormos testified at the first penalty phase only before Silveria's jury; Travis was not present.  Given Travis's absence, the prosecutor would not have had any reason to raise this issue.

Silveria also asserts that Travis fully cross-examined Silveria at the first penalty phase, hence there could be no confrontation clause issue for Travis at the penalty retrial.  Travis was present for and cross-examined Silveria regarding his testimony on the circumstances of the crime.[26]  However,

---

[26]    As noted, at the first penalty phase, Travis and Silveria had separate juries.  As pertinent here, the trial court ruled that if Silveria or Travis testified, they would testify before both juries when discussing the circumstances of the crime.  The court stated it was in "no position" to tell a defendant how to testify, and that if the testimony regarding the circumstances of the crime was not made a separate topic, "then both juries will have to be present for the entire testimony of the defendant."  Silveria structured his testimony so that his testimony about the crime was distinct from his testimony about other areas of

Travis was not present, and did not cross-examine Silveria regarding Silveria's testimony about his childhood. Moreover, although Silveria asserts that Travis testified at the penalty retrial, this testimony occurred *after* the parties entered into the agreement regarding Dr. Kormos's testimony.

Silveria further asserts that the trial court's "threats to . . . strike all of Dr. Kormos's testimony" resulted in the exclusion of critical mitigating evidence. But Silveria's counsel asserted below that he would "use Dr. Kormos as I primarily did last time . . . simply to establish the effects of the childhood traumas that Mr. Silveria suffered and how it affected the development of his personality up to a point short of the crime." He also said, "I need not ask the doctor questions about his diagnosis of Mr. Silveria subsequent to the time of the crime, that is, during the time he was in jail." There was no mention of counsel curtailing desired examination because of concern that the trial court had identified striking the testimony as one option. Although counsel later retreated on these statements when the court ruled that Silveria had opened the door to the prosecutor's cross-examination, the parties and the court were entitled to rely on counsel's earlier representations in formulating and approving the agreement.

Nor, contrary to Silveria's assertion here, were the limitations on Dr. Kormos's testimony proposed by Silveria a result of the trial court's reference to contempt. The court's reference to contempt occurred 50 transcript pages before the parties reached the agreement regarding Dr. Kormos's

his life such as his childhood. Neither Travis nor his jury was present for this latter testimony, which was, of course, not relevant to Travis's penalty determination.

testimony. The record indicates that when the trial court said Silveria's counsel Mr. Braun was "close to contempt," it was expressing frustration regarding counsel's unwillingness to simply address an issue, frustration that may well have been compounded by a recently revealed discovery violation by counsel that had just been addressed during the same hearing. The record is not reasonably read as demonstrating that "because Judge Mullin threatened to . . . hold Braun in contempt . . . , Braun sought to salvage his defense case by proposing to confine his direct examination of Dr. Kormos from [Silveria's] early childhood up to [Silveria's] 21st birthday."

Moreover, any assumed error in accepting the parties' agreement to limit Dr. Kormos's testimony was harmless beyond a reasonable doubt. Silveria asserts that the limitation precluded evidence that would have demonstrated "how the neglect, deprivation and physical and sexual abuse [Silveria] suffered throughout his childhood, and his "relationship with co-appellant Travis, and the other co-defendants," affected Silveria's "conduct at the time of the crimes," and how Silveria had positively developed in the six years since the crimes. He also asserts that prejudice is demonstrated because the first penalty phase jury could not reach a verdict and deliberated for a lengthier period of time than the penalty retrial jury.

At the penalty retrial, Dr. Kormos testified he was of the view that "there was an unusual accumulation of negative factors in this particular case, more than you would ordinarily see on the average." He agreed with defense counsel that a person with Silveria's background of failure to bond with either biological parent, and his experiences of neglect, abandonment, physical abuse, sexual abuse, and emotional abuse, would be impaired in his ability to make rational choices later in life,

because "there would likely be such distortions in his views of the world that his decisions are likely to be skewed." He subsequently added, "I think their entire world view would be impaired, and that would certainly have an effect on all decisions they make." He also testified that a "solid majority" of persons who had suffered abuse similar to that suffered by Mr. Silveria "would indeed suffer from severe psychiatric and psychological problems," including criminality, later in life. Dr. Kormos also opined that Silveria had "a very primitive, a very impaired way of dealing with reality" by trying to push out of his mind problems that occurred because he believed "there was . . . nothing that he could possibly do about it." As to Silveria's relationship with his coperpetrators, Dr. Kormos testified that Silveria, Travis, Spencer, and Jennings "were quite close," and "important to each other," "almost like they were trying to make up an artificial, a pseudo-family." Thus, the jury could reasonably extrapolate from Dr. Kormos's testimony a view of how Silveria's childhood abuse and relationship with his coperpetrators affected his conduct on the day of the crime.

Moreover, Silveria's counsel asserted below that "I need not ask the doctor questions about his diagnosis of Mr. Silveria subsequent to the time of the crime, that is, during the time he was in jail." Indeed, ample evidence was introduced regarding Silveria's positive behavior in jail following the crime. As noted, several correctional officers, Silveria's former girlfriend, one of his foster mothers, and Reverend Charon testified regarding Silveria's spirituality and his remorse for the capital crime. One officer also testified that Silveria did not engage in physical altercations with other inmates, commit assaults on correctional staff, or display behavioral problems. He had not been caught

136

possessing weapons, drugs, or alcohol. Another officer testified that Silveria was intelligent, cooperative, and volunteered for additional jobs. He appeared to go out of his way to welcome new inmates, and at the officer's request, had provided orientation for inmates new to the module. James Park, a former San Quentin associate warden, testified Silveria displayed a "positive and productive" outlook, had spent his jail time constructively by studying, and if he were to serve a sentence of life imprisonment without the possibility of parole, he would "make a good adjustment," and would not be "a threat or a danger to other staff or other inmates." (See *ante*, pp. 17–20, 23–24.)

Thus, Silveria fails to demonstrate what significant mitigating evidence was excluded by the limitation on Dr. Kormos's testimony, and hence also fails to demonstrate that there is a reasonable possibility that the penalty verdict would have been different had Dr. Kormos's testimony not been limited. Nor, for this same reason, is prejudice demonstrated, by itself, because the first penalty phase jury hung, or because the penalty retrial jury deliberated for a shorter period of time than did Silveria's first penalty jury. (See *People v. Johnson* (2015) 61 Cal.4th 734, 753 ["The length of jury deliberations in this two-homicide case, by itself, supports no conclusion as to the closeness of the case or as to any prejudicial effect of joinder"].)

Silveria asserts that the trial court's ruling that Silveria had opened the door to questions regarding a time after Silveria's 21st birthday lacks support in the record and was contrary to the court's earlier statement that it did not "think anybody has gone beyond the agreement." It is admittedly unclear why the court changed its view of the record, but it had

discretion to later find, apparently after reviewing the written record, that asking "later in life" questions had in fact opened the door. Nor were the parties misled by the court's earlier statement that it did not think the agreement had been violated because there was no testimony by Dr. Kormos after the court's statement and before the prosecutor's cross-examination.

Silveria asserts that the trial court allowed the prosecutor "to cross-examine Dr. Kormos about [Silveria's] conduct at the time of the crimes in a completely illegal and blatantly unfair attempt to show [Silveria] committed a torture-murder, after preventing [Silveria] from presenting evidence directly relating to the same time period to show mitigation." The focus of the prosecutor's line of inquiry was not whether Silveria had committed a torture murder, but rather whether because of Silveria's inconsistent statements regarding when during the murder he used the stun gun, antisocial personality disorder was a more appropriate diagnosis than Dr. Kormos's diagnosis of child neglect. Moreover, although the prosecutor was permitted to ask Dr. Kormos whether his opinion that child neglect was the most appropriate diagnosis would change in light of Silveria's inconsistent statements as to when he used the stun gun against Madden, Dr. Kormos replied that this information would not change his opinion.

Nor, contrary to Silveria's assertion, did the prosecutor assert during closing argument that there "had been no evidence explaining how those risk factors could be expected to manifest and affect a person as an adult" or "exploit[] the fact that the defense had been precluded from presenting the very testimony that would have explained such a connection." The prosecutor's point in the challenged argument was that no one could know for certain why individuals with the same background turned

out differently, and that although Silveria had suffered a difficult childhood, he had found a reprieve in the Gambles' home, and then made his own choice to rob and kill.

### i. *Fifth Amendment invocation*

Silveria contends the trial court erroneously denied his right to compulsory process and diluted relevant mitigating evidence when it ruled that his former foster parent Michael George had validly invoked his privilege against self-incrimination. We reject the claim.

In December 1995, during the original penalty phase, Silveria testified that in about 1982, when he was about 12 years old, he lived for nearly a year with then San Jose Police Officer Michael George and his family. On several occasions, George had sexually molested Silveria.

During the 1997 penalty retrial, at a hearing outside the presence of the jury, Silveria sought to call George as a witness and asserted that the statute of limitations for the molestations had expired. Stuart Kirchick, George's counsel, stated he had spoken with a San Jose police sergeant, "and he said all he could tell me was there was an open investigation" as to George and Silveria, and "[w]hether or not that matter is within the statute of limitations is still a decision that needs to be made." For that reason, Kirchick had advised George to invoke his Fifth Amendment privilege.

The prosecutor gave the court and counsel copies of a letter he had received that morning from a private attorney in a civil action pending against George. The letter stated that George had admitted molesting the attorney's client when the client was 13 years old, and had been "sentenced to a 12 year term at San Quentin." The attorney wanted to be present in court

should George testify in Silveria's case. In response to the court's inquiry, Kirchick said that George had suffered these convictions in Lake County and had served about 10 months of his sentence. George was called as a witness during the hearing, but refused to answer any questions about allegedly sexually molesting Silveria, and invoked his Fifth Amendment privilege against self-incrimination. The court ruled that George "has a legitimate right to claim the Fifth Amendment."

We review independently the trial court's ruling that George was entitled to invoke his Fifth Amendment privilege to not incriminate himself. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*).) The Fifth Amendment privilege embraces not only "answers that would in themselves support a conviction," but also those that "would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime." (*Hoffman v. United States* (1951) 341 U.S. 479, 486 (*Hoffman*); see *People v. Cudjo* (1993) 6 Cal.4th 585, 617 (*Cudjo*).) The privilege "must be accorded liberal construction in favor of the right it was intended to secure." (*Hoffman*, at p. 486.) This protection is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." (*Ibid.*) "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial [court] in appraising the claim 'must be governed as much by

140

[its] personal perception of the peculiarities of the case as by the facts actually in evidence.'" (*Id.* at pp. 486–487.) It must be "'*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." (*Id.* at p. 488.)

Likewise, Evidence Code section 940 provides that "a person has a privilege to refuse to disclose any matter that may tend to incriminate him" to the extent that such a privilege exists under the state or federal Constitution. Evidence Code section 404, which we have stated is consistent with the federal *Hoffman* standard, provides: "Whenever the proffered evidence is claimed to be privileged under Section 940, the person claiming the privilege has the burden of showing that the proffered evidence might tend to incriminate him; and the proffered evidence is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege." (Evid. Code, § 404; see *Cudjo, supra*, 6 Cal.4th at p. 617.)

At the time of the 1997 hearing in this case, section 803, former subdivision (g) (section 803(g)) permitted prosecution of child molestation "within one year of the time the victim report[ed] an independently corroborated crime to law enforcement officials. . . . [T]he new one-year limitations period applie[d] whether the crime occurred before or after section 803(g) became effective" and "without regard to whether the fixed statute of limitations for the crime ha[d] already expired, and had already expired, when section 803(g) took effect." (*People v. Frazer* (1999) 21 Cal.4th 737, 742, see *id.* at pp. 744–747.) In *Frazer*, this court held former section 803(g) was "not an ex post facto law." (*Frazer*, at p. 765.) *Frazer* was

abrogated in *Stogner v. California* (2003) 539 U.S. 607, 609–610 [§ 803(g) is an ex post facto law because it authorized criminal prosecutions that the passage of time had previously barred, and was enacted after prior limitations periods for the defendant's alleged offenses had expired].)

Although section 803(g) was later found to be unconstitutional, at the time of the hearing below, George had "reasonable cause to apprehend danger from a direct answer." (*Hoffman, supra,* 341 U.S. at p. 486; see *Seijas, supra,* 36 Cal.4th at p. 307 ["The Court of Appeal's after-the-fact disagreement with the parties, even if ultimately correct as a matter of law . . . does not mean [the witness] did not reasonably apprehend danger at trial"].) Apparently based on Silveria's testimony at the first penalty phase, the San Jose Police Department was investigating whether George had molested Silveria, and no decision had been made as to whether the statute of limitations had run. As the People assert, "George could reasonably have feared that existing state law . . . could expand the statute of limitations for his offenses or even revive them if they had expired." Under these circumstances, it does not "clearly appear[]" that George's testimony could not "possibly have a tendency to incriminate" him. (Evid. Code, § 404; see *Hoffman,* at p. 488.)

In sum, the trial court did not err in ruling George was entitled to assert his Fifth Amendment privilege.

### 6. *Mistrial Motion*

Silveria contends the trial court erroneously denied his mistrial motion. We disagree.

During Travis's questioning of his defense expert witness Sharon Lutman, Travis's counsel said: "I want to show you a

picture here of something and see if we can talk about this for a minute. Do I need these marked for identification? I'm not going to attempt to enter these." The trial court replied, "All right." Counsel continued, "I'm going to show you a picture, Ms. Lutman, and maybe — is there a shelf on there?" The prosecutor interjected, "Your Honor, if counsel is going to refer to an item in the record and display it to the jury as per testimony about it and then it's not marked and introduced into evidence, it does create a problem for the appellate court on review. I think that it's necessary if he intends to publish them and to seek testimony about them to have them marked." The court replied, "All right. Let's mark them then."

Silveria then asked to "approach the bench on a procedural matter based on what [the prosecutor] just said." At sidebar, Silveria unsuccessfully moved for a mistrial. He then requested the court admonish the jury ultimately requesting that it be told: (1) "the reason the matter [was] being retried has nothing to do with any appeal that occurred and, in fact, no appeal has ever taken place in this case," (2) the "reason why the matter was tried once in 1995 and why the penalty phase is being retried at this time," (3) the jury was to "disregard" what the prosecutor said, and that it was "not to consider whether or not this matter will ever be appealed or what the result of any such appeal might ever be," and (4) that the jury is "indeed the last word . . . on the subject, that [it was] not to assume that there will be any appeal or any subsequent intervention by an appellate court and that the decision [it makes] is in fact what will happen to Mr. Silveria and Mr. Travis."

The court twice admonished the prosecutor at sidebar, "You didn't need to talk about the appellate court." It declined to admonish the jury, stating: "Based upon the Court's view of

the jury, the lack of any reaction by the jury and simple common sense this Court will not admonish the jury regarding the use of the term 'appellate court' " because "[t]o do so would only highlight the term."

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198 (*Collins*).)

Here, the prosecutor's statement was not "so incurably prejudicial that a new trial was required." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683 (*Ledesma*).) His reference to the appellate process was brief and isolated, did not refer to the circumstance that Silveria and Travis were being retried, and was directed not to the jury, but to the court in the midst of a technical discussion about whether an exhibit should be marked.

Nor, contrary to Silveria's assertion, did the prosecutor's reference constitute *Caldwell* error. (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 (*Caldwell*) ["it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere"].) There is no reasonable likelihood the jury understood the brief comment — which again did not occur during argument to the jury but during an evidentiary discussion with the court as to whether an exhibit should be

marked — as lessening its sentencing responsibility. (See *People v. Moon* (2005) 37 Cal.4th 1, 18 ["Certainly the mere mention of the appellate process, while ill-advised, does not — standing alone — necessarily constitute reversible *Caldwell* error"].) Moreover, the trial court instructed the jury at the end of the penalty retrial: "Under the law of this state, you must now determine which of these penalties shall be imposed on each defendant. In determining what penalty is appropriate in this case, you must assume that whichever of the two penalties you impose will be carried out. That is: If you impose life without the possibility of parole, you must assume that the defendant will spend the rest of his life in prison and will never be released. If you impose death, you must assume that the defendant will be executed." The brevity and context of the prosecutor's comment, together with the court's instructions at the end of the penalty retrial, "convince[] us the jury could not reasonably have understood the [prosecutor] to mean the jury's verdict was advisory only." (*Moon*, at p. 18.)

The trial court also acted within its discretion in declining to admonish the jury when the prosecutor's comment was made. The court was reasonably concerned that an admonition would unnecessarily highlight the reference to the appellate process.

Silveria also challenges the prosecutor's closing argument statement that if the jury decided it was appropriate to impose the death penalty, "this is not something that you or we as a system are doing to these men. This is something that each of these two defendants has brought upon himself." Silveria claims this statement exploited both the prosecutor's error in earlier referring to the appellate process, and the trial court's "failure to remedy that error." The prosecutor merely reminded the jury that the defendants' own actions had created a situation

in which a jury was choosing between penalties of life imprisonment without the possibility of parole and death. Nothing in these statements misled the jury " 'as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision.' " (*Romano v. Oklahoma, supra*, 512 U.S. at p. 9.)

### 7. *Claims Regarding Sympathy and Mercy*

#### a. *Mercy instruction and argument*

Silveria and Travis contend that the trial court prejudicially erred in ordering counsel to tell their witnesses not to use the word "mercy," precluding either side from using the word "mercy" during closing argument, and refusing to instruct the jury "on mercy or a juror's use of mercy." We conclude there was no error. Based on the trial court's instructions and counsels' argument, "there is no reasonable likelihood the jury was misled as to its ability to grant" defendants leniency based on the mitigating evidence by the trial court's preclusion of the word "mercy." (*People v. Ervine* (2009) 47 Cal.4th 745, 802 (*Ervine*).)

#### (1) Factual background

Before the penalty retrial, Silveria, joined by Travis, sought to "argue mercy." In a lengthy ruling, the trial court denied Silveria's motion. It noted that "mercy," as defined in the dictionary, "implies compassion that forebears punishing even when justice demands it." The court stated: "The idea of mercy falls, if at all, under Factor (k) of Penal Code Section 190.3," but "[m]ercy is not a circumstance which . . . extenuates the gravity of the crime. It is forgiveness and forbearance of warranted punishment. The jury's job is not to forgive. The jury's job is to punish with either death or life without parole."

The court stated it would instruct the jury in the language of CALJIC No. 8.85, factor (k), but that "[m]ercy is not a sympathetic or other aspect of the defendant's character or record. There is sympathetic evidence and the jury should consider that evidence. The defendant's upbringing, background and life experiences, good and bad, are to be considered when . . . evidence of them is presented."

The court also noted that the United States Supreme Court had held: " '[S]entencers may not be given unbridled discretion in determining the fates of those charged with capital offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion.' " (*California v. Brown* (1987) 479 U.S. 538, 541.) The trial court observed, "To permit the defense to argue mercy would allow the jury to engage in the exact type of decision-making that the United States Supreme Court condemned." "Granting mercy would seem to grant an unduly lenient sentence — one not based on the evidence presented."

At the end of the penalty retrial, the trial court instructed the jury in the language of CALJIC No. 8.85, factor (k), directing the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The court also instructed the jury: "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. . . . [I]t is not necessary that all twelve jurors unanimously agree upon the existence or truth of any . . .

particular mitigating circumstance. Rather, each juror is entitled to weigh and consider any . . . mitigating circumstance which he or she finds to be true in arriving at a penalty verdict." The court defined a "mitigating circumstance" as "any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."

### *(2) Analysis*

We have previously held that a trial court does not err in directing the parties to refer to "sympathy, pity, or compassion instead of mercy" in argument. (*Ervine, supra*, 47 Cal.4th at p. 802.) When based on the trial evidence, counsel's use of any of these terms — mercy, sympathy pity, or compassion — during argument properly requests leniency from the jury. (*Ibid.* [" 'mercy' and 'compassion' are synonymous" in the context of the penalty phase jury instructions]; *People v. Boyce* (2014) 59 Cal.4th 672, 707 (*Boyce*) ["the court did not foreclose defense counsel from urging the jury to show sympathy and mercy to defendant"]; *People v. Seaton* (2001) 26 Cal.4th 598, 685 (*Seaton*) [defense counsel's argument that the jury could consider " 'mercy, sentiment, and sympathy for the defendant' " informed the jury "it could consider sympathy"]; *People v. Andrews* (1989) 49 Cal.3d 200, 228 (*Andrews*) [relying in part on the prosecutor's argument acknowledging that the jury could consider "compassion" to conclude "the jury was not misinformed regarding its power to exercise mercy"].) The trial court's direction in this case permitted the parties to use various terms that conveyed the jury's latitude in considering the evidence and making the profoundly personal and normative penalty decision. (See *Kansas v. Carr, supra*, 577 U.S. at p. __

[136 S.Ct. at p. 642] ["In the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, which is what our case law is designed to achieve"].)

We have also observed that the word "mercy," when not based on the trial evidence, may invite a purely subjective rather than a reasoned moral response. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1195 [the "*unadorned* use of the word 'mercy' implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances" (italics added)]; *Boyce, supra,* 59 Cal.4th at p. 707 [same]; *People v. Lewis* (2001) 26 Cal.4th 334, 393 [same]; see also *Rhoades, supra,* 8 Cal.5th at p. 452 ["We have held . . . that an express reference to 'mercy' risks encouraging arbitrary decisionmaking"].) We have also said, relying on *McPeters*, that the word mercy "connote[s] an emotional response to the mitigating evidence instead of a reasoned moral response." *(Ervine, supra,* 47 Cal.4th at p. 802; see *People v. Henriquez* (2017) 4 Cal.5th 1, 43–44 [same].) Nonetheless leniency toward the defendant is properly considered at the penalty phase. (*Kansas v. Carr, supra,* 577 U.S. at p. __ [136 S.Ct. at p. 642]; *People v. Robertson* (1982) 33 Cal.3d 21, 57 ["in the penalty phase of a capital trial the jury may properly consider sympathy or pity for the defendant in determining whether to show mercy and spare the defendant from execution"].) We clarify here that so long as attorneys base their penalty arguments on the trial evidence, it is not improper for them to use the word "mercy" or its synonyms in argument.

Here, although all counsel were precluded from using the word "mercy," "there was no suggestion in the arguments of either party that the jury could not consider mercy in determining penalty." (*Andrews, supra,* 49 Cal.3d at p. 227.)

The prosecutor argued: "Now when . . . [Silveria defense counsel] Mr. Braun or Ms. Angel ask you for your sympathetic consideration, for charity for Mr. Silveria given his life and his childhood and his foster homes and the abuse that he suffered, physical and sexual, as he will as no doubt will she, when [Travis defense counsel] Mr. Leininger asks you to find room in your heart to consider the sympathetic aspects under [CALJIC No. 8.85,] [f]actor (k) of his client's background and childhood, his substance abuse, his chemical addiction," look at Madden's bloody shirt and "remember the man who was wearing it."

Silveria's counsel urged the jury that "[W]hat [f]actor (k) takes into account is the entire life of a particular defendant, and in this case the entire life of my client, Danny Silveria, [is] to be measured against what he did on that one terrible night." "[T]he law requires you not to just look at the crime. It requires you to weigh and consider who Danny Silveria was, how Danny Silveria became as he is now and who Danny Silveria is now." Counsel asserted that based on the mitigating evidence, "Danny is a worthwhile human being, . . . he is a person worth saving," he is "more than the worst thing he ever did." Counsel argued, "just as there has been sin so too there can be redemption," suggested "[w]e can have compassion enough for everybody in this case," and asked the jury "to spare Danny's life." Travis's counsel asserted: "What I'm asking you to do is look within yourself to discover whether there are any feelings of sympathy or compassion for the boy . . . who suffered, the boy whose anger was kindled by shame, fanned by countless humiliations, by a cruel masochistic sexual predator, the boy who experienced all of these things without the protection of family, social agencies or even one good friend . . . ." Counsel told the jury, "I'd like to see you live with the peace that comes not from vengeance, not

from anger, not from destruction of human life, but from the forbearance of imposing death." Hence defense counsel were accorded broad latitude in marshalling the mitigating evidence and attempting to persuade the jury that this evidence warranted a sympathetic response, and were not meaningfully limited in this effort by preclusion of the word "mercy."

In addition, " 'a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise 'mercy.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 344; see *People v. Brasure* (2008) 42 Cal.4th 1037, 1069–1070 ["To the extent the proposed instructions told the jurors they were free to consider 'mercy, sympathy and/or sentiment' . . . or 'compassion or sympathy' . . ., they were essentially duplicative of CALJIC No. 8.85, which told jurors that under section 190.3, factor (k) they could consider 'any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death' "]; *People v. Brown* (2003) 31 Cal.4th 518, 570 ["Because defendant's jury had been instructed in the language of section 190.3, factor (k), we must assume the jury already understood it could consider mercy and compassion; accordingly, the trial court did not err in refusing the proposed mercy instruction"].)

Here, the trial court instructed the jury in the language of CALJIC No. 8.85. "As we have previously explained, CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. [Citation.] We therefore 'must assume the jury already understood it could consider mercy and compassion.' " (*Ervine, supra,* 47 Cal.4th at p. 801.) The court's additional instructions also informed the jury of its latitude to consider sympathetic and extenuating evidence at trial in

determining penalty. The mere exclusion of the word "mercy" did not undercut these instructions.

In sum, "there is no reasonable likelihood the jury was misled as to its ability to grant" defendants leniency based on the mitigating evidence by the trial court's preclusion of the word "mercy." (*Ervine, supra*, 47 Cal.4th at p. 802.)

Silveria and Travis note that the prosecutor violated the trial court's order during opening statements when he said Madden had struggled against "the tightly-wrapped duct tape that so mercilessly bound him." There was no contemporaneous objection, but during a recess later that day Travis, joined by Silveria, sought a mistrial, or in the alternative, for all counsel to be permitted to use the word "mercy." The trial court accepted defense counsels' representation that the prosecutor had used the word "mercilessly," denied the motions, and said, "Any further violation of the Court's original order will be dealt with severely." The prosecutor asked to "speak in regards to that," and the trial court responded: "No. We're done."

Defendants do not delineate how the trial court erred in denying the motions. As noted, " '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*Collins, supra*, 49 Cal.4th at p. 198; see *ante*, pt. II.B.6.)

Here, the prosecutor's single use of the word "merciless" was not "so incurably prejudicial that a new trial was required." (*Ledesma, supra*, 39 Cal.4th at p. 683.) In his reply brief,

Silveria cites the trial court's ruling as "further demonstrat[ion] to the jury the extent to which the judge leaned on the prosecution's side of the scale." But neither the objection nor the ruling were made before the jury, nor was the prosecutor even permitted to defend his asserted violation. Rather, the trial court accepted defense counsels' representation of what had occurred and reprimanded the prosecutor. These circumstances fail to demonstrate judicial bias favoring the prosecution.

### b. CALJIC No. 1.00

Silveria contends that the trial court prejudicially erred by instructing some potential jurors before trial in the language of CALJIC No. 1.00. We reject the claim.

In December 1996, during jury selection for the penalty retrial, the court instructed certain prospective jurors in the language of CALJIC No. 1.00: *"You must not be influenced by pity for a defendant* or by prejudice against him. . . . Both the defendants and the People have the right to expect that you will conscientiously consider and weigh the evidence, apply the law and reach a just verdict *regardless of the consequences*." The instruction was not repeated in the court's April 1997 instructions to the jury at the end of the penalty retrial.

"We have repeatedly explained that this instruction should not be given at the penalty phase because the ' "consequences" ' at the penalty phase — the choice between death and life imprisonment without the possibility of parole — 'are precisely the issue that the jury must decide.' " (*Erskine, supra,* 7 Cal.5th at p. 302; *People v. Ray* (1996) 13 Cal.4th 313, 354 (*Ray*) ["language instructing the jury to disregard the consequences of its verdict is inappropriate and should not be given at the penalty phase" (italics omitted)].) Moreover, it is

erroneous to instruct a penalty phase jury not to be influenced by pity or sympathy for the defendant. (*Seaton, supra*, 26 Cal.4th at pp. 684–685.)

We conclude there is no reasonable likelihood that the court's error misled the jury. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579 ["In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution."].) Here instruction in the language of CALJIC No. 1.00 was given to only some potential jurors *before* the penalty retrial, and was not repeated four months later at its conclusion. Rather, at the end of the penalty retrial, the court instructed the jury that it must "determine which of these penalties" — death or life imprisonment without the possibility of parole — "shall be imposed on each defendant," and that in making this determination it "must assume that whichever of the two penalties you impose will be carried out." It further instructed the jury: "Both the People and each defendant have a right to expect that you will conscientiously consider all of the evidence, follow the law and reach a just verdict."

Moreover, as noted, the trial court instructed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." The court also instructed the jury: "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. . . . [I]t is not necessary that all twelve

jurors unanimously agree upon the existence or truth of any . . . particular mitigating circumstance. Rather, each juror is entitled to weigh and consider any . . . mitigating circumstance which he or she finds to be true in arriving at a penalty verdict." The court defined a "mitigating circumstance" as "any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."

Given these instructions at the end of the penalty retrial, there is no reasonable likelihood that the jurors who may have heard the challenged language at the outset of trial failed to understand that they "bore the ultimate responsibility for choosing between death and life imprisonment without parole" (*Ray*, *supra*, 13 Cal.4th at p. 355), and that they could consider pity and sympathy for the defendants.

### 8. *Asserted Prosecutorial Misconduct*

Silveria and Travis assert that the prosecutor committed prejudicial misconduct. We reject the claim.

"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) "When attacking the

prosecutor's remarks to the jury, the defendant must show" that in the context of the whole argument and the instructions there was " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

Travis, joined by Silveria, contends the prosecutor committed misconduct during closing argument by referring to CALJIC No. 8.85, factor (k) evidence as "a kitchen sink." During closing argument, the prosecutor asserted that Silveria's counsel "will urge you to consider and be swayed by [f]actor (k) evidence, which you will see is sort of like a kitchen sink category of — " Both defendants unsuccessfully objected to the term "kitchen sink." The prosecutor read the language of the instruction on factor (k), and explained that the factor was "an all-encompassing category . . . of, in effect, sympathetic evidence as to" the defendants. In the prosecutor's rebuttal argument, he stated: "Factor (k), that's basically, I submit, all of the penalty phase evidence that has been offered on behalf of both Mr. Travis and Mr. Silveria by their respective attorneys. Factor (k), which I refer[] to as a kitchen sink, meaning by that an all-encompassing category." He explained: "Basically it is a catch-all category put in by statute for the defendant's benefit in a capital case. Factor (k) allows you to consider any sympathetic aspect of" Mr. Travis's and Mr. Silveria's "character or record as a basis for a sentence less than death."

We conclude any assumed misconduct in using the term "kitchen sink" to describe the CALJIC No. 8.85, factor (k) evidence was harmless beyond a reasonable doubt. The language of factor (k), which informs the jury that it may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime

and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," describes a broad range of evidence. The prosecutor also referred to factor (k) as an "all-encompassing" or "catch-all" category of defendants' sympathetic evidence. In light of this, and contrary to Travis's assertion, the prosecutor's characterization of this evidence did not send "a clear message that any factor (k) evidence was not to be taken seriously" or constitute prejudicial misconduct.

Silveria and Travis also contend that the prosecutor committed misconduct by urging the jury to rely on Dr. Pakdaman's opinion that "[t]his is one of the most atrocious cases that I have ever seen," and thus shifted responsibility for the penalty decision to Dr. Pakdaman in violation of *Caldwell*.[27] (*Caldwell*, *supra*, 472 U.S. at pp. 328–329; see *ante*, pt. II.B.4.b.) We have concluded above that even assuming the pathologist's statement was inadmissible, it was harmless beyond a reasonable doubt because it was brief and isolated, and less compelling than Dr. Pakdaman's detailed description of Madden's 32 "slash-like superficial cuts" and "stab-like wounds" in his neck, chest, and abdomen, including stab wounds that penetrated his heart and fractured his ribs, and Dr. Stratbucker's testimony that marks made by the stun gun on Madden's thigh were inflicted while he was alive, and that Madden remained conscious "to the bitter end." (See *ante*, pt. II.B.4.b.).

---

[27] *Caldwell* error claims are not forfeited on appeal for failure to object below if the trial, as here, occurred before our decision in *People v. Cleveland* (2004) 32 Cal.4th 704, 761–762.

Nor did the prosecutor's recounting of Dr. Pakdaman's statement during closing argument mislead the jury " 'as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision.' " (*Romano v. Oklahoma, supra,* 512 U.S. at p. 9.)  The prosecutor recounted Dr. Pakdaman's testimony regarding the number and type of stab wounds Madden had suffered.  He showed the jury crime scene and autopsy photographs, asked the jury to consider Madden's bloody shirt, and noted Dr. Pakdaman's testimony that it took Madden between 10 and 30 minutes to die, and that he was alive at the end of the attack.  The prosecutor asked, "What is morally compelling about this case?"  He noted Dr. Pakdaman had performed thousands of autopsies, could not recall all of them, but remembered this case because, "This is one of the most atrocious cases that I have ever seen."  The prosecutor described Dr. Pakdaman as "visibly emotional" during this exchange.  After discussing Dr. Pakdaman's testimony, the prosecutor argued that the "callousness and horror of this case, of this murder is beyond all human comprehension."  He then argued Travis had enjoyed the murder, and discussed the Tex Watson letter and Travis's statements to police.  After a recess, the prosecutor told the jury he wanted to "be absolutely clear" that the jury's moral evaluation was not mechanical or a mere counting of factors, but an "individual assessment[] as to what is morally compelling and your assignment of whatever moral weight you feel you should give to each of these various factors that the law allows you to consider."  In this context nothing in the prosecutor's recounting of Dr. Pakdaman's statement regarding the relative atrocity of the case shifted responsibility for the penalty decision

from the jury to Dr. Pakdaman in violation of *Caldwell*. (*Caldwell*, *supra*, 472 U.S. at pp. 328–329.)

### 9. *Additional Claims Regarding the Prosecutor's Conduct*

Silveria contends the trial court erred when it permitted the prosecutor to elicit certain testimony and Silveria and Travis contend the court erred in allowing the prosecutor to make certain statements during closing argument. We reject these claims.

#### a. *Sissy Madden's testimony*

Silveria contends the trial court erred in allowing the prosecutor to elicit testimony from Sissy Madden that delays in the trial are torture to her, that she has no peace, and that all she wants is justice for her husband's death. He contends that the effect of trial delays on Sissy were "too remote from any act of [Silveria] to be relevant to his moral culpability," that Sissy's testimony was so unduly prejudicial it rendered the penalty retrial fundamentally unfair, and that Sissy's "request for justice for her husband's murder violated the Eighth Amendment because it essentially told the jury" she believed "death was the appropriate sentence." We reject the claim.

During Sissy's direct testimony, the prosecutor asked her how she had been affected by her testimony being rescheduled to that day from the day before. She replied: "[I]t was horrible. This . . . is so hard for me to do, because I'm in a room full of strangers, talking to you about something that's very intimate to me: My relationship with my husband. I feel like — every time that this gets put off it feels like — I don't know that you can understand, but it feels like a little bit of torture to me. . . . I don't feel like I have any peace. I don't feel like I have any

closure. And all I want is just, you know, to have just a little bit of justice for my husband, you know. That's all I want. And this has been six years now, and it doesn't seem like a lot, one afternoon or one day doesn't seem like a lot, but I have been going through this now for six years, just waiting and waiting for a phone call, having to call . . . the attorney, 'When is this going to happen?' It's just . . . not pleasant." Silveria did not object and his mistrial motion based on this testimony, made after the jury had left for the day, was denied. The court found that nothing in the prosecutor's question or Sissy's response "put blame on the defense for them having to come back to court."

Even assuming Silveria's claim is preserved, it is meritless. The prosecutor did not reasonably elicit Sissy's testimony that she felt tortured simply by asking how she had been affected by a scheduling change. Nor, contrary to Silveria's claim, was her testimony unduly prejudicial. The jury would reasonably expect that the anticipation of testifying in a trial regarding a loved one's murder, and delays in the resolution of that trial, would be stressful. Moreover, Sissy's statement was cumulative to other testimony Silveria does not challenge. Coworker Thuringer testified that nearly six years after the murder, and two days before Thuringer's testimony, Sissy "really went to pieces" because she received a court scheduling call. Thuringer explained, "It just brings it back fresh all over again." Sissy's supervisor House testified that Sissy had been in tears and told House she had Thuringer speak to the prosecutor on the telephone because "I can't. I just feel like I'm being tortured. This is just a constant torture to me."

To the extent Sissy's challenged comments could reasonably be interpreted to mean she believed the death

penalty would be "justice" for Madden, as Silveria contends, the trial court instructed the jury: "Any wishes of the various members of the victim's family concerning which penalty should be imposed is not before you and such evidence is inadmissible as irrelevant. You may not speculate about that matter, consider it, or take it into account in any way." We presume the jury understood and followed this instruction. (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1178.)

### b. *Closing argument*

#### (1) *Victim impact*

Silveria and Travis contend that the trial court erred in allowing the prosecutor to argue "future victim impact evidence." We reject the claim.

At the penalty retrial, the trial court ruled that victim impact witnesses would be permitted to testify as to the effect of Madden's murder upon them or a close family member up until the time of their testimony, "but nothing in the future as that is speculative." During Silveria's closing argument, defense counsel Annrae Angel mentioned her 18-month old son Ian. She later argued: "Life in prison without parole is enough for Danny Silveria. It is a serious punishment. . . . If you sentence Danny . . . to life in prison without parole, he will be in state prison for the rest of his life. As Ian grows up and as time passes, we can all — and all of the children that you know, we can look back and we can say, 'He's still in prison for what he did.' And I submit to you that this case is not going to go away all that quickly. We're going to think about this case for a long time. Maybe forever. This is not something that we will all easily put behind us and easily put in a box, because it is so filled with emotion and pain and heartache."

In his rebuttal argument, the prosecutor said: "Well, it's true that Mr. Travis and Mr. Silveria would be in prison for the rest of their lives, the rest of their natural lives, day after day, year after year. So why should you regret [returning a life imprisonment verdict]? Ms. Angel . . . says, 'As Ian grows up and gets older and older you would know that the defendants are still in custody.' Yes, you would. Holidays would come and go each year and would continue to do so as Ian grows up, as all of you get older, as your children grow up, as your children have children. Holidays would come and go for you, for your families, for Mr. Travis, for Mr. Silveria and for the Madden family. I submit that with each holiday, Valentine's Day or Mother's Day — " Ms. Angel's cocounsel, Mr. Braun, objected at sidebar that the prosecutor's argument violated the court's ruling precluding evidence of victim impact in the future. The trial court overruled the objection, finding the argument was "proper rebuttal based on what counsel has said in their opening arguments."

The prosecutor subsequently made the comments Silveria challenges here: "As the holidays come and go in the years to come, I submit that with each holiday, Valentine's Day or Mother's Day, Father's Day, or Thanksgiving or Christmas, you will think about this. And remember, Ms. Angel pointed out this is a case that no doubt will stay with you forever, for a long time. . . . [A]s the years pass, you will consider that Julie Madden no longer has a father to give Valentine's Day gifts to or Father's Day gifts to. You will be wondering who will be taking Julie shopping for a Mother's Day gift this year. As time goes on and the holidays come and go you will remember this case, ladies and gentlemen, for the rest of your lives. Every Christmas what will you think of? Will you think of Julie

Madden missing her father? Will you think of an empty space around a holiday table? Or, on the other hand, will you think of John Travis or Daniel Silveria somewhere in a prison facility living out the rest of . . . his or their natural lives, receiving visitors, sending holiday greetings, receiving cards or gifts?"

Contrary to Silveria's claim, the trial court did not permit the prosecutor "to violate [its] earlier order restricting victim impact to no later than the time of trial." Silveria's argument urging the jury to return a verdict of life imprisonment without the possibility of parole relied on the circumstance that as defense counsel's son and other children the jurors knew grew older, the defendants would continue to be incarcerated. The prosecutor was entitled to respond to this argument by observing that as the victim's daughter grew older, she would continue to be affected by her father's murder. Moreover, in general it is not improper at the penalty phase of the trial for the jury to consider the "residual and lasting impact" of the murder (*People v. Brown* (2004) 33 Cal.4th 382, 398), so long as the "evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180; see *People v. Garcia* (2011) 52 Cal.4th 706, 762 ["Jurors were simply asked to draw reasonable inferences from evidence of the family's close relationship and favorite activities about the long-term effects of Joseph's murder on his children"]; *People v. Verdugo* (2010) 50 Cal.4th 263, 296–298 (*Verdugo*) [upholding admission of victim impact evidence of the family's observance of the victim's 19th birthday at the cemetery several months after her murder, statements made by the victim's young niece that she had seen the victim after her death, and testimony that the victim's father died seven months after her murder]; *Brown*,

at p. 398 [testimony that the victim's brother saluted the victim's grave every time he drove by the cemetery and that the victim's father has not gone fishing since his son's death was evidence of "understandable human reactions" to the murder].)

Nor, as Silveria further contends, did the prosecutor's argument "count[] the jurors among the victims of [the] defendant's crime" by implying that "in order to mitigate the impact that the jurors would suffer on their future holidays, they should impose the death penalty," or divert the jury from its proper sentencing role. Rather, Silveria argued that if the jury returned a sentence of life imprisonment without the possibility of parole, it could be reassured as time went by that the defendants would remain incarcerated. The prosecutor properly responded to this argument by suggesting the continuing effect of the murder on the victim's family each holiday, and noting that the defendants, unlike the murder victim, would have the opportunity to continue to celebrate holidays should they serve a life imprisonment sentence.

Travis contends that the trial court erred in allowing the prosecutor to argue: "Travis and Silveria took something from Jim Madden, something perhaps even more . . . valuable than his very life itself. And that's a lifetime . . . with his wife, Sissy, and the opportunity of watching his little girl, being there for her in the audience during those dance performances instead of an empty chair, first father-daughter dance and the ones to follow, perhaps walking his little girl down the aisle when that time comes." The trial court sustained defendants' objections.

Travis asserts that the prosecutor's argument was an "appeal to pure emotion," and that although the trial court sustained his objection, "the damage was already done." The trial court instructed the jury before closing arguments that "[i]f

164

an objection was sustained to a question, do not guess what the answer might have been.  Do not speculate as to the reason for the objection."  The jury would reasonably apply this principle to sustained objections during closing argument.

## *(2) Retribution*

Silveria and Travis contend the trial court erred in allowing the prosecutor to argue for retribution while precluding defendants from arguing for mercy.  There was no error.

During Silveria's closing argument, defense counsel Mr. Braun said: "Now, what justification can the state offer you for killing Mr. Silveria?  I submit there is only one, and that is pure retribution for what might colloquially be termed payback or vengeance.  Now, would any such punishment or vengeance bring back Jim Madden or somehow make his family whole?  It will not."

On rebuttal, the prosecutor argued:  "Mr. Braun argues that since the victim can't be brought back nothing can be gained by killing a killer so why should society do that.  I submit, ladies and gentlemen, that everyone from a civilized society has the right to make sure that the law, theoretically and ideally, is carried out as it's supposed to be, because each of us have given up our personal right to do that ourselves.  The instinct for just retribution is part of the nature of every human being.  Channeling that instinct to the administration of criminal justice serves an important purpose in promoting the stability of a society that is . . . governed by law and order. Where certain crimes are concerned, and this is definitely one of them, retribution is not a forbidden consideration or one inconsistent with society's respect for the very dignity of man and humanity.  The decision that capital punishment may be the appropriate action in an extreme case, which I submit this is, is the

expression of the community's belief that certain crimes are, and those who commit them in and of themselves are, so grievous an af[f]ront to humanity that the only appropriate response must be the imposition of the penalty of death."

Travis did not object to the prosecutor's reference to retribution, but his objection to reference to the "community's feelings about this" was sustained, and the court also struck this language. The prosecutor continued: "Like it or not, ladies and gentlemen, retribution is still a part of being human and of being a human being. I submit that in spite of the fact that both defendants are asking you, or their lawyers are, to spare their lives, that when they chose to take Jim Madden's life that night they forfeited their own." Silveria unsuccessfully objected that the argument implied "that the act itself automatically warrants the death penalty."

Silveria asserts that allowing the prosecutor to argue for retribution, but precluding an argument for mercy by defense counsel, "blatantly displayed the depth of the unfairness and uneven treatment . . . accorded" Silveria. Assuming this claim is preserved, it is meritless. As discussed above, although defense counsel were precluded from using the word "mercy" during closing argument, they were accorded great latitude in marshalling the mitigating evidence and attempting to persuade the jury that this evidence warranted a sympathetic response from the jury and the imposition of a lesser punishment. (See *ante*, pt. II.B.7.a.) Hence no unfair treatment is demonstrated. Moreover, the prosecutor's reference to retribution was a legitimate response to Silveria's closing argument that retribution would accomplish little because it could not "bring back" Madden.

### *(3) Societal demand for the death penalty*

Travis asserts that the trial court erred in allowing the prosecutor to present an argument that "effectively urged the jury to return a death verdict" not based on the capital crime or the defendants, but "because society demanded such a penalty for anyone guilty of murder." We reject the claim.

Travis broadly contends that "the prosecutor was permitted to argue that a jury that chose life without parole was taking the easy way out, that a death verdict was merely the fulfillment of a responsibility resulting from a law passed by the jurors' fellow citizens and affirmed by the courts, and that any action beyond the least-aggravated murder possible was automatically a factor in aggravation of the penalty." As to the assertion that the "prosecutor was permitted to argue that a jury that chose life without parole was taking the easy way out," the prosecutor argued: "I come before you . . . to ask you to return a verdict of death against these two defendants. . . . This request is made on the basis of the evidence showing that these two defendants . . . have committed the worst of crimes under the law of this state and have under our social contract earned that ultimate penalty. I don't ask this of you lightly. I know full well that this is a hard, hard thing for me to ask all of you to consider and to do. . . . [A]s a direct result of the verdicts in the guilt phase of this trial [defendants] . . . will be sentenced to no less than life in prison without parole for what they have done. To simply let that happen, to let them go off to prison to live out the rest of their natural lives would be the easy way out," but not "what the evidence in this case warrants . . . . You, ladies and gentlemen, the few, have been selected as representatives of the community in this case to decide the question of which of the only two possible penalties here, death or life without parole,

167

should be meted out to these two defendants for what they have done. Your verdict, ladies and gentlemen, will reflect the conscience of the community on the ultimate question of penalty for what Mr. Travis and Mr. Silveria did here. It's a solemn responsibility . . . . The responsibility of voting for the appropriate penalty in this case, given the evidence, is not one to be taken lightly, and that responsibility is not one to take the easy way out of by voting for life without parole simply because the other alternative is too difficult to contemplate. That wouldn't be right."

In arguing that the jury should not "take the easy way out . . . by voting for life without parole," the prosecutor simply urged the jury to consider the death penalty even though that consideration was "difficult to contemplate." That is proper. (*Spencer, supra,* 5 Cal.5th at p. 685 [the prosecutor did not "denigrate the jury's 'solemn responsibility' by insisting that anything but a death sentence would be taking the easy way out," but rather "urged jurors not to forgo the punishment for the wrong reasons — because it would absolve them of the need to weigh the moral blameworthiness of [the defendant's] conduct"]; see *People v. Adcox* (1988) 47 Cal.3d 207, 259 [in arguing that the jury not " 'take the easy way out and not make a decision based on the evidence' " the prosecutor "simply urged the jury not to decide defendant's fate based on untethered compassion for him or his mother alone, without following their lawful obligation to consider the evidence"].)

In his reply brief, Travis contends that "jurors in a capital case are bound by no 'social contract' to return a death verdict." The prosecutor did not argue that the jurors were bound by social contract to return a death penalty verdict and there is no reasonable likelihood the jury understood the prosecutor's brief

comment in this way.  Rather, the prosecutor repeatedly reminded the jury its role was to determine whether defendants should receive a penalty of death or life imprisonment without the possibility of parole.  For example, the prosecutor subsequently observed:  "You've heard a lot of evidence.  No doubt you have paid great attention to the evidence that you have heard.  Never can it be said that the penalty which you finally decide that Mr. Travis and Mr. Silveria should receive for what they have done here will be something that wasn't considered and reflected on by a jury of twelve who are considering all of the factors that the law says they are to consider within the scope of the law. . . . Now, when you do decide this case, do not decide it on prejudice or whim, but decide it upon an extensive moral evaluation of the evidence."

Travis contends that the "prosecutor was permitted to argue . . . that a death verdict was merely the fulfillment of a responsibility resulting from a law passed by the jurors' fellow citizens and affirmed by the courts."  The prosecutor simply urged the jury that if it found after a consideration of the evidence that death was the appropriate punishment, it should not hesitate to reach that verdict because of a feeling of guilt.

Travis also contends that the prosecutor argued "that any action beyond the least-aggravated murder possible was automatically a factor in aggravation of the penalty."  The prosecutor properly argued that certain circumstances of the capital crime, such as  defendants' planning of the robbery and murder of Madden by arming themselves and obtaining duct tape and gasoline, and their waiting and watching for Madden to close the store, made the crime more egregious than a simple store robbery.

Nor, as Travis asserts, did the prosecutor "unmistakably impl[y] criticism of any juror who did not vote for death — implying that such jurors were lacking in strength and courage." The prosecutor argued: "The penalty must fit the crime for justice to be satisfied and served. I'm asking you to find that under the circumstances of this case justice requires that ultimate penalty for the wrongs done here, the imposition of the death penalty for Mr. John Travis and for Mr. Daniel Silveria. . . . I submit to you that there's no question that each of these men deserve the death penalty for participating in this indescribably brutal murder, this crime that we have here. And I submit when you think about it that's not really the issue if you're honest with yourselves. The issue is whether you have the courage, the strength to do what the law requires, to weigh and evaluate and to impose what is required here by the facts and circumstances of . . . this horrible crime of what was done to this man, Jim Madden, what was done to his family. Remember, we as individual members of society have given up our right to take the law into our own hands and have entrusted the state and our system of justice to apply. A free society requires of its citizens, of its jurors vigilance, courage and strength and resolve in making the decision that you're going to have to make here. What I'm asking you to do is to follow the law, consider the evidence and render a just verdict appropriate for these men and their crime."

The prosecutor simply argued that in his view death was the appropriate punishment based on the evidence, and urged the jury to adopt this view. His reference to courage was in regard to the difficulty of considering the evidence and making a penalty decision. His comments were different from those we criticized as "unfair and unkind" in *People* v. *Williams* (1988)

45 Cal.3d 1268, 1326, on which Travis relies. In *Williams*, the prosecutor compared prospective jurors who had been excused because they could not decide the issue of penalty to " 'people who do not take a position in life between good and evil, they are bystanders in every type of war we have,' " and speculated they would " 'stand by and watch an innocent person [be] struck down because they don't want to impose themselves in the battle between good and evil.' " (*Id*. at pp. 1325–1326.) No such aspersions were present here.

The prosecutor stated: "Thankfully because of this process of law, of which you have all now become a part, we're no longer a society that's made up of vigilante justice or lynch mobs crying out for vengeance in the streets." Travis asserts that by this statement "the prosecutor was able to imply that anything less than a death verdict would invite a return to vigilante justice and lynch mobs," and that the prosecutor's argument pertained not to "the present crimes or to the backgrounds of the perpetrators," but "equally to every murder, urging the jurors to react with a gut emotional revulsion." Travis also erroneously asserts that the objections by both counsel to the prosecutor's statement were overruled. They were, in fact, sustained, and the court struck the comment and instructed the jury to disregard it. We presume the jury understood and followed these instructions. (*Hajek and Vo, supra*, 58 Cal.4th at p. 1178.)

Travis further contends that "this strong appeal to emotion was punctuated by twenty-seven photographs of the bloody victim, prominently displayed throughout the argument, generating continuing tears from the victim's widow and mother." Travis does not identify the 27 exhibits or challenge their admission. On the record page he cites, during a recess, Silveria observed that 17 crime scene photographs and five

autopsy photographs unveiled during the argument were still on display.  Silveria identified 17 of the exhibits.  He asserted: "At the point where those were unveiled Mr. Madden's widow, Shirley [Sissy] Madden, who has been present in the court during all of these arguments and his mother, Joan Madden, who has also been present for all of these arguments at that point in time began to cry.  And I notice that Mrs. Joan Madden essentially was crying continuously thereafter right up until the . . . beginning of this recess which I believe exacerbates the prejudice that was created when the Court admitted some of those photographs which I had objected to."  The court replied: "[T]he Court has ruled that all those photographs are admissible . . . .  And the fact that they were exposed to the jury is perfectly proper in that they are in evidence.  It's something for the jury to consider."

Travis asserts no reason why the court's ruling is incorrect.  Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  The trial court's discretion to preclude evidence such as crime scene and autopsy photographs under Evidence Code section 352 " 'is much narrower at the penalty phase than at the guilt phase.  This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code,] § 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present.' [Citations.]   At the penalty phase, the jury 'is *expected* to subjectively weigh the evidence, and the prosecution is entitled

to place the capital offense and the offender in a morally bad light.' " (*Bell, supra*, 7 Cal.5th at pp. 105–106.)

We have reviewed the murder and autopsy photographs identified during the recess. Although they are graphic and unpleasant, they illustrated for the jury the circumstances of the crime. The trial court acted within its discretion in concluding their probative value at the penalty retrial was not substantially outweighed by the probability of undue prejudice.

As to the asserted emotional display by Sissy and Joan Madden, Travis does not inform us if the matter was addressed by the court or claim to have objected below. Nor does he raise a claim regarding spectator conduct on appeal. Nor does the circumstance — standing alone — that these family members may have cried demonstrate that allowing the display of the photographs during closing argument was erroneous or unduly inflammatory. Indeed, the jury would reasonably anticipate that autopsy and crime scene photographs of the murder victim might be emotionally upsetting to the victim's family. (See *Verdugo, supra*, 50 Cal.4th at p. 298 ["the circumstance that [the victim's] mother cried during her [own] testimony does not render that testimony inflammatory. Her tears reflected a normal human response to the loss of a child, a response that the jury would reasonably expect a mother to experience"].)

Travis asserts that "[t]his emotional appeal" was exacerbated "by a large graphical depiction of the scales of justice with a very long list of assertedly aggravating factors on one side, arrayed against a mocking abbreviation of the many legitimate mitigating factors on the other side." We have reviewed both this exhibit and the similar exhibit that was used by the prosecutor when discussing the evidence regarding Silveria. We conclude the charts' recitation of the aggravating

and mitigating evidence accurately listed the relevant factors and was not misleading simply because it broke down in greater detail the aggravating factors. Travis was free to elaborate on the mitigating factors during his closing argument or present his own chart. Although he contends he had no "fair opportunity" to create his own chart, he points to no place in the record where he requested additional time to do so. Nor, to the extent Travis raises this argument, did the "use of a chart impl[y] that scales . . . should be used in determining penalty, and that the process is one of numerical computation rather than evaluation and judgment." (*People v. Fauber* (1992) 2 Cal.4th 792, 861.) Rather, "[t]aking the argument as a whole, we find it readily apparent that the prosecutor took care to avoid any such mechanistic approaches to the sentencing decision." (*Ibid.*)

Travis further asserts that the prosecutor's "emotional appeal was punctuated by the dramatic and completely unnecessary act of repeatedly firing the stun gun into the air, producing a sound and an electrical spark that was far different from what would occur when a stun gun was fired at a person." This assertion is not supported by Silveria's counsel's statement during a recess, on which Travis relies, that the prosecutor had "zapped" the stun gun "in the air for approximately one second." Nor, given there was no evidence Travis used the stun gun on Madden, is it clear how Travis claims he was prejudiced by this demonstration.

### 10. Additional Asserted Instructional Error

#### a. Deliberate and premeditated murder

Silveria contends that the trial court erred in instructing the jury they were free to determine whether he committed a deliberate and premeditated murder. We reject the claim.

The court instructed the jury: "The juries that heard the guilt portion of the trial determined that Mr. Travis and Mr. Silveria were each guilty of murder in the first degree and that the special circumstances of murder in the course of burglary and in the course of robbery were true. Those juries were not asked to and did not state in their verdicts upon which theory they found the murder to be in the first degree. There is no way to know whether the prior juries found the defendants guilty of first degree murder on the same theory or on different theories, nor is it possible to know if either or both juries found the murder to be premeditated or intentional on the part of either or both defendants. It is not necessary that any or all of you make a determination as to which theory the defendants are guilty of first degree murder. However, such a determination can be made by any or all of you and considered as a circumstance of the crime under [f]actor (a). You are free to make that determination for yourselves." The court then instructed the jury on the theories of premeditated and felony murder.

Silveria contends that under this "erroneous instruction, one or all of the second penalty phase jurors could have improperly concluded that [Silveria] committed a deliberate and premeditated murder by a lesser standard than" beyond a reasonable doubt, "or no standard at all; then sentenced him to death since such a murder increased his culpability." As the People note, Silveria *requested* this instruction because he was

concerned the penalty retrial jury would assume he had been found guilty of premeditated murder. He also agreed to the trial court's modification of his proposed instruction. Having done so, he cannot now complain that the instruction was given. (*Powell*, *supra*, 6 Cal.5th at p. 170 [the "asserted error was invited by his counsel's own request"]; *People v. Penunuri* (2018) 5 Cal.5th 126, 157 ["Because any error was invited by the defense, it cannot now be asserted as a basis for relief"].)

Moreover, the instruction did not affect Silveria's substantial rights. It is well settled that the guilt phase jury is not required to agree on a theory of first degree murder. (*People v. Potts* (2019) 6 Cal.5th 1012, 1048.) In addition, "[a] defendant's culpable mental state may be considered a circumstance of the crime under section 190.3, factor (a)." (*People v. Dykes* (2009) 46 Cal.4th 731, 802, fn. 18 (*Dykes*).) Here, it was not known on what theory the guilt phase jury had convicted Silveria of first degree murder. Yet, "[e]ven when the verdict is *based* upon a felony-murder theory, it is appropriate to consider any apparent premeditation on the part of the defendant as an aggravating circumstance of the crime." (*Id.* at pp. 802–803, fn. 18, italics added; see *id.* at p. 802 ["a jury that has convicted a defendant of first degree murder on the basis of a felony-murder theory may consider, as part of its evaluation of the defendant's culpability and its moral and normative decision concerning the appropriate penalty, the defendant's state of mind with respect to the murder — that is, whether the defendant also intended to kill or acted with malice aforethought"].) Contrary to Silveria's contention, in considering evidence of Silveria's state of mind, the penalty retrial jury was not determining whether he committed murder,

a fact already conclusively found beyond a reasonable doubt by the guilt phase jury.

### b. CALJIC No. 8.84.1

Silveria contends that the trial court erroneously failed to instruct the jury in the language of CALJIC No. 8.84.1 to "[d]isregard all other instructions given to you in other phases of this trial." Such an instruction would have been mystifying to the jury given it had only served at the penalty retrial and was not familiar with the instructions given at the other trial phases.

### 11. Asserted Judicial Misconduct

Silveria contends that the trial court's unjustified abuse and unequal treatment of his defense counsel, Geoffrey Braun, combined with erroneous legal rulings, violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We reject the claim.

Silveria cites to more than 65 different colloquies in the 314 volumes of the reporter's transcript for this case to support his claim that the trial court "engaged in a pattern of overt judicial hostility toward" Braun, but treated the prosecutor with courtesy. Nineteen of the challenged colloquies are from the first penalty phase. As Silveria acknowledges, he suffered no possible prejudice from any assumed misconduct at the first penalty phase because the jury hung as to penalty.

Most of the remaining challenged colloquies were not made in the presence of either the guilt phase jury or the penalty retrial jury, but at hearings held outside the presence of the jury. Therefore they could not have prejudiced either jury's view of Braun or Silveria. In addition, for many of the challenged colloquies, Silveria simply recites what was said during the

exchange, and makes no effort to explain how the exchange constitutes judicial misconduct. As Silveria acknowledges, "a trial judge has the discretion to rebuke an attorney when that attorney askes inappropriate questions, ignores the court's instructions, or otherwise engages in improper conduct."

For others, Silveria simply disputes the trial court's ruling on an objection or motion, but does not explain how any assumed legal error constituted judicial misconduct. "[A] judge's 'rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review.' "[28] (*People v. Armstrong* (2019) 6 Cal.5th 735, 798.)

For the vast majority of the challenged colloquies Silveria did not object on the grounds of judicial misconduct, no exception to the general requirement of an objection applies, and the claim as to these instances is therefore forfeited. (*People v. Houston* (2012) 54 Cal.4th 1186, 1220.) We discuss below two colloquies in which he did object. Although "a failure to object to judicial misconduct does not preclude appellate review when an objection could not have cured the prejudice or would have been futile" (*ibid.*), Silveria fails to demonstrate circumstances — such as a trial court's numerous "sua sponte objections" to questions posed by defense counsel and

---

[28] Indeed, we have already addressed and rejected above Silveria's claim that the trial court erroneously allowed the prosecutor to introduce "highly prejudicial evidence of an attempted murder by a notorious prison gang," noting no reference to the Nuestra Familia prison gang was made before the jury, but rather was only mentioned by Travis's counsel during a bench conference. (See *ante*, pt. II.B.4.g.) Given the evidence was never introduced or even mentioned in front of the jury, it also provides no factual predicate for a claim of judicial misconduct or bias.

"derogatory comments" to counsel and defense witnesses — that would have made his objections futile (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*); see *id.* at p. 1233).

Moreover, we have reviewed the challenged portions of the record and conclude Silveria's claim as to each instance is meritless. The record indicates the trial judge was engaged, thoughtful, and occasionally abrupt with each party's counsel during this lengthy trial when it appeared counsel was exceeding appropriate boundaries. Silveria "fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was 'so prejudicial that it deprived defendant of " 'a fair, as opposed to a perfect, trial.' " ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 533.)

### a. *Madden's shirt*

Before the penalty retrial, Silveria moved to exclude as an exhibit the bloody shirt Madden had been wearing at the time of the murder. The court ruled that the shirt was admissible and not unduly prejudicial, noting "it can be displayed to the jury, but as soon as the witness is through testifying about the shirt . . . [it] should be taken down."

At the penalty retrial, the prosecutor asked Dr. Pakdaman, the pathologist who had performed Madden's autopsy, about Madden's shirt. Silveria asked for an offer of proof "as to what relevant evidence . . . can be provided by the shirt." At sidebar, the prosecutor explained the shirt was relevant to the pathologist's stab wound testimony, and after hearing argument, the court overruled Silveria's objection. The pathologist resumed testifying about the shirt, and when he was asked by the prosecutor about a wound with a different track than the others, Silveria again unsuccessfully objected that the

shirt testimony was irrelevant and sought to have it struck and the shirt covered.

Soon after, the prosecutor stated he had no further questions about the shirt, and said, "If Mr. Braun wishes to cover it up, that would be fine." Braun replied, "Well, I would ask that the person who uncovered it cover it." The court said, "Cross-examination, Mr. Leininger?" The prosecutor said, "I [still] had a couple of questions regarding the throat. I had nothing about the shirt. I was just deferring to Mr. Braun if he wishes to cover it." Braun replied, "Is Mr. Rico suggesting, Your Honor, that I go up there and —" The court said: "Oh, come on, people. Why don't we just cover the shirt. I don't believe it. I really don't believe it." Braun said, "I don't either." The court replied, "Mr. Braun, why don't you just be quiet. Thank you." The prosecutor continued his direct examination.

Later that same day, during Travis's cross-examination of Dr. Pakdaman, Travis's counsel Leininger responded to an objection by the prosecutor by stating: "Well, the victim wasn't responding to me. I don't mean the victim. The witness." The prosecutor said, "The victim won't respond in this case." The court said, "Let's get on with it."

At the next recess, outside the presence of the jury, Silveria moved for a mistrial. Braun stated: "I object to the fact that the shirt was shown to the jury and move for a mistrial on that ground . . . . I also object to the way the Court treated me when the subject of covering the shirt up again arose. . . . In the course of that colloquy in which I think my behavior was entirely appropriate the Court in the presence of the jury told me to be quiet which I thought was demeaning to me and harmful to the defense generally in how that whole thing appeared to the jury. I object to that and join that to the exposure of the shirt itself in

my motion for a mistrial." Braun also moved for a mistrial on the basis of the prosecutor's comment that " 'the victim won't respond either[,]' or words to that effect," when "Mr. Leininger . . . accidently referred to Dr. Pakdaman who was the witness as 'the victim.' "

The court denied the mistrial motion, noting: "As far as the Court telling you to sit down, Mr. Braun, it's not the first time the Court has had to do that because you're a very slow learner. As far as the shirt being re-covered up, it was your motion to have it covered up or to cover it up and your conversations directly with Mr. Rico w[ere] completely improper, as you should know."

The court continued: "Now, apparently we're dealing with a kindergarten class here by the three of you and I'm not at all happy with any of you. So therefore we have to treat you like kindergartners. And if I have to do it in front of the jury, by God, I will. I would expect this from some of the newer attorneys in this county, but not from you three. You've been around long enough. Thou shalt not continue to argue a point or objection after the Court has ruled. Thou shalt not address each other directly, only through the Court. Apparently you can't do it civilly. Thou shalt not interrupt an attorney during the attorney's argument. Thou shalt not make snide, catty or cheap remarks whether under thy breath or not. Thou shalt not interrupt a witness when the witness is answering thy questions. And any violation of these orders will result[] in thou paying the coffers of the general fund of this county. Does everybody understand that?"

Silveria claims the court's comments demonstrate the court's "persistent[,] uneven treatment of Braun." The record is otherwise. It indicates that in front of the jury, the trial court

reprimanded both parties about their inappropriate comments regarding who would cover the shirt. The court only focused on Braun after he said he shared the court's disbelief at the attorneys' conduct and thus appeared to be minimizing his own culpability.

Likewise, in denying Silveria's mistrial motion outside the jury's presence, the court largely directed its conduct admonition to all counsel. Although the court observed it had previously had to tell Braun to sit down, and that Braun was a slow learner, these comments, albeit a bit intemperate, fall well short of demonstrating judicial misconduct. (See *Sturm*, *supra*, 37 Cal.4th at p. 1233 [A " 'trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression that it is allying itself with the prosecution' "].) Indeed, Braun seemed unwilling to accept the court's ruling with respect to the bloody shirt. Even though Silveria's pretrial in limine motion to exclude the shirt had been denied, during the pathologist's direct examination about the shirt at the penalty retrial Braun unsuccessfully objected at sidebar to admission of the shirt and then later moved to strike all testimony about the shirt.

Nor does the court's denial of Silveria's mistrial motion on the ground that the prosecutor had made an inappropriate comment to Travis's counsel that the victim would not respond demonstrate bias toward Braun or constitute judicial misconduct. As noted, the court has broad discretion in ruling on a mistrial motion, and though the prosecutor's statement in front of the jury was inappropriate, the court could reasonably conclude its comment, "Let's get on with it," adequately

addressed the prosecutor's gratuitous aside. (See *Collins*, *supra*, 49 Cal.4th at p. 198; see *ante*, pt. II.B.6.)

### b. *Indirect contempt*

During a recess in the prosecutor's cross-examination of Travis, Travis's counsel requested leave to interrupt the cross-examination so that defense expert Dr. Cermak could testify. The prosecutor, Mr. Rico, unsuccessfully opposed the motion.

After the recess, and before the jury was brought in, the court stated: "Mr. Braun, regarding your indirect contempt that you weren't able to accomplish here after the Court took the recess this morning in your behavior regarding Mr. Rico, your laughing, your taunting him, as far as I'm concerned — you don't need to answer this, Mr. Braun. Just have a seat because I am not going to hear — I am not —" Braun interjected, "I feel I do." The court replied, "I am not going to hear an answer from you, Mr. Braun. If you don't sit down[,] I will hold you in direct contempt, do you understand that?" Braun began, "I feel —" The court said: "And the deputy will sit you down; do you understand? Now do it now. As far as I'm concerned, you're all acting like children. Why don't you all try being professional? If there's any further acting out like this the offending party will be banned from the courtroom during any recess." Braun replied, "Your Honor, there was acting out, but it wasn't by me."

The following day, during a recess that the court had told the jury would last "about 15 minutes," the court reminded Braun he had earlier indicated he wanted to put something on the record. Braun stated: "I'm still very upset over what occurred . . . yesterday afternoon when the Court indicated that I was in indirect contempt . . . . I think that the Court owes me an apology for accusing me of the indirect contempt in the

manner in which the Court did and I would ask permission now to put the matter on the record as to what in fact did happen, then there w[ere] other things that I needed to follow through with."

The court replied: "Follow-up. Do the other things then. We're not going to hear this." Braun then engaged in a lengthy argument asserting that he was treated differently from other counsel in the case because the court "almost invariably" did not permit him to make a record or complete his arguments, and had "demonstrated overt hostility toward" Braun "in open court throughout this trial" and "at the bench . . . simply for making arguments that ought to be made by any counsel who is zealously representing his client. . . . I thought that the Court treated me very badly in the manner of my calling Dr. Kormos as a witness."

The court replied: "What are you talking about? Would you explain that a little bit more." Braun said that he was referring to when, during Dr. Kormos's testimony, the court had "essentially castigat[ed] me and blam[ed] me in a very angry and what I perceived as a hostile tone of voice for simply calling my witness." Braun continued, asserting that "the whole atmosphere in this court is very intimidating to me," "the Court has been very one-sided against the defense, and me in particular," and citing as the "worst example . . . when only I got castigated for indirect contempt" the day before. He moved for a mistrial.

The court replied: "That motion is denied. Anything that has come to you, Mr. Braun, you brought upon yourself. . . . [T]he Court has a duty to control a proceeding. Now, the problem arises when counsel continue to argue objections and

argue with the Court after the Court has ruled. . . . Counsel continues to argue, and Mr. Braun unfortunately is the biggest offender of this in the Court's eyes. I think the record will show many times where the Court has had to tell Mr. Braun to please be quiet, to shut up, or whatever, because the Court has ruled, and Mr. Braun insists on going further and further and pushing the envelope further and further."

No judicial misconduct or bias is demonstrated. Although the court did not fully describe on the record Braun's objectionable recess behavior, it appears Braun had acted inappropriately by appearing to visibly taunt the prosecutor when the prosecutor unsuccessfully opposed Travis's motion to allow Dr. Cermak to testify out of order. The court therefore reprimanded Braun, and told all counsel they were acting like children, and that such visible taunting would not be tolerated. The court could reasonably be of the view there was little Braun could say to ameliorate his observed conduct, and decline to hear argument on the matter. The court's language may have been intemperate, but it was outside the presence of the jury and an effort by the court to control what it perceived to be inappropriate conduct by counsel. The following day, when during a recess scheduled to last 15 minutes Braun moved for a mistrial based on not only this interaction but on broad generalizations regarding the court's treatment of him throughout the trial, the court listened patiently and allowed Braun to speak at length.

Silveria asserts: "Not every example amounts to misconduct independently, nor does each necessarily involve an erroneous legal ruling. But together they tend to illustrate the demeaning and hostile attitude [the trial court] displayed toward Braun." We conclude that Silveria has failed to

demonstrate any individual instance of judicial bias or misconduct, nor are the challenged colloquies cumulatively prejudicial.

## *12. Constitutionality of the Death Penalty Statute*

Defendants contend California's death penalty statute and implementing instructions are constitutionally invalid in numerous respects. We have repeatedly rejected similar claims, and defendants provide no persuasive reason to revisit our decisions.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*Dykes*, *supra*, 46 Cal.4th at p. 813.) We further "reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978.)

Defendants claim that the failure to require the jury unanimously find true the aggravating factors relied on violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution. We have previously rejected this claim. (*Rangel*, *supra*, 62 Cal.4th at p. 1235; *People v. Casares* (2016) 62 Cal.4th 808 853–854.) Nor does the death penalty statute "lack safeguards to avoid arbitrary and capricious sentencing, deprive defendant[s] of the right to a jury trial, or constitute cruel and unusual punishment on the ground that it does not require . . . findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*Rangel*, at p. 1235.) "Nothing in

*Hurst v. Florida* (2016) 577 U.S. ___ [193 L.Ed.2d 504, 136 S.Ct. 616], *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *Ring v. Arizona*[ (2002)] 536 U.S. 584, or *Apprendi v. New Jersey* [, *supra*,] 530 U.S. 466 . . . , affects our conclusions in this regard." (*Rangel*, at p. 1235; see *id.* at p. 1235, fn. 16.)

Silveria alternatively claims that the "jury should have been instructed that there was no burden of proof." In fact, the trial court here instructed the jury that "there is no burden of proof in a penalty phase" other than for evidence of unadjudicated "criminal activity involving force or violence or the threat thereof under Factor (b) or any prior felony conviction under Factor (c)" which "must be proven beyond a reasonable doubt." Silveria also claims that the instructions erroneously failed to inform the jury that a finding a mitigating circumstance was true need not be unanimous. But again here the court instructed the jury it need not be unanimous in finding the "existence or truth" of a mitigating factor.

The trial court need not instruct that there is a presumption of life, or that if the mitigating factors outweigh the aggravating factors the jury should return a verdict of life imprisonment without the possibility of parole. (*People v. Williams* (2016) 1 Cal.5th 1166, 1204; *People v. Adams* (2014) 60 Cal.4th 541, 581.) The trial court was not required to delete inapplicable factors from CALJIC No. 8.85 (*People v. Watson* (2008) 43 Cal.4th 652, 701), or "instruct that the jury can consider certain statutory factors only in mitigation" (*People v. Valencia* (2008) 43 Cal.4th 268, 311). "Written findings by the jury during the penalty phase are not constitutionally required, and their absence does not deprive [a] defendant of meaningful

appellate review." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.) "A prosecutor's discretion to select those eligible cases in which the death penalty is sought does not offend the federal or state Constitution." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1098.) Nor does such discretion "create a constitutionally impermissible risk of arbitrary outcomes that differ from county to county." (*People v. Myles* (2012) 53 Cal.4th 1181, 1224.)

"The language '"so substantial"' and 'warrants'" in CALJIC No. 8.88 "is not impermissibly vague." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 56.) "Use of the adjectives 'extreme' and 'substantial' in section 190.3, factors (d) and (g) is constitutional." (*People v. Dement* (2011) 53 Cal.4th 1, 57.)

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.) We do perform intracase review, but Travis does not request such review here. (See *People v. Landry* (2016) 2 Cal.5th 52, 125.) " '[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating' a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment." (*People v. Carrasco* (2014) 59 Cal.4th 924, 971.)

Travis's citation to statistics not based on the record, "even if properly before us, do[es] not establish that our review of defendant's appeal specifically, or of all automatic appeals in general, has been affected by 'political considerations,' resulting in a denial of his right to due process. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1140–1141 [113 Cal.Rptr.2d 27, 33 P.3d 450].)" (*People v. Lightsey* (2012) 54 Cal.4th 668, 732.) "One under judgment of death does not suffer cruel and unusual

punishment by the inherent delays in resolving his appeal." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 677.) " 'The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 373.)

### *13. Cumulative Prejudice*

Defendants contend the cumulative effect of penalty phase error requires us to reverse the death judgments. We have found error, but no prejudice, in the trial court's instruction to certain penalty retrial prospective jurors in the language of CALJIC No. 1.00. (See *ante*, pt. II.B.7.b.) Likewise, we have assumed error but found no prejudice in other claims raised by defendants. We further conclude that this error and the assumed errors are not prejudicial when considered cumulatively.

## III. DISPOSITION

For the reasons above, we affirm the judgments.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Silveria and Travis
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S062417
**Date Filed:** August 13, 2020
_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Hugh Mullin III

_____

**Counsel:**

Michael Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, John Fresquez, Timothy Foley, Jessica K. McGuire and Kristin Traicoff, Deputy State Public Defenders, for Defendant and Appellant Daniel Todd Silveria.

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant John Raymond Travis.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Jeffrey M. Laurence, Assistant Attorney General, Alice B. Lustre and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Timothy Foley
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Mark E. Cutler
P.O. Box 172
Cool, CA 95614-0172
(530) 885-7718

Arthur P. Beever
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-3664
(415) 510-3761